# United States Court of Appeals

*for the*

# Third Circuit

PENNSYLVANIA STATE UNIVERSITY,

*Appellant,*

– v. –

VINTAGE BRAND, LLC; SPORTSWEAR, INC., d/b/a Prep Sportswear;
CHAD HARTVIGSON; ERIK HARTVIGSON; MICHELLE YOUNG,

*Appellees.*

_____

ON APPEAL FROM AN ORDER OF THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA IN CASE NO. 4:21-CV-01091
HONORABLE MATTHEW W. BRANN, U.S. DISTRICT JUDGE

## BRIEF FOR *AMICUS CURIAE* SOCIETY OF PRODUCT LICENSORS COMMITTED TO EXCELLENCE IN SUPPORT OF APPELLANT

SEAN P. HVISDAS
GOLDBERG SEGALLA LLP
1700 Market Street, Suite 3232
Philadelphia, Pennsylvania 19103
(267) 519-6800

– and –

LAURA A. COLCA
GOLDBERG SEGALLA LLP
665 Main Street
Buffalo, New York 14203
(716) 566-5401

*Attorneys for Amicus Curiae*

**CORPORATE DISCLOSURE FORM**

Pursuant to Rule 26.1 and Third Circuit LAR 26.1, the Society of Product Licensors Committed to Excellence makes the following disclosure: It has no parent corporation, and no publicly held corporation owns 10% or more of its stock. SPLiCE is not a publicly traded entity and does not issue stock. No publicly held entity has any ownership interest in SPLiCE.

# TABLE OF CONTENTS

INTEREST OF AMICUS CURIAE SPLICE — STATEMENT OF
 IDENTIFICATION ............................................................1

SUMMARY OF THE ARGUMENT ......................................................2

ARGUMENT .......................................................................4

I.   THE DISTRICT COURT'S MANUFACTURER-IDENTITY
     REQUIREMENT IS INCOMPATIBLE WITH CBP'S
     STATUTORY MANDATE AND MODERN
     BORDER-ENFORCEMENT REALITIES.............................4

     A.   The District Court's Definition of Counterfeit Goods Would
          Cripple Border Enforcement............................................5

     B.   Border Enforcement Is Designed for Rapid, Mark-Based
          Decisions, Not Fact-Intensive Manufacturer Inquiries..................6

          1.   Statutory and Regulatory Guidelines.....................................6

          2.   Recordation Is Built Around Authorization...........................6

          3.   Practical Enforcement Reality .............................................7

     C.   The Volume and Nature of Today's Imports Make a
          Manufacturer-Origin Test Unadministrable .................................7

          1.   Small-Package Surge Requires Fast Calls............................7

          2.   Apparel and Licensed Goods Are Core Seizure
               Categories .............................................................8

          3.   Scale and Modes of Entry Demand a Mark-Centric
               Standard .............................................................9

D.    Congress and the Executive Branch Have Long Implemented Counterfeiting as an Authorization-Based Offense at the Border .......................................................10

    1.    ACPA and MSRP-Based Penalties ......................................10

    2.    DOJ's Enforcement Position.................................................10

E.    Consequences: The District Court's Rule Would Effectively Nullify CBP's Ability to Police Core Counterfeit Pipelines .........11

F.    Requested Disposition..................................................................12

II.    THE DISTRICT COURT'S DILUTION RULING MISAPPREHENDS BOTH THE LICENSING MARKETPLACE AND THE PURPOSE OF DILUTION LAW, AND ITS REASONING THREATENS BRAND OWNERS, CONSUMERS, AND THE LICENSED-MERCHANDISE INDUSTRY.........................12

A.    The Decision Reflects a Fundamental Misunderstanding of the Licensing Marketplace ...........................................................13

B.    The District Court's Rule Punishes the Licensees Who Play by the Rules.................................................................................14

C.    The Decision Accelerates Willful Dilution of Famous Marks in the Real World .........................................................................16

D.    The District Court's Approach Creates a Blueprint for Free-Riding and Undermines Decades of Investment ...................17

E.    This Court Should Correct the District Court's Error and Restore Dilution Protection to What Congress Intended..............18

CONCLUSION .......................................................................................19

# TABLE OF AUTHORITIES

## Cases

*Sakar Int'l, Inc. v. United States*,
  516 F.3d 1340 (Fed. Cir. 2008) ...........................................................10

