# United States Court of Appeals

*for the*

# Third Circuit

Case Nos. 25-2398, 25-2494

PENNSYLVANIA STATE UNIVERSITY,

*Appellant,*

— v. —

VINTAGE BRAND, LLC; SPORTSWEAR, INC., d/b/a Prep Sportswear;
CHAD HARTVIGSON; ERIK HARTVIGSON; MICHELLE YOUNG,

ON APPEAL FROM AN ORDER OF THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA IN CASE NO. 4:21-CV-01091,
MATTHEW W. BRANN, DISTRICT JUDGE

## BRIEF OF *AMICUS CURIAE* INTELLECTUAL PROPERTY OWNERS ASSOCIATION IN SUPPORT OF PLAINTIFF-APPELLANT

JOHN J. CHEEK,
   *President*
SAMANTHA GROVER,
   *Deputy Executive Director & Chief*
   *Policy Counsel*
INTELLECTUAL PROPERTY OWNERS
   ASSOCIATION
1501 M Street NW, Suite 1150
Washington, DC 20005
(202) 507-4500

ERIC R. MORAN,
   *Counsel of Record*
DAVID S. MILLER
PAUL H. BERGHOFF
MCDONNELL BOEHNEN HULBERT
   & BERGHOFF LLP
300 South Wacker Drive
Chicago, Illinois 60606
(312) 913-0001

*Attorney for Amicus Curiae Intellectual Property Owners Association*

CP COUNSEL PRESS    (800) 4-APPEAL • (388832)

# TABLE OF CONTENTS

TABLE OF CONTENTS............................................................................ i

TABLE OF AUTHORITIES ................................................................ ii

INTEREST OF THE *AMICUS CURIAE*................................................1

INTRODUCTION AND SUMMARY OF THE ARGUMENT ............................2

ARGUMENT ....................................................................................4

    I. A TRADEMARK LICENSOR SHOULD HAVE THE SAME ABILITY
    TO PROTECT ITS MARKS VIA A COUNTERFEITING REMEDY AS
    A TRADEMARK OWNER WHO HAPPENS TO MAKE AND SELL
    ITS OWN GOODS .......................................................................4

    A. Counterfeiting under the Lanham Act does not distinguish between
    trademark licensors and licensees.......................................................5

    B. Trademark licensing programs are essential to maintain goodwill
    associated with brand ownership and are an important driver of the U.S.
    economy...................................................................................9

    II. DILUTION BY BLURRING SHOULD NOT REQUIRE THE USE OF
    AN IDENTICAL MARK ...............................................................12

CONCLUSION .................................................................................15

# TABLE OF AUTHORITIES

**Cases**

*Angelo Bros. Co. v. A & H Co.*, 1996 U.S. Dist. LEXIS 14834 (E.D. Pa. 1996)......9

*Chanel, Inc. v. Gordashevsky*, 558 F. Supp. 2d 532 (D.N.J. 2008)..........................6

*Coach, Inc. v. Bag Place, Co.*, No. 10-6226, 2012 WL 13028160 (D.N.J. May 7, 2012)....................................................................................................................6

*Coca-Cola Bottling Co. v. Coca-Cola Co.*, 269 F. 796 (D. Del. 1920)....................7

*Doeblers' Pa. Hybrids, Inc. v. Doebler*, 442 F.3d 812 (3d Cir. 2006)....................10

*Levi Strauss & Co. v. Abercrombie & Fitch Trading Co.*, 633 F.3d 1158 (9th Cir. 2011) .....................................................................................................................14

*Louis Vuitton Malletier & Oakley, Inc. v. Veit*, 211 F. Supp. 2d 567 (E.D. Pa. 2002) .....................................................................................................................6

*Pa. State Univ. v. Vintage Brand, LLC*, 715 F. Supp. 3d 602 (M.D. Pa. 2024)...4, 6, 10, 12

*Premier Dental Prods. Co. v. Darby Dental Supply Co.*, 794 F.2d 850 (3d Cir. 1986) ......................................................................................................................7

*Starbucks Corp. v. Wolfe's Borough Coffee, Inc.*, 588 F.3d 97 (2d Cir. 2009).......13