*United States v. Able Time, Inc.*,
  545 F.3d 824 (9th Cir. 2008) .............................................................10

## Statutes

15 U.S.C. § 1124 ............................................................................5, 11

19 U.S.C. § 1526 .......................................................................5, 10, 11

## Other

19 C.F.R. pt. 133 ...............................................................................11

19 C.F.R. § 133.21 ...........................................................................5, 6

The Society of Product Licensors Committed to Excellence ("SPLiCE") is a 501(c)(6) nonprofit corporation whose members include brand licensors, rights holders, and industry stakeholders dedicated to promoting best practices in trademark licensing and protecting the integrity of licensed products. Its membership spans universities, sports organizations, entertainment companies, and consumer-product licensors, all of whom rely on strong and consistent enforcement of the Lanham Act to maintain brand quality and protect consumers from confusion and deception.

SPLiCE and its member companies have a significant interest in this appeal because the District Court's rulings on counterfeiting and dilution, if allowed to stand, would destabilize the legal framework that underpins the modern licensing economy. SPLiCE members routinely authorize third-party manufacturers to produce licensed goods under rigorous quality-control standards. Their ability to protect their marks at the border, prevent unauthorized uses in commerce, and preserve the distinctiveness of their brands depends on longstanding legal principles recognizing that trademark licensing is fully consistent with the Lanham Act and does not diminish a brand owner's enforcement rights. By tying counterfeiting to the identity of the physical manufacturer and imposing a near-identity requirement for dilution, the District Court's decision threatens to impair border enforcement,

undermine trademark protection, and erode the licensing structures relied upon by SPLiCE membership and the industries they support.

Because SPLiCE and its member companies are directly affected by how the Lanham Act is applied to licensed marks, and because this case presents questions with broad implications for trademark protection across multiple sectors, SPLiCE has a strong interest in assisting the Court in understanding the practical, legal, and economic consequences of the District Court's decision. SPLiCE files this brief with the consent of all parties.[1]

## SUMMARY OF THE ARGUMENT

SPLiCE submits this brief to emphasize that the Lanham Act and the modern licensing marketplace rest on the same foundation, authorized trademark licensing is lawful, indispensable, and fully compatible with robust trademark enforcement, and it does not weaken the brand owner's rights in any respect. The Act has long recognized that a trademark owner may authorize third-party manufacturers, exercise quality control over their output, and rely on that authorized use to strengthen, not weaken, the distinctiveness and goodwill of the mark. This structure

---

[1] Pursuant to Rule 29(a)(2)(E), no party's counsel authored this brief in whole or in part; no party or party's counsel contributed money that was intended to fund preparing or submitting this brief; and no person other than the amicus curiae, its members, or its counsel contributed money that was intended to fund preparing or submitting this brief.

is the bedrock of today's collegiate, sports, entertainment, and consumer-goods licensing industries. Every SPLiCE member company depends on licensing to meet consumer demand and protect brand integrity.

For that reason, SPLiCE and its member companies have a direct and urgent interest in correcting the District Court's misinterpretations. In the counterfeiting context, the Lanham Act and Custom and Border Protection's ("CBP'") regulations make clear that the touchstone is authorization, namely whether a substantially indistinguishable mark is applied without permission, not who operated the factory. Decades of federal practice, including CBP's mark-recordation and seizure system, are built around this authorization-based structure because licensed goods are routinely manufactured by controlled third parties. If counterfeiting is redefined to hinge on deception about the producer rather than unauthorized use of a protected mark, the nation's border enforcement regime would collapse for licensed brands, allowing counterfeiters to exploit the very licensing model Congress sought to protect.

The same statutory logic applies with equal force to dilution. Famous marks do not lose dilution protection merely because the brand owner licenses production. To the contrary, licensing is a core indicator of fame, investment, and consumer recognition, precisely the interests Congress sought to shield. SPLiCE members know firsthand that dilution occurs when unauthorized uses accumulate and blur a

mark's distinctiveness, not only when an infringer produces an exact replica. The District Court's rule, which excuses unauthorized uses whenever the infringer adds decorative elements or disclaimers, is incompatible with market reality and would create a blueprint for systematic exploitation of the mark without permission or accountability. SPLiCE therefore urges this Court to reaffirm that licensing is fully consistent with the Lanham Act and that licensors retain the full counterfeiting and dilution protections Congress intended, protections essential to safeguarding consumers, preserving brand integrity, and sustaining the legitimate licensing marketplace on which universities, sports organizations, and global brand owners depend.