*Tiffany (NJ) Inc. v. eBay, Inc.*, 600 F.3d 93 (2d Cir. 2010) ....................................14

**Statutes**

15 U.S.C. § 1055 ......................................................................................................10

15 U.S.C. § 1114 ................................................................................................5

15 U.S.C. § 1116(d)(1)(B)(ii) .............................................................................6

15 U.S.C. § 1125(c)(2)(B) ................................................................................13

15 U.S.C. § 1127 ........................................................................................ 6, 7, 9

**Other Authorities**

Licensing International, GLOBAL LICENSING SURVEY,

   https://licensinginternational.org/get-survey/ (last visited Dec. 28, 2025). .........12

Russell L. Parr, *How Big is Licensing?*, INTELLECTUAL PROPERTY VALUATION AND

   ROYALTY RATE CONSULTING (March 7, 2018),

   http://www.ipresearch.com/2018/03/07/how-big-is-licensing/ (last visited Dec.

   28, 2025) ........................................................................................................11

## INTEREST OF THE *AMICUS CURIAE*

*Amicus curiae* Intellectual Property Owners Association (IPO) is an international trade association representing companies and individuals in all industries and fields of technology that own or are interested in intellectual property rights.[1] IPO's membership includes more than 200 companies and more than 12,000 individuals who are involved in IPO either through their companies or as inventors, authors, executives, law firms, or attorney members. The corporate members of IPO own tens of thousands of trademarks and rely on the federal trademark system to protect these valuable assets.[2] Founded in 1972, IPO regularly represents the interests of its members before government entities and has filed *amicus curiae* briefs in the U.S. Supreme Court and other federal courts on significant issues of intellectual property law.

Uniquely, IPO represents the interests of all owners of intellectual property, and its mission is to promote high quality and enforceable intellectual property rights and predictable legal systems for all industries and technologies. IPO offers a wide array of services, including supporting member interests relating to legislative and

---

[1] All parties have consented to the filing of this brief. Pursuant to Federal Rule of Appellate Procedure 29, Amicus states that no counsel for a party authored this brief in whole or in part. No person other than Amicus or his counsel made a monetary contribution to its preparation or submission.

[2] IPO procedures require approval of positions in briefs by a two-thirds majority of directors present and voting. The list of directors is attached to this brief.

international issues, analyzing current intellectual property issues, providing information and educational services, and disseminating information to the public on the importance of intellectual property. IPO advocates for effective, affordable, and balanced intellectual property rights before both Congress and the United States Patent and Trademark Office. The IPO Board of Directors approved the filing of this brief.[3]

## INTRODUCTION AND SUMMARY OF THE ARGUMENT

This case presents two questions of substantial practical importance to IPO's members. First, whether the Lanham Act's remedies, including anti-counterfeiting remedies, are equally available to trademark owners whose use is solely through their licensees, in addition to trademark owners whose rights are based on their direct use of their marks, and, second, whether a requirement of identicality or essential similarity is needed in determining whether a mark is likely to cause dilution by blurring.

In evaluating The Pennsylvania State University's ("Penn State") counterfeiting claim, IPO believes that the District Court's decision improperly ignored the following basic principles regarding trademark usage rights:

[3] IPO procedures require approval of positions in briefs by a two-thirds majority of directors present and voting.

1. The principle that use by a trademark licensee of a trademark under a valid license from the licensor is considered use of that trademark by the licensor;

2. The principle that a trademark licensor is considered the origin of the goods or services that bear its mark, even where it is not the physical source of the goods or services, so long as a valid license is in place between the licensor and licensee; and

3. The principle that the Lanham Act's remedies, including anti-counterfeiting remedies, are equally available to trademark owners whose use is solely through their licensees, in addition to trademark owners whose rights are based on their direct use of their marks.

In addition, IPO believes the District Court applied too strict a requirement of identicality or essential similarity in evaluating Penn State's dilution claim regarding Vintage Brand, LLC's ("Vintage Brand") usage of the marks at issue and the registered marks, a requirement at odds with the language of the Lanham Act and its underlying policy.