## ARGUMENT

### I. THE DISTRICT COURT'S MANUFACTURER-IDENTITY REQUIREMENT IS INCOMPATIBLE WITH CBP'S STATUTORY MANDATE AND MODERN BORDER-ENFORCEMENT REALITIES

SPLiCE members rely on a functioning border-enforcement regime to prevent unauthorized, counterfeit-marked products from entering U.S. commerce. That regime depends on U.S. Customs and Border Protection's ("CBP") ability to ban counterfeit shipments swiftly using a mark-centric standard that compares applied marks on goods to recorded federal registrations and verifies authorization, **not** the identity of the physical manufacturer. Congress designed the customs statutes and CBP regulations with this operational reality in mind.

## A. The District Court's Definition of Counterfeit Goods Would Cripple Border Enforcement

The District Court's analysis suggesting that counterfeiting hinges on deception about the producer/manufacturer rather than authorization is incompatible with the text and structure of the customs laws and would make CBP's mission unworkable. CBP's regulations define a "counterfeit mark" as a *spurious* mark "identical with, or substantially indistinguishable from" a federally registered mark and authorize detention and seizure on that basis. *See* 19 C.F.R. § 133.21. In other words, CBP procedures provide for rapid, visual mark comparison and authorization checks at the border, not manufacturer-identity inquiries.

Congress's statutory scheme makes clear that 15 U.S.C. § 1124 prohibits the importation of goods that 'copy or simulate' registered trademarks and directs the U.S. Treasury and CBP to rely on a mark-recordation system to enable officers to identify protected marks at the border. In tandem, 19 U.S.C. § 1526 authorizes CBP to seize, forfeit, destroy, and assess civil fines against merchandise that bears counterfeit marks. Together, these provisions establish a deliberately straightforward, mark-driven enforcement framework that empowers CBP officers to determine quickly and reliably whether imported goods are authorized and to seize suspicious shipments at the border without engaging in fact-intensive inquiries into manufacturer identity.

**B. Border Enforcement Is Designed for Rapid, Mark-Based Decisions, Not Fact-Intensive Manufacturer Inquiries**

1. *Statutory and Regulatory Guidelines*

CBP's authority pursuant to 19 C.F.R. § 133.21 allows detention whenever officers suspect a counterfeit mark. It also provides a streamlined process to share unredacted images/packaging with the rights holder, solicit input, and seize if the mark is counterfeit, all without adjudicating who physically manufactured the goods. This process hinges on whether the applied mark is substantially indistinguishable from a recorded registration for the same goods and whether the import is unauthorized.

2. *Recordation Is Built Around Authorization.*

The CBP e-Recordation Program and USPTO guidance instruct rights holders to record Principal Register trademark registrations so that CBP can lawfully detain and seize unauthorized imports bearing marks that are identical or substantially indistinguishable from the recorded registrations. CBP expressly requires that a trademark be federally registered on the Principal Register before it can be recorded, and the e-Recordation system allows trademark owners to submit product guides, authentication materials, and lists of authorized manufacturers and importers, resources CBP officers use during inspections to determine whether goods are authorized and not counterfeit. The USPTO likewise advises trademark owners that recording their Principal Register registrations with CBP enables officers to detain

and seize infringing goods and encourages recordation as a critical border-protection tool. The USPTO guidance also notes that rights holders commonly provide CBP with information identifying authorized manufacturers and importers to facilitate rapid authenticity and authorization checks. These recordation materials are designed to give officers immediate, actionable information about whether a shipment is authorized, not to require CBP to make any determination about which entity physically manufactured the goods.

3.      *Practical Enforcement Reality.*

CBP leadership and training materials consistently describe counterfeits as goods bearing unauthorized, substantially indistinguishable marks recorded with CBP, subject to detention and seizure, while "copying or simulating" marks are also detainable. The workflow is inherently visual and authorization-centric, not manufacturer-centric.