IPO believes the District Court's grant of summary judgment in favor of Vintage Brand should be reversed on both issues. The District Court's holdings on the issues of counterfeiting and dilution narrow the ability of brand owners to enforce their rights. A Third Circuit decision clarifying the proper counterfeiting and

dilution standards will have substantial impact across the licensing ecosystem, particularly with respect to licensed merchandise featuring brands owned by sports teams, universities, entertainers, and content creators.  These intellectual property owners rely on the availability of counterfeiting and dilution claims and remedies to protect their valuable intellectual property and prevent free riding off their goodwill.

IPO does not, however, take a position on any of the other issues, legal or factual, raised by the parties before this Court.

## ARGUMENT

### I.    A TRADEMARK LICENSOR SHOULD HAVE THE SAME ABILITY TO PROTECT ITS MARKS VIA A COUNTERFEITING REMEDY AS A TRADEMARK OWNER WHO HAPPENS TO MAKE AND SELL ITS OWN GOODS

In granting summary judgment to Vintage Brand, the District Court stated: "it is nearly impossible to believe that any rational consumer would expect that an institution of higher education produces its own merchandise and, therefore, equally difficult to believe that any consumer would be confused as to the origin of Vintage Brand's goods that carry the Penn State Marks." *Pa. State Univ. v. Vintage Brand, LLC*, 715 F. Supp. 3d 602, 651 (M.D. Pa. 2024).  Essentially, the District Court asserted that because no reasonable consumer would believe that a university manufactured merchandise, as opposed to licensing its marks for use on merchandise, unauthorized merchandise bearing the Penn State registered

trademarks could not be a counterfeit as a matter of law. According to this logic, a trademark licensor who has its licensee manufacture goods covered by trademark rights cannot prove counterfeiting of its mark, regardless of the extent of copying.

The District Court's interpretation of what constitutes counterfeiting conflicts with certain fundamental and long-settled rights of trademark owners. It is common for trademark owners to license their marks to third-party licensees for the purpose of manufacturing and/or selling the goods covered by the trademark rights. It is also common for trademark owners to apply their marks to goods obtained from third parties, either through traditional purchases or through contract manufacturing arrangements. IPO believes these are fundamental and noncontroversial right of all trademark owners. IPO urges this Court to adopt a principled, text-consistent approach to the question of counterfeiting, recognizing that counterfeiting encompasses uses of registered marks that are identical or substantially indistinguishable in the marketplace context and that "spurious" use is not limited solely to confusion about the physical manufacturer.

### A. Counterfeiting under the Lanham Act does not distinguish between trademark licensors and licensees.

Ownership of a valid trademark registration in the United States is generally sufficient for a registrant to institute a civil action against alleged infringers, including counterfeiters. 15 U.S.C. § 1114. The Lanham Act does not include a requirement that the trademark owner manufacture its own goods.

For purposes of a trademark counterfeiting claim, the term "counterfeit mark" means "a counterfeit of a mark that is registered on the principal register in the United States Patent and Trademark Office for such goods or services sold, offered for sale, or distributed and that is in use, whether or not the person against whom relief is sought knew such mark was so registered" or "a spurious designation that is identical with, or substantially indistinguishable from" a registered mark. 15 U.S.C. § 1116(d)(1)(B)(ii); 15 U.S.C. § 1127.

Counterfeiting is "the act of producing or selling a product with a sham trademark that is an intentional and calculated reproduction of the genuine trademark." *Louis Vuitton Malletier & Oakley, Inc. v. Veit*, 211 F. Supp. 2d 567, 581 (E.D. Pa. 2002). To establish trademark counterfeiting, a plaintiff must show that: "(1) defendants infringed a registered trademark in violation of the Lanham Act, 15 U.S.C. § 1114(1)(a), and (2) intentionally used the trademark knowing that it was counterfeit or was willfully blind to such use." *Chanel, Inc. v. Gordashevsky*, 558 F. Supp. 2d 532, 536 (D.N.J. 2008). A finding of intentional trademark infringement using an identical or near identical mark is sufficient to show counterfeiting. *Id.* at 536-37; *Coach, Inc. v. Bag Place, Co.*, No. 10-6226, 2012 WL 13028160, at *5 (D.N.J. May 7, 2012).