**C.      The Volume and Nature of Today's Imports Make a Manufacturer-Origin Test Unadministrable**

1.      *Small-Package Surge Requires Fast Calls*.

The Government Accountability Office found that CBP is required to seize suspected counterfeits and must do so efficiently in a small-parcel environment that has exploded with e-commerce.[2] Adding a manufacturer-origin requirement would

---

[2] GAO, often called the "congressional watchdog," is an independent, nonpartisan agency that works for Congress. GAO examines how taxpayer dollars are spent

paralyze decision-making and undermine seizure mandates at the very moment counterfeiters exploit micro-shipments.

2.     *Apparel and Licensed Goods Are Core Seizure Categories.*

CBP's FY 2024 IPR Seizure Statistics, CBP Publication Number 43964-0125, leave no doubt that apparel-related goods dominate counterfeit products, and that CBP officers rely on a rapid, mark-centric authorization check to make those determinations. The data show that "Wearing Apparel/Accessories" represented **$178,985,556 MSRP** in seized goods and accounted for **1,043,853 seized items**, while "Headgear" represented an additional **$40,040,596 MSRP**. These categories sit alongside other heavily counterfeited consumer goods precisely because counterfeiters routinely target well-known licensed marks, universities, professional sports leagues, entertainment franchises, and fashion brands, where the applied mark, not the identity of the factory, is what misleads consumers and infringes rights. *See* FY 2024 IPR Seizure Statistics | U.S. Customs and Border Protection (www.cbp.gov/document/annual-report/fy-2024-ipr-seizure-statistics).

CBP's operational reality reflects this enforcement structure. Officers processing millions of packages annually, especially in the small-parcel and express-consignment environment, do not and cannot pause to investigate whether

and provides Congress and federal agencies with objective, non-partisan, fact-based information to help the government save money and work more efficiently.

the trademark owner literally manufactured the T-shirt, sweatshirt, or cap at issue. Instead, seizures hinge on a straightforward, statutorily mandated comparison: (1) Does the shipment bear a mark that is identical or substantially indistinguishable from a recorded registration for these goods? and (2) Is the shipment authorized? The FY 2024 statistics underscore that this streamlined approach is indispensable. The volume of apparel and headgear seizures alone would be unadministrable under any rule requiring officers to determine factory identity or trace supply-chain source. Officers properly focus on what Congress told them to, namely, **the mark and the authorization**, not who operated the sewing machines to make the particular item. In this environment, where over **1 million apparel items** and tens of millions of dollars in counterfeit merchandise are seized annually, any shift away from a mark-based standard would effectively collapse CBP's ability to police these core counterfeit categories at all.

   3.   *Scale and Modes of Entry Demand a Mark-Centric Standard.*

CBP reports that the vast majority of IPR seizures occur in express consignment and mail. In FY 2023, China and Hong Kong accounted for 84% of MSRP seized, reflecting massive volumes processed in minutes by reference to recorded marks and authorization, not production-line identity. *See* www.cbp.gov/sites/default/files/2024-06/ipr-seizure-stats-fy23-508.pdf (Intellectual Property Rights Seizure Statistics, Publication Number:3736-0624).

**D.** **Congress and the Executive Branch Have Long Implemented Counterfeiting as an Authorization-Based Offense at the Border**

       1.     *ACPA and MSRP-Based Penalties*.

The Anticounterfeiting Consumer Protection Act ("ACPA")[3] strengthened 19 U.S.C. § 1526 ability to enable seizure, forfeiture, destruction, and civil fines tied to the MSRP of the genuine goods, an enforcement design that presupposes swift, mark-driven decision-making by CBP. The Federal Register confirms that the fines regime was calibrated to facilitate uniform border penalties, not to invite case-by-case inquiries into manufacturer identity.

       2.     *DOJ's Enforcement Position.*

In *United States v. Able Time, Inc.*, 545 F.3d 824 (9th Cir. 2008), the Ninth Circuit held that § 1526 contains *no* requirement that the trademark owner manufacture the same goods being imported. Customs may impose civil penalties for merchandise bearing a counterfeit mark "even though the owner of the registered mark does not manufacture or sell the same type of merchandise." *Id*. 1346. *See also Sakar Int'l, Inc. v. United States*, 516 F.3d 1340, 1346 (Fed. Cir. 2008) recognizing that a mark is counterfeit under CBP's enforcement framework when it is substantially indistinguishable from a registered mark. Nothing in the court's

---

[3] The Anticounterfeiting Consumer Protection Act of 1996 is Public Law No: 104-153, signed July 2, 1996 by Congress.

analysis requires the rights holder to manufacture the same goods. These cases align with decades of CBP practice.