Here, the District Court acknowledged that "spurious" is not a statutorily defined term under the Lanham Act and stated that "spurious is best understood to

mean something that is fake or deceptively suggesting an erroneous *origin*." *Pa. State Univ.*, 715 F. Supp. 3d at 652 (citing *Lontex Corp. v. Nike, Inc*., 384 F. Supp. 3d 546, 555 (E.D. Pa. 2019)).  In reaching its conclusion, the District Court appears to equate the term "origin" with "manufacturer."  However, this interpretation is at odds with the realities of trademark licensing programs and trademark owner goods procurement practices and the relationship between trademark licensors and their licensees and suppliers.

In the context of a trademark registration, the "origin" of the goods bearing the registered mark refers to the "source" of goods or services, "even if that source is unknown."  15 U.S.C. § 1127.  Nowhere does the Lanham Act, or case law applying the Lanham Act, require that a trademark owner physically make or sell the goods covered by trademark rights to preserve its ability to institute action against counterfeiters.  If Congress had intended such a limitation, it would have included language to that effect in the statute.  However, no such limitation exists.

Moreover, as this Court has recognized, "[i]t is well established that a distributor may own the trademark in goods it does not manufacture."  *Premier Dental Prods. Co. v. Darby Dental Supply Co.*, 794 F.2d 850, 853 (3d Cir. 1986).  "The decisive question is not who manufactured the article sold under a given trademark, but which business or article is symbolized by it."  *Id*. (quoting RUDOLPH CALLMAN, UNFAIR COMPETITION, TRADEMARKS AND MONOPOLIES § 17.16 (4th ed.,

1981)).  *See also Coca-Cola Bottling Co. v. Coca-Cola Co.*, 269 F. 796, 806 (D. Del. 1920).

Trademark owners who properly license their marks to third parties or source goods from third parties should have no fewer rights and avenues to enforce those rights than trademark owners who choose to make and sell their own goods. Trademark licensing agreements provide robust processes for brand owners to control the quality of goods being manufactured under license.  Trademark licensors have an obligation to monitor licensee compliance with quality standards and brand representation to ensure brand integrity.  Accordingly, use of a trademark by a licensee under a valid license from the licensor should be considered use of that trademark by the licensor.  Similarly, use of trademark on goods purchased from a third party or made for a trademark owner by a third party should be considered use of that trademark by the trademark owner.  This principle should apply to all remedies available for unauthorized use of a mark, including counterfeiting.

Moreover, economic policy strongly favors the full availability of counterfeiting remedies to trademark owners regardless of how the owners choose to have their goods made and sold.  Counterfeiting deprives legitimate businesses of sales, resulting in loss of jobs and reducing incentives for business investment in new products and innovation.  In addition, the presence of counterfeit products in the marketplace damages brand reputation and erodes consumer confidence.

**B. Trademark licensing programs are essential to maintain goodwill associated with brand ownership and are an important driver of the U.S. economy.**

Consumers, whether individuals or businesses, rely on trademarks as an indicator of quality. Congress specified its intent to regulate commerce by making actionable the deceptive and misleading use of marks in such commerce, "to prevent fraud and deception in such commerce by the use of reproductions, copies, counterfeits, or colorable imitations of registered marks." 15 U.S.C. § 1127. In opining on the scope of the Lanham Act, courts have reiterated that the focus of the Lanham Act is on quality and ensuring that the trademark owner remains in control of the nature and quality of the goods sold in association with the trademark. Indeed, "[o]ne of the most valuable and important protections afforded by the Lanham Act is the right to control the quality of the goods manufactured and sold under the holder's trademark." *Angelo Bros. Co. v. A & H Co*., 1996 U.S. Dist. LEXIS 14834, at *16 (E.D. Pa. 1996) (quoting *El Greco Leather Prods. Co. v. Shoe World, Inc*., 806 F.2d 392, 395 (2d Cir. 1986)).

When counterfeiters are allowed to copy trademarks and pass off their goods as legitimate, authorized goods, the consumer's ability to rely on that quality is compromised. Since counterfeit goods are often inferior, counterfeiting can present serious safety and performance issues to unsuspecting consumers. Typically, consumers are not concerned with who physically manufactures or sells legitimate,

authorized goods. Rather, consumers focus on the reputation and goodwill of the trademark owner as an indication of quality for such goods, providing assurance that a legitimate entity stands behind that quality.