**E.    Consequences: The District Court's Rule Would Effectively Nullify CBP's Ability to Police Core Counterfeit Pipelines**

The District Court's counterfeiting rule, tying counterfeiting to deception about the identity of the physical producer rather than the unauthorized use of a substantially indistinguishable mark, would be nothing short of catastrophic for modern brand protection. If counterfeiting were limited to situations in which consumers are misled about who operated the factory, the vast majority of licensed sectors, including but not limited to universities, professional sports leagues, entertainment companies, and even major fashion and luxury brands, would be effectively stripped of border enforcement. These brand owners routinely license production to third-party manufacturers, and consumers overwhelmingly understand this reality. Under the District Court's logic, CBP would be compelled to admit shipments bearing unambiguously counterfeit marks simply because the licensor does not personally manufacture the goods. That outcome would nullify the protections Congress codified in 15 U.S.C. § 1124 and 19 U.S.C. § 1526 and undermine the entire regulatory architecture of 19 C.F.R. pt. 133. Reducing counterfeiting to a manufacturer-identity test defies statutory text, contradicts decades of CBP practice, and creates an untenable and dangerous precedent that would open the floodgates for counterfeiters while depriving brand owners of the

border protections Congress explicitly designed to safeguard consumers, commerce, and brand integrity.

### F. Requested Disposition

SPLiCE respectfully urges the Court to reject the District Court's manufacturer-origin requirement and reaffirm that counterfeiting encompasses the *spurious* use of marks identical or substantially indistinguishable from registered marks on covered goods, an authorization-based standard that is faithful to the Lanham Act, essential to CBP's mission, and indispensable to brand licensors' ability to protect consumers and brand owners at the border.

## II. THE DISTRICT COURT'S DILUTION RULING MISAPPREHENDS BOTH THE LICENSING MARKETPLACE AND THE PURPOSE OF DILUTION LAW, AND ITS REASONING THREATENS BRAND OWNERS, CONSUMERS, AND THE LICENSED-MERCHANDISE INDUSTRY

The District Court granted summary judgment against Penn State's federal and state dilution claims on two grounds: (1) Vintage Brand's uses were not "substantially similar" to Penn State's registered marks, and (2) Penn State offered "no evidence" that Vintage Brand's designs "lessen[ed] the capacity" of the PENN STATE mark to identify Penn State as the source of licensed goods.

On the issue of similarity, the District Court relied heavily on the presence of additional imagery, alternative fonts, use of Vintage Brand's own house mark and disclaimers, concluding that these design elements rendered the accused uses

insufficiently similar to support dilution. The District Court opined that even modest differences, such as use of one's own name or a different typeface, can defeat dilution.

On the issue of harm, the District Court found no evidence of diminished distinctiveness. It emphasized that consumers purchased Vintage Brand's goods because they wished to show affiliation with Penn State, reasoning that such purchases *reinforced* the association between the mark and the University rather than weakening it. On this basis, the District Court concluded there was no dilution, actual or likely.

This reasoning forms the backdrop for urgent concern by SPLiCE and its member companies, because the District Court imposed a significantly narrowed understanding of dilution law that, if upheld, would destabilize and upend the entire trademark licensing industry.

## A.    The Decision Reflects a Fundamental Misunderstanding of the Licensing Marketplace

Modern licensing is built on the simple truth that the strength of the mark drives the market. Fans buy a product because it bears the name of their university, team or company, not because of the font, not because of a graphic overlay, and certainly not because the reseller includes its own branding alongside the mark.

The District Court's contrary view, namely, that additional imagery or a seller's own mark meaningfully distinguishes an unauthorized product, does not

reflect real consumer behavior. Fans purchase goods because the *PENN STATE* mark is present. That is the value proposition. Nothing about Vintage Brand's add-on "retro" graphics changes the basic commercial reality that the famous mark is doing the work.