Trademark owners commonly enter into licensing agreements with manufacturers to produce goods under the trademark and control the quality of manufacture. As this Court has recognized, "[u]se of a trademark need not always be made directly by the trademark owner and is often made 'with the permission' of the owner via a licensing agreement." *Doeblers' Pa. Hybrids, Inc. v. Doebler*, 442 F.3d 812, 823 (3d Cir. 2006). A trademark license typically "contains express terms giving the licensor [the] power to engage in quality control to ensure that the licensee does not engage in mere 'naked' use of the mark." *Id.* Moreover, "[w]here a registered mark ... is or may be used legitimately by related companies, such use shall inure to the benefit of the registrant ... and such use shall not affect the validity of such mark or of its registration." 15 U.S.C. § 1055.

Here, the District Court recognized that Penn State contracts with an exclusive licensing agent to operate a formal trademark licensing program to review and evaluate prospective licensees' merchandise to determine quality. *Pa. State Univ.*, 715 F. Supp. 3d at 614-15. Penn State's trademark licensing program has been operational for more than 40 years. *Id.* at 614. A typical consumer would not be concerned whether Penn State owns a clothing manufacturing facility or otherwise

manufactures goods featuring the Penn State trademarks. Instead, consumers rely on Penn State to carefully select and monitor the licensees making authorized Penn State merchandise, thereby ensuring that the appropriate level of quality is maintained. Penn State can offer no such assurances for counterfeit goods.

Trademark licensing is a vital and indispensable tool for a brand owner to protect the integrity of its intellectual property, provide consumers with products with established quality and value, and promote and grow its core products. Trademarks and associated licensing programs generate significant global revenue and are an integral component to business profitability. Moreover, consumer product licensing is integral to the United States economy and for consumers alike.

Revenues derived from licensed intellectual property are enormous. Using a calculation based on an average royalty rate of five percent, Russell Parr, co-author of the treatise Intellectual Property: Valuation, Exploitation, and Infringement Damages (4th ed., 2017), estimates that total revenues derived from licensed intellectual property nearly reached $3.9 trillion in 2013. Russell L. Parr, *How Big is Licensing?*, INTELLECTUAL PROPERTY VALUATION AND ROYALTY RATE CONSULTING (March 7, 2018), http://www.ipresearch.com/2018/03/07/how-big-is-licensing/ (last visited Dec. 28, 2025). Licensing International, a global trade association for the licensing industry, estimates that global sales revenue generated by licensed merchandise and services grew to $369.6 billion in 2024, a 3.7% increase

over the $356.5 billion generated in 2023. Licensing International, GLOBAL LICENSING SURVEY, https://licensinginternational.org/get-survey/ (last visited Dec. 28, 2025).

Because goods covered by trademark licenses provide a substantial portion of economic activity in the United States and abroad, it is imperative that trademark licensors retain all rights associated with ownership of a trademark, including the right to pursue anti-counterfeiting remedies as a means of enforcement. The Lanham Act does not differentiate between trademark licensors and licensees. Rather, the use of a mark by a licensee under a valid license from the licensor is considered use of that mark by the licensor. If a valid license is in place between licensor and licensee, the licensor is considered the origin of the goods or services that bear the relevant mark, even where the licensor is not the physical source or manufacturer of the goods.

## II.     DILUTION BY BLURRING SHOULD NOT REQUIRE THE USE OF AN IDENTICAL MARK

In granting summary judgment to Vintage Brand on the claim of dilution, the District Court set the bar too high by requiring Vintage Brand's usage to be "very similar, if not identical" to or "essentially the same" as the registered marks. *Pa. State Univ.*, 715 F. Supp. 3d at 653 (citing *Pharmacia Corp. v. Alcon Lab'ys, Inc.*, 201 F. Supp. 2d 335, 379 (D.N.J. 2002)). The Lanham Act has no such requirement. Instead, the Lanham Act lists six factors that should be considered in determining

"whether a mark is likely to cause dilution by blurring," including "the degree of similarity between the mark or trade name and the famous mark." 15 U.S.C. § 1125(c)(2)(B).