By dismissing dilution whenever the infringer adds decorative elements, the decision rewrites dilution law into something unrecognizable, effectively creating a doctrine in which unauthorized sellers may appropriate the core of a famous mark with impunity so long as they make trivial aesthetic alterations. That is not how consumers perceive these products, and not how the licensing industry functions.

### B. The District Court's Rule Punishes the Licensees Who Play by the Rules

The harm of the District Court's ruling extends well beyond brand owners. In fact, it falls directly and disproportionately on the legitimate licensees who do business the right way. These licensed manufacturers operate under rigorous contractual and quality-control obligations. They pay royalties that support the brand's programs and operations, submit every design for advance approval, implement detailed brand-use standards, comply with strict quality-control and product-safety requirements, and invest heavily in building supply chains that meet the licensor's ethical, sourcing, and manufacturing expectations. These commitments are costly, time-consuming, and central to preserving the integrity of the licensed goods marketplace. When an unauthorized seller is permitted to trade

on the same mark without any of these obligations, it undermines the lawful partners who uphold the system and erodes the value of the licenses they have paid for.

These obligations are *not optional* and *not cheap*. They are the engine of the licensed merchandise economy and are the very reason consumers trust officially licensed products.

Vintage Brand, by contrast, bore none of these burdens. Yet under the District Court's reasoning, its unauthorized products would be permitted so long as they feature additional graphics or disclaimers. This gives unlicensed sellers every economic advantage, they can charge less, move faster, and skip compliance entirely, all while leveraging the goodwill of the famous mark that licensees paid for and agreed to protect.

Such an arrangement undermines the economic foundation of brand protection and places noncompliant actors in a favored competitive position over legitimate partners. Allowing unauthorized sellers to exploit a famous mark while avoiding the costs and obligations borne by licensees inevitably destabilizes the licensing model. And if unlicensed operators may secure all the commercial benefits without paying for the privilege, what incentive remains for manufacturers to pursue lawful licenses at all? In practical effect, the ruling rewards the free rider and punishes the compliant partner.

**C. The Decision Accelerates Willful Dilution of Famous Marks in the Real World**

The District Court's reasoning suggests that dilution arises only when a mark is copied with near-photographic exactness. But dilution is a gradual process in which a famous mark's distinctiveness weakens as unauthorized uses accumulate, not only when a precise replica is offered for sale.

Universities and sports franchises rely on licensing revenues to fund academic programs, athletic departments, student scholarships, campus facilities, and community outreach. In these sectors, dilution is not abstract, every unauthorized sale siphons from the very programs the marks are intended to support.

Vintage Brand's business model leverages the goodwill of famous marks to sell merchandise that consumers *perceive* as connected to the brand. That perception, even when accompanied by additional graphics, is the very association that federal dilution law protects against. By recharacterizing that association as harmless, the District Court invites a market in which famous marks become decorative design elements available to all.

Once that precedent is set, Vintage Brand will not be the only entity eager to exploit it. The marketplace will fill with sellers reposting historic crests, stylized mascots, or retro names, each claiming immunity because their design is "different enough" or because they included a "not affiliated" disclaimer. That is how famous marks lose distinctiveness. And it is precisely what Congress sought to prevent.

### D. The District Court's Approach Creates a Blueprint for Free-Riding and Undermines Decades of Investment

The District Court's analysis treats dilution as if it can occur only when an unauthorized user produces a near-photographic reproduction of a mark, but that understanding bears no resemblance to how dilution actually harms brand owners. Dilution is a cumulative process. A famous mark's distinctiveness weakens as unauthorized uses multiply across the marketplace, each one subtly eroding the mark's ability to signal a single, trusted source. This harm arises not only from perfect copies but from the steady proliferation of unlicensed depictions, variations, and "reinterpretations" that appropriate the brand's identity without authorization. Brand owners know that the danger is not merely in isolated replicas but in the aggregate effect of uncontrolled uses, which over time blur the clarity of the mark, diminish its commercial force, and undermine the very licensing programs that depend on the mark's strength.

This framework guts the very purpose of dilution law which is to stop exactly this kind of misappropriation of brand value through unauthorized association. Under the District Court's approach, the stronger and more recognizable the mark, the easier it becomes for unlicensed sellers to exploit it.