The federal statute only asks courts to consider the degree of similarity without imposing a strict standard of identicality or essential similarity, as applied by the District Court. Indeed, "[c]onsideration of a 'degree' of similarity as a factor in determining the likelihood of dilution does not lend itself to a requirement that the similarity between the subject marks must be 'substantial' for a dilution claim to succeed." *Starbucks Corp. v. Wolfe's Borough Coffee, Inc.*, 588 F.3d 97, 108 (2d Cir. 2009).

The policy reasons for not imposing an arbitrarily high standard of similarity are straightforward. The value of famous marks can be harmed by the use of marks that blur the consuming public's ability to view the famous mark as indicating a single, unitary source. As recognized by the Lanham Act and other United States Courts of Appeal, dilution by blurring can occur even where the diluting mark is not identical to the registered mark.

As determined by the Ninth Circuit Court of Appeals, "[t]he plain language of 15 U.S.C. § 1125(c) does not require that a plaintiff establish that the junior mark is identical, nearly identical or substantially similar to the senior mark in order to obtain injunctive relief. Rather, a plaintiff must show, based on the factors set forth

in § 1125(c)(2)(B), including the degree of similarity, that a junior mark is likely to impair the distinctiveness of the famous mark." *Levi Strauss & Co. v. Abercrombie & Fitch Trading Co.*, 633 F.3d 1158, 1172 (9th Cir. 2011). In addition, as stated by the Second Circuit Court of Appeals, "[w]e have recently explained that under the Trademark Dilution Revision Act of 2006 ("TDRA"), Pub. L. No. 109-312, 120 Stat. 1730, 1731 (Oct. 6, 2006), the similarity between the famous mark and the allegedly blurring mark need not be 'substantial' in order for the dilution by blurring claim to succeed." *Tiffany (NJ) Inc. v. eBay, Inc.*, 600 F.3d 93, 111 n.17 (2d Cir. 2010).

As a general rule of thumb, the more famous the mark, the more likely its value will be diluted by conflicting marks that are not substantially identical. IPO believes that the District Court's use of a stricter standard of identicality or essential similarity is contrary to the more nuanced balancing required by the policy underlying the Lanham Act. Accordingly, IPO urges this Court to clarify that the similarity requirement for dilution does not require identical marks and that the use of additional imagery, disclaimers, or a house mark does not make a mark insufficiently similar as a matter of law. IPO further urges this Court to hold that evidence that consumers associate allegedly diluting marks with the mark holder does not preclude dilution by blurring as a matter of law, as this interpretation is counter to the provisions of 15 U.S.C. § 1125(c)(2)(B).

**CONCLUSION**

For the reasons stated above, IPO respectfully requests that this Court reverse the District Court's summary judgment rulings in favor of Vintage Brand on counterfeiting and dilution.


Respectfully submitted,

John J. Cheek
   *President*
Samantha Grover
   *Deputy Executive Director &*
   *Chief Policy Counsel*
Intellectual Property
   Owners Association
1501 M St. N.W., Suite 1150
Washington, D.C. 20005
(202) 507-4500

*/s/ Eric R. Moran*
Eric R. Moran
   *Counsel of Record*
David S. Miller
Paul H. Berghoff
McDonnell Boehnen
   Hulbert & Berghoff LLP
300 South Wacker Drive
Chicago, IL 60606
(312) 913-0001

*Counsel for Amicus Curiae, Intellectual Property Owners Association*

## CERTIFICATION OF ADMISSION TO BAR

I, Eric R. Moran, hereby certify as follows:

1.  I am a member in good standing of the bar of the United States Court of Appeals for the Third Circuit.

2.  Pursuant to 28 U.S.C. § 1746, I certify under penalty of perjury that the foregoing is true and correct.


Dated:  January 27, 2026            */s/ Eric R. Moran*
                                       Eric R. Moran, Esq.