No licensing dependent industry, from collegiate merchandising to entertainment to sports to heritage brands, can function under a rule that treats ornamental add-ons as permission to appropriate a famous mark.

**E.** **This Court Should Correct the District Court's Error and Restore Dilution Protection to What Congress Intended**

Dilution law was enacted to protect the value of famous marks in exactly the circumstances present here, where multiple unauthorized uses threaten to blur the clarity, identity, and economic power of the brand. The District Court's ruling strips away those core protections by demanding near identity, elevating disclaimers and house marks to unwarranted significance, and ignoring the marketplace reality that dilution is measured by association, not by perfect replication. A proper understanding of dilution recognizes that the harm arises when unauthorized uses accumulate and weaken the mark's distinctiveness, undermining both the brand owner's investment and the structured system of legitimate licensees, retailers, and consumers who rely on the integrity of the mark.

SPLiCE respectfully urges this Court to reaffirm that dilution does not hinge on identical copying, cannot be neutralized by superficial design changes or disclaimers, and must be evaluated based on how consumers encounter and associate the marks in the real world. Only by restoring these principles can the Court preserve the licensing model that supports billions of dollars in commerce, funds core educational, athletic, and cultural missions, and ensures that famous marks remain reliable indicators of authenticity, quality, and authorized origin.

# CONCLUSION

SPLiCE respectfully urges this Court to reverse the District Court's rulings on counterfeiting and dilution and reaffirm that the Lanham Act protects licensed brands through an authorization-based trademark regime. The Court should hold that counterfeiting turns on the unauthorized use of a mark that is identical or substantially indistinguishable from a registered trademark, consistent with the statutory text, congressional intent, and the operational framework relied upon by U.S. Customs and Border Protection. By restoring this correct standard, the Court will preserve a functioning border-enforcement system that enables CBP to intercept counterfeit goods efficiently and protects the licensing marketplace that Congress designed the Lanham Act to support.

The Court should likewise reject the District Court's narrowed interpretation of dilution and reaffirm that famous marks retain full dilution protection regardless of licensing. Unauthorized uses that trade on a famous mark's distinctiveness, whether or not accompanied by decorative additions or disclaimers, create the very kind of blurring Congress enacted the dilution statutes to prevent. SPLiCE therefore asks the Court to restore the proper legal standards for counterfeiting and dilution, ensuring that brand owners, their licensees, and the consumers they serve continue to benefit from the robust protections the Lanham Act provides.

Dated: January 27, 2026

/s/ Sean P. Hvisdas

Sean P. Hvisdas
Goldberg Segalla LLP
1700 Market Street, Suite 3232
Philadelphia, Pennsylvania 19103
(267) 519-6800

– and –

Laura A. Colca
Goldberg Segalla LLP
665 Main Street
Buffalo, New York 14203
(716) 566-5401

*Attorneys for Amicus Curiae*

# CERTIFICATION OF ADMISSION TO BAR

I, Sean P. Hvisdas, certify as follows:

    1.    I am a member in good standing of the bar of the United States Court of Appeals for the Third Circuit.

    2.    Pursuant to 28 U.S.C. § 1746, I certify under penalty of perjury that the foregoing is true and correct.

Dated: January 27, 2026

/s/ Sean P. Hvisdas
Sean P. Hvisdas

# CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B). This brief contains 3,941 words, excluding the parts of the brief exempted by Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure.

This brief complies with the typeface requirements of Rule 32(a)(5) of the Federal Rules of Appellate Procedure and the type style requirements of Rule 32(a)(6) of the Federal Rules of Appellate Procedure because this brief has been prepared in a proportionally spaced typeface using the 2019 version of Microsoft Word in 14 point Times New Roman font.

This brief complies with the electronic filing requirements of Local Rule 31.1(c) because the text of this electronic brief is identical to the text of the paper copies, and the Vipre Virus Protection, version 3.1 has been run on the file containing the electronic version of this brief and no viruses have been detected.


Dated: January 27, 2026


/s/ Sean P. Hvisdas
Sean P. Hvisdas

**CERTIFICATE OF FILING AND SERVICE**

I certify that foregoing was filed through CM/ECF system and served on all

parties or their counsel of record through the CM/ECF system.

Dated: January 27, 2026

/s/ Sean P. Hvisdas
Sean P. Hvisdas