                                       Counsel for Amicus Curiae
                                       Intellectual Property Owners Association

## <u>CERTIFICATION OF COMPLIANCE WITH FEDERAL RULE OF</u>
## <u>APPELLATE PROCEDURE 32(a) AND LOCAL RULE 31.1</u>

Pursuant to Fed. R. App. P. 32(a)(7)(B), I certify the following:

This brief complies with the type-volume limitation of Rule 32(a)(7)(B) of the

Federal Rules of Appellate Procedure because this brief contains 3,306 words,

excluding the parts of the brief exempted by Rule 32(f) of the Federal Rules of

Appellate Procedure.

This brief complies with the typeface requirements of Rule 32(a)(5) of the

Federal Rules Appellate Procedure and the type style requirements of Rule 32(a)(6)

of the Federal Rules of Appellate Procedure because this brief has been prepared in

a proportionally spaced typeface using Word for Microsoft 365 in 14-point Times

New Roman font.

This brief complies with the electronic filing requirements of Local Rule

31.1(c) because the text of this electronic brief is identical to the text of the paper

copies, and a virus detection program Vipre Virus Protection, version 3.1 was run

on the file containing the electronic version of this brief and no viruses have been

detected.

Dated:  January 27, 2026        */s/ Eric R. Moran*
                                          Eric R. Moran, Esq.

                                          Counsel for Amicus Curiae
                                          Intellectual Property Owners Association

## CERTIFICATE OF SERVICE

I, Eric R. Moran, hereby certify that on this 27th day of January, 2026, a copy of the foregoing Amicus Curiae Brief In Support of Appellant was electronically filed with the Third Circuit Court of Appeals, and service was made upon counsel of record through the Court's electronic docketing system.

Dated: January 27, 2026

/s/ Eric R. Moran
Eric R. Moran, Esq.

Counsel for Amicus Curiae
Intellectual Property Owners Association

# APPENDIX

**Members of the Board of Directors**
**Intellectual Property Owners Association**

David Alban
    Xylem

Matthew Anderson
    Medtronic, Inc.

Ronald Antush
    Nokia of Americas Corp.

Scott Barker
    Micron Technology, Inc.

Thomas R. Beall
    Corning Incorporated

Tyrome Brown
    Dolby Laboratories

John J. Cheek
    Tenneco Inc.

Dan Choi
    Microsoft Corporation

Brandon Clark
    SLB

Robinson Clark
    Exxon Mobil Corp.

Tonya Combs
    Eli Lilly and Co.

Jamie Davis
    Bayer Intellectual Property GmbH

Ewa Davison
    The Boeing Co.

Anthony DiBartolomeo
    SAP SE

Cass Dottridge
    Cargill, Inc.

Jake Feldman
    Kenvue

Yen Florczak
    3M Innovative Properties Co.

Louis Foreman
    Enventys

Darryl P. Frickey
    Dow Chemical Co.

Mony Ghose
    Danaher Corp.

Robert Giles
    Qualcomm Inc.

Laura Ginkel
    Merck & Co.

Krish Gupta
    Dell Technologies

Henry Hadad
    Bristol-Myers Squibb Co.

Aamir Haq
    Hewlett Packard Enterprise

Scott Hayden
    Amazon

Emily Johnson
    Amgen, Inc.

Michael King
    Caterpillar Inc.

Thomas R. Kingsbury
    Bridgestone Americas, Inc.

Laurie Kowalsky
    Koninklijke Philips N.V.

Christine Lam
    NetApp

David Lane
    Johnson & Johnson

Alexander Long
    GE Aerospace

Ceyda Maisami
    HP Inc.

Paul Mussell
    Wells Fargo & Company

Jeffrey Myers
    Apple Inc.

Sandra Nowak
    Solventum

Hugh Pasika
    Thermo Fisher Scientific Inc.

Erik Perez
    Shell USA, Inc.

Troy Prince
    RTX Corporation

Kaveh Rashidi-Yazd
    Eaton Corporation

Corey Salsberg
    Novartis

Matthew Sarboraria
    Oracle Corporation

Laura Sheridan
    Google Inc.

Jessica Sinnott
    DuPont

Thomas Smith
    GlaxoSmithKline

Daniel Staudt
    Siemens Corp.

Sarah Tully
    Roche, Inc.

Mark Vallone
    IBM Corp.