In The

# United States Court of Appeals
## for the Third Circuit

———————

THE PENNSYLVANIA STATE UNIVERSITY,

*Plaintiff-Appellant / Cross-Appellee,*

vs.

VINTAGE BRAND LLC, ET AL.,

*Defendants-Appellees / Cross-Appellants.*

———————

On Appeal from the United States District Court
for the Middle District of Pennsylvania, Case No. 4:21-cv-01091
Honorable Matthew W. Brann, U.S. District Judge

## OPENING AND RESPONSE BRIEF OF
## VINTAGE BRAND LLC, ET AL.

Joshua D. Harms
John T. Fetters
STOKES LAWRENCE, P.S.
1420 Fifth Avenue, Suite 3000
Seattle, Washington 98101
(206) 626-6000
*josh.harms@stokeslaw.com*
*john.fetters@stokeslaw.com*

Mark P. McKenna
LEX LUMINA PLLC
745 Fifth Avenue, Suite 500
New York, New York 101501
(646) 898-2055
*mark@lex-lumina.com*

*Counsel for Defendants-Appellees / Cross-Appellants*
*Vintage Brand LLC, Sportswear, Inc. and Chad Hartvigson*

**United States Court of Appeals for the Third Circuit**
**Corporate Disclosure Statement and Statement of Financial Interest**
No. 25-2398, 25-2494

THE PENNSYLVANIA STATE UNIVERSITY

v.

VINTAGE BRAND LLC, ET AL.

Instructions

Pursuant to Rule 26.1, Federal Rules of Appellate Procedure any nongovernmental corporate party to a proceeding before this Court must file a statement identifying all of its parent corporations and listing any publicly held company that owns 10% or more of the party's stock.

Third Circuit LAR 26.1(b) requires that every party to an appeal must identify on the Corporate Disclosure Statement required by Rule 26.1, Federal Rules of Appellate Procedure, every publicly owned corporation not a party to the appeal, if any, that has a financial interest in the outcome of the litigation and the nature of that interest. This information need be provided only if a party has something to report under that section of the LAR.

In all bankruptcy appeals counsel for the debtor or trustee of the bankruptcy estate shall provide a list identifying: 1) the debtor if not named in the caption; 2) the members of the creditors' committee or the top 20 unsecured creditors; and, 3) any entity not named in the caption which is an active participant in the bankruptcy proceedings. If the debtor or the bankruptcy estate is not a party to the proceedings before this Court, the appellant must file this list. LAR 26.1(c).

The purpose of collecting the information in the Corporate Disclosure and Financial Interest Statements is to provide the judges with information about any conflicts of interest which would prevent them from hearing the case.

The completed Corporate Disclosure Statement and Statement of Financial Interest Form must, if required, must be filed upon the filing of a motion, response, petition or answer in this Court, or upon the filing of the party's principal brief, whichever occurs first. A copy of the statement must also be included in the party's principal brief before the table of contents regardless of whether the statement has previously been filed. Rule 26.1(b) and (c), Federal Rules of Appellate Procedure.

If additional space is needed, please attach a new page.

Pursuant to Rule 26.1 and Third Circuit LAR 26.1,  Vintage Brand, LLC makes the
following disclosure:                                            (Name of Party)

1) For non-governmental corporate parties please list all parent corporations:

There is no such corporation.

2) For non-governmental corporate parties please list all publicly held companies that hold 10% or more of the party's stock:

There is no such corporation.

3) If there is a publicly held corporation which is not a party to the proceeding before this Court but which has as a financial interest in the outcome of the proceeding, please identify all such parties and specify the nature of the financial interest or interests:

There is no such corporation.

4) In all bankruptcy appeals counsel for the debtor or trustee of the bankruptcy estate must list: 1) the debtor, if not identified in the case caption; 2) the members of the creditors' committee or the top 20 unsecured creditors; and, 3) any entity not named in the caption which is active participant in the bankruptcy proceeding. If the debtor or trustee is not participating in the appeal, this information must be provided by appellant.


/s/ *Joshua D. Harms*                              Dated:      3/12/2026
(Signature of Counsel or Party)

## United States Court of Appeals for the Third Circuit
## Corporate Disclosure Statement and Statement of Financial Interest
No. 25-2398, 25-2494

### THE PENNSYLVANIA STATE UNIVERSITY
v.
### VINTAGE BRAND LLC, ET AL.

### Instructions

Pursuant to Rule 26.1, Federal Rules of Appellate Procedure any nongovernmental corporate party to a proceeding before this Court must file a statement identifying all of its parent corporations and listing any publicly held company that owns 10% or more of the party's stock.

Third Circuit LAR 26.1(b) requires that every party to an appeal must identify on the Corporate Disclosure Statement required by Rule 26.1, Federal Rules of Appellate Procedure, every publicly owned corporation not a party to the appeal, if any, that has a financial interest in the outcome of the litigation and the nature of that interest. This information need be provided only if a party has something to report under that section of the LAR.

In all bankruptcy appeals counsel for the debtor or trustee of the bankruptcy estate shall provide a list identifying: 1) the debtor if not named in the caption; 2) the members of the creditors' committee or the top 20 unsecured creditors; and, 3) any entity not named in the caption which is an active participant in the bankruptcy proceedings. If the debtor or the bankruptcy estate is not a party to the proceedings before this Court, the appellant must file this list. LAR 26.1(c).

The purpose of collecting the information in the Corporate Disclosure and Financial Interest Statements is to provide the judges with information about any conflicts of interest which would prevent them from hearing the case.

The completed Corporate Disclosure Statement and Statement of Financial Interest Form must, if required, must be filed upon the filing of a motion, response, petition or answer in this Court, or upon the filing of the party's principal brief, whichever occurs first. A copy of the statement must also be included in the party's principal brief before the table of contents regardless of whether the statement has previously been filed. Rule 26.1(b) and (c), Federal Rules of Appellate Procedure.

If additional space is needed, please attach a new page.

Pursuant to Rule 26.1 and Third Circuit LAR 26.1,  <u>Sportswear Inc.</u> makes the
following disclosure:                                                    (Name of Party)

      1) For non-governmental corporate parties please list all parent
corporations:

      There is no such corporation.

      2) For non-governmental corporate parties please list all
publicly held companies that hold 10% or more of the party's stock:

      There is no such corporation.

      3) If there is a publicly held corporation which is not a party to the
proceeding before this Court but which has as a financial interest in the outcome
of the proceeding, please identify all such parties and specify the nature of the
financial interest or interests:

      There is no such corporation.

      4) In all bankruptcy appeals counsel for the debtor or trustee of the
bankruptcy estate must list: 1) the debtor, if not identified in the case caption; 2)
the members of the creditors' committee or the top 20 unsecured creditors; and,
3) any entity not named in the caption which is active participant in the
bankruptcy proceeding. If the debtor or trustee is not participating in the appeal,
this information must be provided by appellant.


<u>/s/ *Joshua D. Harms*       </u>      Dated:   <u>  3/12/2026   </u>
(Signature of Counsel or Party)

# TABLE OF CONTENTS

Page

I. INTRODUCTION.................................................................1

II. STATEMENT OF JURISDICTION.................................3

III. STATEMENT OF THE ISSUES..................................3

IV. STATEMENT OF THE CASE.......................................4

   A. Vintage Brand's Memorabilia and Print-On-Demand Products.................................................................4

   B. Penn State and Its Trademark Merchandising..........11

   C. The Parties' Cross-Motions for Partial Summary Judgment.................................................................17

   D. The Trial and Post-Trial Motions.............................18

V. SUMMARY OF ARGUMENT.......................................18

VI. ARGUMENT.................................................................24

   A. Argument on Cross-Appeal.......................................24

     1. The District Court Erred by Not Granting Judgment as a Matter of Law on Defendants' Aesthetic Functionality Defense.............................................26

       a. Posture and Standard of Review.........................27

       b. A Design is Functional if it is Useful for Anything Beyond Branding.................................28

       c. Consumers Want Penn State-related Images to Show their Support for Penn State......................31

       d. Exclusive Use of the Composite Historic Images Puts Competitors at a Significant, Non-reputation Related Disadvantage.........................................34

     2. The District Court Erred by Not Granting Judgment as a Matter of Law on, or Failing to Instruct the Jury About, Penn State's Threshold Burden to Establish Vintage Brand's Trademark Use..............................39

       a. Posture and Standard of Review.........................40

b. Penn State Did Not Carry Its Burden to Establish that Vintage Brand used the Historic Images as Trademarks ..................................................40

c. The Evidence Did Not Demonstrate that Vintage Brand Made Trademark Use ................................44

3. The District Court Erred by Allowing the Jury to Consider Initial Interest and Post-Sale Confusion.................46

a. Posture and Standard of Review ........................46

b. Penn State Pursued Post-Sale and Initial Interest Theories ................................................................47

c. The Court Erred by Failing to Grant Judgment as a Matter of Law and also Failing to Instruct the Jury .........48

4. The District Court Erred by Refusing to Grant Judgment as a Matter of Law on Sportswear's Direct Liability...................................................................51

a. Posture and Standard of Review ........................52

b. Sportswear was an Invisible Middleman in Transactions Between Vintage Brand and Its Customers................................................................53

c. Direct Liability for Trademark Infringement Attaches to True Sellers, not Invisible Middlemen............55

B. Response to Penn State's Appeal ................................60

1. Standard of Review.................................................60

2. The District Court Appropriately Granted Summary Judgment on Penn State's Counterfeiting Claim ...................60

a. Penn State Forfeited its Argument that There Was a Triable Issue Regarding Source Confusion ....................62

b. Counterfeiting is Not Simply Trademark Infringement with Greater Similarity of Marks ................65

c. The District Court Properly Applied the Lanham Act's Strict Statutory Limits on Counterfeiting.................70

  d. Vintage Brand's Composite Historic Imagery is not Substantially Indistinguishable from Penn State's Marks........................................................................73

  e. A Mark-by-Mark Comparison Establishes Defendants Cannot be Liable for Counterfeiting...............77

 3. The District Court Appropriately Granted Summary Judgment on Dilution.................................................................84

  a. Dilution by Blurring Requires an Impairment, not a Strengthening, of Distinctiveness......................................84

  b. The TDRA Did Not Alter the Emphasis on a Substantially Similar Diluting Mark .................................87

  c. The District Court Appropriately Found No Issues of Material Fact....................................................................89

  d. Penn State Failed to Proffer Evidence of Fame .................91

VII. CONCLUSION .................................................................................93

# TABLE OF CITATIONS

**Cases**                                                    **Page(s)**

*1-800 Contacts, Inc. v. JAND, Inc.*,
   119 F.4th 234 (2d Cir. 2024) ............................................................. 49

*Abitron Austria GmbH v. Hetronic International, Inc.*,
   600 U.S. 412 ...................................................................................... *Passim*

*Alcoa, Inc. v. United States*,
   509 F.3d 173 (3d Cir. 2007) ................................................................ 60

*Arcona, Inc. v. Farmacy Beauty, LLC*,
   976 F.3d 1074 (9th Cir. 2020) ...................................................... 77, 82

*Atari Interactive, Inc. v. Printify, Inc.*,
   714 F.Supp.3d 225 (S.D.N.Y. 2024) .................................................. 56

*Boston Prof'l Hockey Ass'n, Inc. v. Dallas Cap & Emblem Mfg., Inc.*,
   510 F.2d 1004 (5th Cir. 1975) ............................................................ 19

*Broselow v. Fisher*,
   319 F.3d 605 (3d Cir. 2003) ................................................................ 68

*Century 21 Real Estate Corp. v. Lendingtree, Inc.*,
   425 F.3d 211 (3d Cir. 2005) ................................................................ 39

*Checkpoint Sys., Inc. v. Check Point Software Techs., Inc.*,
   269 F.3d 270 (3d Cir. 2001) ................................................................ 49

*Coach Servs., Inc. v. Triumph Learning LLC*,
   668 F.3d 1356 (Fed. Cir. 2012) ...................................................... 91, 92

*Cohen & Co., Ltd. v. Cohen & Co. Inc.*,
   2022 WL 5250271 (E.D. Pa. Oct. 6, 2022) ........................................ 67

*Colgate-Palmolive Co. v. J.M.D. All-Star Imp. & Exp. Inc.*,
   486 F.Supp.2d 286 (S.D.N.Y. 2007) .................................................. 76

**Cases** (cont.)                                          **Page(s)**

*Coty Inc. v. Cosmopolitan Cosmetics Inc.*,
   432 F.Supp.3d 345 (S.D.N.Y. 2020) ....................................68

*Coty Inc. v. Excell Brands, LLC*,
   277 F.Supp.3d 425 (S.D.N.Y. 2017)....................................77

*Dastar Corp. v. Twentieth Century Fox Film Corp.*,
   539 U.S. 23 (2003)............................................................39, 45

*Estate of P.D. Beckwith, Inc., v. Comm'r of Patents*,
   252 U.S. 538 (1920) ..............................................................74

*Ezaki Glico Kabushiki Kaisha v. Lotte Int'l Am. Corp.*,
   986 F.3d 250 (3d Cir. 2021) .........................................*Passim*

*G.D. Searle & Co. v. Hudson Pharm. Corp.*,
   715 F.2d 837 (3d Cir. 1983) ................................................36

*G6 Hospitality Franchising LLC v. Hi Hotel Group, LLC*,
   171 F.Supp.3d 340 (M.D. Pa. 2016)....................................67

*Galena v. Leone*,
   638 F.3d 186 (3d Cir. 2011) ................................................27

*GMA Accessories, Inc. v. BOP, LLC*,
   765 F.Supp.2d 457 (S.D.N.Y. 2011)....................................68

*Green v. Fornario*,
   486 F.3d 100 (3d Cir. 2007) ................................................91

*Grubbs v. Sheakley Grp., Inc.*,
   807 F.3d 785 (6th Cir. 2015)................................................43

*Gucci Am., Inc. v. Guess?, Inc.*,
   868 F.Supp.2d 207 (S.D.N.Y. 2012)........................65, 70, 77

v

**Cases** (cont.)                                                           **Page(s)**

*Guthrie v. Lady Jane Collieries, Inc.,*
   722 F.2d 1141 (3d Cir. 1983) ............................................................91

*ICCS USA Corp. v. United States,*
   952 F.3d 1325 (Fed. Cir. 2020) .......................................................70

*Illinois Tool Works Inc. v. J-B Weld Co., LLC,*
   469 F.Supp.3d 4 (D. Conn. 2020).....................................................70

*International Order of Job's Daughters v. Lindeburg & Co.,*
   633 F.2d 912 (9th Cir. 1980)............................................. 34, 35, 38, 44

*Inwood v. Ives Labs, Inc.,*
   456 U.S. 844 (1982)..................................................................29, 52

*Jack Daniel's Properties, Inc. v. VIP Products LLC*
   599 U.S. 140 (2023).................................................................*Passim*

*KAWS, Inc. v. Printify Inc.,*
   2024 WL 3916493 (S.D. Fla. Aug. 23, 2024) .....................................56

*Keene Corp. v. Paraflex Indus., Inc.,*
   653 F.2d 822 (3d Cir. 1981) ......................................................29, 36

*King Spider LLC v. Panda (Hong Kong) Tech. Co., Ltd.,*
   2025 WL 89123 (S.D.N.Y. Jan. 14, 2025)...........................................56

*KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.,*
   543 U.S. 111 (2004)......................................................................64

*Larry V. Muko, Inc. v. Sw. Pennsylvania Bldg. & Const. Trades Council,*
   670 F.2d 421 (3d Cir. 1982) ...........................................................47

*Levi Strauss & Co. v. Abercrombie & Fitch Trading Co.,*
   633 F.3d 1158 (9th Cir. 2011)..........................................................88

**Cases** (cont.)                                                    **Page(s)**

*Lontex Corp. v. Nike, Inc.,*
   107 F.4th 139 (3d Cir. 2024)..................................61, 67, 74

*Lontex Corp. v. Nike, Inc.,*
   384 F.Supp.3d 546 (E.D. Pa. 2019)...............................67, 75

*LTTB LLC v. Redbubble, Inc.,*
   840 Fed. App'x 148 (9th Cir. 2021).........................31, 35, 44

*Luigino's, Inc. v. Stouffer Corp.,*
   170 F.3d 827 (8th Cir. 1999)...............................................87

*Mall Chevrolet, Inc. v. Gen. Motors LLC,*
   99 F.4th 622 (3d Cir. 2024)................................................60

*Mattel, Inc. v. MCA Records, Inc.,*
   296 F.3d 894 (9th Cir. 2002).........................................44, 85

*Milo & Gabby, LLC v. Amazon.com, Inc.,*
   2015 WL 4394673 (W.D. Wash. July 16, 2015)..................55

*Moseley v. V Secret Catalogue, Inc.,*
   537 U.S. 418 (2003).......................................................85, 87

*Motel 6 Operating LP v. HI Hotel Grp. LLC,*
   670 F. App'x 759 (3d Cir. 2016) .........................................67

*Multi Time Mach., Inc. v. Amazon.com, Inc.,*
   804 F.3d 930 (9th Cir. 2015)..............................................49

*Navajo Nation v. Urban Outfitters, Inc.,*
   2016 WL 3475342 (D.N.M. May 13, 2016) .........................91

*Network Automation, Inc. v. Advanced Sys. Concepts, Inc.,*
   638 F.3d 1137 (9th Cir. 2011).............................................49

**Cases** (cont.)                                                    **Page(s)**

*New Kids on the Block v. News Am. Pub., Inc.*,
  971 F.2d 302 (9th Cir. 1992) ................................................................ 44

*O'Brien v. Middle E. Forum*,
  57 F.4th 110 (3d Cir. 2023) ......................................................... 47, 51

*Ohio State University v. Redbubble, Inc.*,
  989 F.3d 435 (6th Cir. 2021) ....................................................... 56, 58

*Pennsylvania State Univ. v. Parshall*,
  2022 WL 2712051 (M.D. Pa. Feb. 17, 2022) ........................................ 93

*Pharmacia Corp. v. Alcon Labs., Inc.*,
  201 F.Supp.2d 335 (D.N.J. 2002) ...................................................... 90

*PIM Brands Inc. v. Haribo of Am. Inc.*,
  81 F.4th 317 (3d Cir. 2023) ................................................... *Passim*

*Qualitex Co. v. Jacobson Prods. Co.*,
  514 U.S. 159 (1995) ..................................................................... 28, 29

*Rogers v. Grimaldi*,
  875 F.2d 994 (2d Cir. 1989) .............................................................. 43

*Smith v. Borough of Wilkinsburg*,
  147 F.3d 272 (3d Cir. 1998) .............................................................. 40

*Starbucks Corp. v. Wolfe's Borough Coffee, Inc.*,
  588 F.3d 97 (2d Cir. 2009) ........................................................... 88, 89

*Supreme Assembly, Order of Rainbow for Girls v. J. H. Ray Jewelry Co.*,
  676 F.2d 1079 (5th Cir. 1982) ......................................... 21, 35, 38, 44

*Tiffany & Co. v. Costco Wholesale Corp.*,
  971 F.3d 74 ................................................................................... 69

**Cases** (cont.)                                                    Page(s)

*Tiffany (NJ) Inc. v. eBay Inc.*,
  600 F.3d 93 (2d Cir. 2010) ...................................................55

*Times Mirror Magazines, Inc. v. Las Vegas Sports News, L.L.C.*,
  212 F.3d 157 (3d Cir. 2000) ...........................................84, 89

*Toyota Motor Sales, U.S.A., Inc. v. Tabari*,
  610 F.3d 1171 (9th Cir. 2010) ............................................49

*United States v. Joseph*,
  730 F.3d 336 (3d Cir. 2013) ...............................................62

*Univ. of Pittsburgh v. Champion Products Inc.*,
  686 F.2d 1040 (3d Cir. 1982) ........................................19, 37

*Univ. of Pittsburgh v. Champion Products, Inc.*,
  566 F.Supp. 711 (W.D. Pa. 1983)............................20, 21, 37

*Univ. of Texas at Austin v. KST Elec., Ltd.*,
  550 F.Supp.2d 657 (W.D. Tex. 2008) ..................................92

*Vans, Inc. v. Walmart, Inc.*,
  2023 WL 6922833 (C.D. Cal. Oct. 11, 2023)........................56

*Villanueva v. Brown*,
  103 F.3d 1128 (3d Cir. 1997) ..............................................27

*Visa International Service Association v. JSL Corp.*,
  610 F.3d 1088 (9th Cir. 2010) ............................................85

*Wal-Mart Stores, Inc. v. Samara Bros., Inc.*,
  529 U.S. 205 (2000)............................................................30

*Weil Ceramics & Glass, Inc. v. Dash*,
  878 F.2d 659 (3d Cir. 1989) ...............................................69

## Statutes

Page(s)

15 U.S.C. § 1114 ........................................................................66

15 U.S.C. § 1114(1)(a) .............................................................41

15 U.S.C. § 1115(b) ..................................................................64

15 U.S.C. § 1116 ......................................................................65

15 U.S.C. § 1116(d)(1)(B)(i) ....................................................66

15 U.S.C. § 1117(b) ..................................................................66

15 U.S.C. § 1125(a)(1) ..............................................................41

15 U.S.C. § 1125(c) .............................................................84, 87

15 U.S.C. § 1125(c)(2)(A) ........................................................92

15 U.S.C. § 1125(c)(2)(B) .............................................85, 86, 88

15 U.S.C. § 1127 .............................................................*Passim*

28 U.S.C. § 1291 ........................................................................3

28 U.S.C. § 1331 ........................................................................3

28 U.S.C. § 1367 ........................................................................3

54 Pa. Cons. Stat. § 1124 ....................................................86,87

## Rules

F.R.C.P. 56(c)(3) ......................................................................62

**Other Authorities**                                                                       **Page(s)**

Joint Statement on Trademark Counterfeiting Legislation,
  130 Cong. Rec. 31673 (1984).................................................................68

S. Rep. 87-2107 (1962).............................................................................63

S. Rep. 98-526 (1984).......................................................................65, 68

H.R. Rep. 109-23 (2005) ........................................................................87

Stacey Dogan & Mark Lemley, *The Merchandising Right:*
*Fragile Theory or Fait Accompli?*,
  54 EMORY L.J. 461 (2005)..................................................23, 23, 34, 38

Jessica Litman, *Breakfast with Batman: The Public Interest in*
*the Advertising Age*,
  108 YALE L.J. 1717 (1999) .....................................................................23

Mark Lemley & Mark McKenna, *Irrelevant Confusion*,
  62 STAN. L. REV. 413 (2010) ..................................................................23

Michael Grynberg, *Living with the Merchandising Right (or How I*
*Learned to Stop Worrying and Love Free-Riding Stories)*,
  25 YALE J.L. & TECH. 1 (2023) ..............................................................23

James Boyle & Jennifer Jenkins, *Mark of the Devil: The University*
*as Brand Bully*,
  31 FORDHAM INTELL. PROP. MEDIA & ENT. L.J. 391 (2020) .............34, 38

Mark Lemley & Mark McKenna, *Owning Mark(et)s*,
  109 MICH. L. REV. 137 (2010) ...............................................................23

John Rothchild, *That Old College Try: Judge-Made Monopolies*
*in the Market for Affinity Goods*,
  13 TEX. A&M L. REV. 343 (2025) .............................................23, 34, 36

Mark Lemley, *The Modern Lanham Act and the Death of Common Sense*,
  108 YALE L.J. 1687 (1999) ....................................................................23

Jodi S. Balsam,*Timeout for Sports Trademark Overprotection: Comparing the United States, European Union, and United Kingdom*,
  52 CAL. W. INT'L L.J. 351 (2022)..........................................................23

Glynn Lunney, Jr., *Trademark Monopolies*,
  48 EMORY L.J. 367 (1999).............................................................23, 69

MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION (5th ed.) ...*Passim*

CALLMANN ON UNFAIR COMPETITION, TRADEMARKS & MONOPOLIES (4th ed.) ...............................................................................88

RESTATEMENT (THIRD) OF UNFAIR COMPETITION § 25..............................78

# I.  INTRODUCTION

The Pennsylvania State University ("Penn State") characterizes this as a "classic case of willful trademark counterfeiting and dilution." Br. at 1. It is actually a case about the purposes of trademark law, and specifically about Penn State and other universities' misuse of trademark law to control the market for fan merchandise that refers to them.

All of Penn State's claims are based on the assertion that composite images printed ornamentally on the front of merchandise (wall art, t-shirts, mugs etc.) are infringing because the images contain within them Penn State trademarks.

  

It does not matter to Penn State what else the images contain, or that the images come as a whole from genuine historic memorabilia, typically many decades old, that Vintage Brand painstakingly collects. Nor does it matter that Vintage Brand sells its products only on its own

1

website, which is replete with disclaimers of affiliation, or that Vintage Brand never claims to be officially licensed—unlike Penn State's licensees, who announce their affiliation with the subtlety of a firehose. According to Penn State, the words and symbols that reference Penn State belong to it, and no one else can use them. Indeed, Penn State thinks that anyone who references them on merchandise is a counterfeiter, subject to the Lanham Act's most serious remedies.

All of this is based on a fig leaf of confusion, specifically the argument that consumers are confused because they always expect that merchandise is licensed, no matter how much information they have to the contrary. In other words, the law should require a license because consumers believe that the law always requires a license.

But that self-fulfilling rule distorts trademark law, which is about preserving the integrity of indicators that tell consumers who is responsible for the quality of a product. Vintage Brand's images are the products; the evidence shows that consumers want merchandise bearing the images so that they can show their support for Penn State, not because the images tell them who is responsible for the quality of the

products. When that is true, trademark law should not interfere with competition. It is not a trademark's lane.

## II.   STATEMENT OF JURISDICTION

The District Court had jurisdiction under 28 U.S.C. §§ 1331 and 1367. Final judgment occurred on June 25, 2025. JA243–JA248; JA249. Defendants timely renewed their motion for judgment as a matter of law. Dkts. 370–71. The District Court issued an order denying that motion, JA253–JA288, and Defendants timely amended their notice of cross-appeal. JA289–JA290. This Court has jurisdiction under 28 U.S.C. § 1291.

## III.   STATEMENT OF THE ISSUES

1.   Whether the District Court erred in denying Defendants' motion for judgment as a matter of law on aesthetic functionality, where consumers want products ornamentally bearing Vintage Brand's historic images so they can show their support for Penn State, not because the imagery indicates who is responsible for the quality of goods ornamented with it.

2.   Whether the District Court erred in denying Defendants' motion for judgment as a matter of law on Penn State's failure to

establish that Vintage Brand's historic images served a trademark function when applied ornamentally to merchandise, as required by the Lanham Act's infringement provisions.

3.      Whether the District Court erred in denying Defendants' motion for judgment as a matter of law on Penn State's initial interest and post-sale theories of confusion, where the evidence at trial was insufficient as a matter of law to support those theories.

4.      Whether the District Court erred in denying Defendants' motion for a new trial, where Penn State's theories of post-sale and initial interest confusion went to the jury without instruction, affecting the jury's consideration of point-of-sale confusion.

5.      Whether the District Court erred in denying Sportswear's motion for judgment as a matter of law on direct liability, where it acted as Vintage Brand's invisible fulfillment vendor.

## IV.   STATEMENT OF THE CASE

### A.   <u>Vintage Brand's Memorabilia and Print-On-Demand Products</u>

Chad Hartvigson, the founder and a co-owner of Vintage Brand, is a former professional baseball player and lifelong sports enthusiast. JA930–JA932; JA8527–JA8529.

Vintage Brand collected over 25,000 pieces of historic sports memorabilia—game tickets, decals, pins etc.—bearing artistic imagery relating to sporting events of long-ago. JA932–JA933; JA8553–JA8554; JA8559.[1] Some of that memorabilia (namely a ticket, sticker, and pin) is shown below:

  

JA7194; JA9448; JA1004; JA9560; JA1006; JA9469.

Vintage Brand scanned and enhanced the imagery on the historic memorabilia. JA933; JA8568–JA8569.

 

JA1229; JA9593; JA1010; JA9409; JA1012; JA9411; JA5778–JA5801.

---

[1] Penn State contends the images are from "genuine branded merchandise . . . ." Br. at 12. That is misleading. Vintage Brand did not dispute it purchased "genuine Penn State Sports collectibles." JA6342. The memorabilia is only "branded" in the sense that the imagery contains the claimed Penn State marks.

It then sold print-on-demand products—ranging from puzzles to t-shirts, coasters, magnets, and wall art—ornamented with the enhanced images. JA355; JA933; JA8574; JA1029–JA1047; JA9416–JA9434.

  

JA1030; JA9418; JA1020; JA9413; JA1024; JA10093.

Vintage Brand sold those products only on its website, which had one "Home Page," the landing page at www.vintagebrand.com. JA936; JA10039-JA10043. From that Home Page, consumers could access "Team Pages" with historic imagery related to around 350 institutions and teams, including Penn State. JA936; JA8587. From a Team Page, customers could navigate to "Product Pages" showing mockups of print-on-demand products. JA1109–JA1142; JA10126–JA10144; JA932–JA933; JA8588.

Vintage Brand's trademark was prominently displayed on each page of its website:



JA10970; JA1109-JA1142; JA9416-JA9434; JA10039-JA10043.

A disclaimer appeared beneath the descriptive header of each Team Page:

**PENN STATE NITTANY LIONS VINTAGE DESIGNS**
Vintage designs not affiliated with, licensed, or sponsored by any college, team or league

JA1058; JA1029; JA9416.[2] Vintage Brand's website also had text boxes containing disclaimers at the top and bottom of each Team Page. JA1029; JA1047; JA9416; JA9434; JA1058–1092; JA8590–JA8592.

Upon selecting a product from a Team Page, website visitors would reach a Product Page, which displayed a mockup product:

---

[2] Penn State contends the disclaimers "were ineffective and intentionally hidden." Br. at 64. Penn State misleadingly relies on testimony regarding a disclaimer in a scrolling text box. JA5806-5809; JA5811-5112; JA1058-JA1076. Penn State also points to Defendants' expert's survey, which did not find significant differences in confusion between disclaimer conditions. But, as Dr. Erdem explained, that result was likely attributable to the fact that the net confusion numbers were so low in every condition. JA851-JA876.



JA10977 (annotation added); JA1029; JA9416.



JA10978; JA1095; JA10138.

Another disclaimer appeared under the Product Page's header:

**1929 PENN STATE NITTANY LIONS MEN'S PREMIUM BLEND RING-SPUN T-SHIRT**

By Vintage Brand™ not affiliated with or sponsored by Penn State Nittany Lions

JA10981; JA1095; JA10138. Yet another disclaimer appeared below the product's description:

Above image Copyright 2018 Vintage Brand. LLC and part of the Vintage Brand® Collection of retro works of art. Vintage Brand® and its products are not affiliated with, licensed, sponsored, or endorsed by any college, university, professional team, league, event, or licensing entity. All designs are derived from actual historic works of art existing in the public domain.

JA1051; JA1095; JA10138. And a disclaimer in contrasting colors appeared at the bottom of every page of the website:

Our products are not affiliated with, licensed, sponsored, or endorsed by any college, team, league, event or licensing entity. The work of art incorporated into this product has been copied from a work that is in the public domain. Vintage Brand® LLC. products are not authorized or sponsored by any college, team, league, or event. All products are designed by Vintage Brand® and manufactured for Vintage Brand®. Privacy policy | CAL Disclosure.

JA937; JA1110; JA1047; JA9434; JA10023; JA10045.

Vintage Brand's products were shipped in packaging bearing its trademark, and its trademark was also printed directly on many products, in locations typically associated with trademarks:









JA1098; JA1100; JA1102; JA1104; JA1106; JA942; JA8619–JA8625; JA9436; JA9438; JA9440; JA9442; JA9639; JA9643; JA9647; JA9649.

From 2018–2021, Vintage Brand offered roughly 35[3] Penn State-related images. JA943; JA5932–JA5950; JA9692–JA9710. Sales of products bearing those images totaled less than $25,000. JA943; JA7170; JA9714–JA9749.

---

[3] The number is not precise because there were variations of some images. *E.g.*, JA5254, JA10396.

**B.** **Penn State and Its Trademark Merchandising**

Penn State is an educational institution. JA338. It has two primary logos, the "Lion Shield" and "Lionhead":



JA1485–JA1490; JA1521; JA1447; JA1255.

The Lion Shield is Penn State's "academic mark." JA1486; JA1447; JA1254–JA1255. The Lionhead is Penn State's "primary athletic mark". JA1521; JA1447; JA1256–JA1257; JA8139 (discussing JA10312).

Vintage Brand never used either of Penn State's modern logos. JA944; JA11008–JA11009; JA8558. And Vintage Brand never offered images consisting of the words PENN STATE alone. JA944; JA8571.

Penn State's claims are premised on its rights in the word marks PENN STATE and THE PENNSYLVANIA STATE UNIVERSITY, and the below designs:



JA339–JA348; JA10766–JA10803. Penn State owns registrations for those marks, with the exception of the bottom-left "S-Lion." JA3805–JA3806.

In the context of merchandise, Penn State does not use any of these marks in the locations typically associated with trademarks (*e.g.*, on the back inside-neck of a t-shirt); overwhelmingly, Penn State ornaments products with those marks, printing them on the front of t-shirts and other merchandise. JA1714; JA1929; JA2077; JA2195; JA2501; JA2809; JA2842; JA2983; JA3023; JA3045; JA3196; JA3390; JA3401; JA3405; JA9616; JA9976; JA9995–JA9998; JA10004; JA10009–JA10011.

Penn State's supporters buy merchandise with Penn State-related ornamentation to express their affinity for, or allegiance with, Penn State. JA1284–JA1285; JA7997; JA8003–JA8005; JA8137; JA8220; JA8221.

Historically, Penn State did not control third-party use of its trademarks. JA3412; JA9678. Around 1982 it established a "formal licensing program," the stated goals of which were to stop unauthorized uses and "derive revenue from fees for the use under license . . . ." JA3411–JA3414; JA9678.

Within the next decade, Penn State hired Collegiate Licensing Company ("CLC") as its licensing agent for merchandise. JA1263–JA1264; JA7984–JA7985; JA8008–JA8009; JA8034. CLC requires sublicensees to affix the "Official Label" to every licensed product. JA3632; JA3643; JA3676; JA9446; JA8083; JA8401.

 

JA3679 (annotation added); JA10319; JA7206–JA7208; JA6445; JA8627–JA8630 (discussing JA9603–JA9610); JA8637 (discussing JA9628); JA8638 (discussing JA9655).

CLC has promoted its "Look for the Label" campaign to educate consumers about using the Official Label to identify licensed products. JA3667–JA3670.[4]

Penn State has several hundred licensees. JA5955–JA5982; JA8056; JA10389. Those licensees prominently announce that their products are "officially licensed." JA3576; JA3579; JA3582; JA3586; JA3613; JA9451–JA9452; JA9461.

---

[4] The CLC memorandum at JA3667-JA3670 is not trial evidence, but a CLC employee testified about the campaign generally. JA8086-JA8087.





JA9451–JA9452; JA9461; JA3576–JA3579; JA8391; JA8401–JA8402.

Licensees print Penn State's trademarks on blanks manufactured by brands such as Nike, Champion, and Gildan. JA3401, JA3405, JA4306, JA4315, JA9604, JA9610, JA9621. For example, when in Pennsylvania for trial, Chad Hartvigson purchased from a grocery store a standard Hanes white t-shirt decorated with Penn State's trademarks and bearing an Official Label. JA9655; JA8638–JA8639.

The record is devoid of any actual confusion. Penn State offered the testimony of Meghan Maffey, the President of its D.C. alumni chapter, on whose behalf she sent many e-mails soliciting donations. JA1308–JA1315; JA1321–JA1322; JA9374; JA9377–JA9380; JA9386. Ms. Maffey does not remember Vintage Brand's website specifically, nor what appeared on it. JA1317–JA1318; JA1327; JA1329; JA9383; JA9392; JA9393. She only recalled seeing "[t]he paw print and the chipmunk logo."[5] JA1318–JA1319; JA9383–JA9384. But neither of those logos were ever on the website. JA946; JA8585–JA8586; JA8754–JA8755.

---

[5] The Lionhead design is sometimes referred to as the "chipmunk." JA1318; JA9384; JA946; JA8206-JA8207; JA8754.

**C.**   **The Parties' Cross-Motions for Partial Summary Judgment**

Both parties moved for partial summary judgment and submitted expert reports. JA589–JA633; JA839–JA896. Penn State's expert, David Franklyn, conducted a survey testing whether images shown on the front of a t-shirt are perceived by consumers as trademarks. JA8–JA10; JA596–JA613. The District Court excluded that survey, JA20–JA33, and struck Penn State's assertion about consumer perception of such ornamentation. JA44; JA10857.

Defendants' expert, Dr. Tülin Erdem, included in her survey questions to assess whether consumers believe Penn State is responsible for the quality of Vintage Brand's products. JA865–JA866; JA876–JA882. Dr. Erdem reported that virtually no one held that belief:

| Figure 8.1 | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| **Net Belief Regarding Responsibility for Product Quality** | | | | | | | | |
| **Condition A (Current Vintage Brand Website)** | | | | | | | | |
| | | | | | | | **Net Belief** | |
| | Test Group 1 *(1929 Penn State Nittany Lions Logo)* | | Test Group 2 *(1950 Penn State Nittany Lions Logo)* | | Control Group *(State of Pennsylvania Seal Logo)* | | Test Group 1 - Control Group | Test Group 2 - Control Group |
| | N | % | N | % | N | % | % | % |
| # of Respondents | 107 | | 107 | | 109 | | | |
| Belief Regarding Responsibility for Product Quality (Open-Ended)[1] | 0 | 0% | 5 | 5% | 4 | 4% | -4% | 1% |
| Belief Regarding Responsibility for Product Quality (Closed-Ended)[2] | 19 | 18% | 19 | 18% | 16 | 15% | 3% | 3% |
| Belief - Any | 19 | 18% | 20 | 19% | 16 | 15% | 3% | 4% |

JA878. The Court denied Penn State's motion to exclude Dr. Erdem's survey, JA33–JA39, so her conclusion regarding consumer perception of responsibility for product quality is unrebutted.

## D. **The Trial and Post-Trial Motions**

Trial began on November 12, 2024. JA7871. Defendants moved for judgment as a matter of law after Penn State closed its case and after the close of evidence; the Court denied both motions. JA208–JA209. The jury returned a verdict in Penn State's favor. JA7842–JA7849. Penn State then filed a motion for a permanent injunction, which the Court granted. JA243–JA248. Defendants renewed their motion for judgment as a matter of law or, alternatively, for a new trial. Dkts. 370–71. The Court denied Defendants' motion. JA253–JA288.

## V.   SUMMARY OF ARGUMENT

This Court has been particularly "careful to keep trademark law in its lane." *Ezaki Glico Kabushiki Kaisha v. Lotte Int'l Am. Corp.*, 986 F.3d 250, 256 (3d Cir. 2021); *see also PIM Brands Inc. v. Haribo of Am. Inc.*, 81 F.4th 317, 321 (3d Cir. 2023). It has an important opportunity to do so here.

The District Court recognized that trademark law was not "intended to be applied in circumstances such as these." JA286. It nevertheless gave Penn State the exclusive right to sell products that use any Penn State imagery, even though the evidence shows that consumers want that imagery so they can show their support for Penn State, not because the imagery indicates who is responsible for the quality of goods ornamented with it.

Penn State's claims boil down to the assertion that no one else can reproduce Penn State marks on merchandise, even if those marks appear as part of composite images long out of copyright. Though its claims gesture at confusion, they are really based on the incorrect notion that use of a mark is infringing when it is "the triggering mechanism" for the sale of the products. *Boston Prof'l Hockey Ass'n, Inc. v. Dallas Cap & Emblem Mfg., Inc.*, 510 F.2d 1004, 1012 (5th Cir. 1975). That idea distorts trademark law, and this Court should reject it here.

In fact, this Court already rejected the reasoning of *Boston Hockey* in a case the collegiate licensing industry has tried to send down the memory hole. In *University of Pittsburgh v. Champion Products Inc.*, 686 F.2d 1040 (3d Cir. 1982), this Court recognized that marks printed on

collegiate merchandise don't function as marks; they *are the products*. "The entire impetus for the sale [of Pitt merchandise] is the consumer's desire to identify with Pitt or, perhaps more realistically, with Pitt's successful athletic programs." *Id.* at 1047; *see also id.* at 1047 n.20 (doubting even a few "particularly astute consumers" value the quality of the garment over the association with the imprint gained by wearing it).

On remand, the district court in that case found that Champion's sales of Pitt-related merchandise was not likely to cause confusion and, further, that Champion's use of the University of Pittsburgh's insignia was functional. *Univ. of Pittsburgh v. Champion Products, Inc.*, 566 F.Supp. 711, 720–21 (W.D. Pa. 1983). Those rulings were correct.

But recognizing the precedent that case would set, the University of Pittsburgh quickly settled, and the settlement included a consent decree pursuant to which the Third Circuit vacated its earlier decision. Glenn Wong, *Recent Trademark Law Cases Involving Professional and Intercollegiate Sports*, 1986 DETROIT COLL. OF L. REV. 87, 107 (1986).

Since then, the collegiate licensing industry has doubled down on its legal strategy against parties that compete with them in the merchandising market. All of their claims depend on the circular

proposition that consumers will be confused about the school's sponsorship of merchandise because consumers expect that all merchandise is licensed. In other words, everyone must get a license because consumers expect that everyone has a license—an expectation that is entirely a function of whether the law, in fact, requires everyone to have a license. JA314–JA315.

Trademark law need not insulate Penn State or other universities from competition just to avoid some remote chance that consumers will wonder whether products are licensed. To the extent consumers care whether products are licensed, that information is readily available by other means. Officially licensed goods are prominently marketed as such. Part IV.B, *supra*. The "Official Label," which literally identifies "Officially Licensed Collegiate Merchandise," is a contractually mandated signal on all CLC-licensed goods. *Id.*; *see Supreme Assembly, Order of Rainbow for Girls v. J. H. Ray Jewelry Co.*, 676 F.2d 1079, 1083 (5th Cir. 1982) (finding the existence of an advertised "official jeweler" to be relevant); *Univ. of Pittsburgh*, 566 F.Supp. at 720 (emphasizing that Champion's products were "clearly marked as made by champion" and they were not "advertised, described, or denominated as 'official' or in any

way sanction by" the University of Pittsburgh); Stacey Dogan & Mark Lemley, *The Merchandising Right: Fragile Theory or Fait Accompli?*, 54 EMORY L.J. 461, 485 (2005) (if some segment of consumers "in fact value obtaining goods from the trademark owner itself" then "the market [would] reflect that by developing a distinction between ordinary merchandise and officially licensed merchandise").

This Court should reverse the District Court's denial of Vintage Brand's motion for judgment as a matter of law. Vintage Brand's historic images are functional when used to ornament merchandise because those images serve purposes beyond branding of the products. *PIM Brands*, 81 F.4th at 321. Alternatively, this Court should reverse the District Court's failure to require Penn State to prove that Vintage Brand used the historic images as trademarks identifying the source of its products, as the Lanham Act requires. Trademark law protects against confusion

regarding whether merchandise *comes from* Penn State; it does not give monopoly rights over products just because they are *about* Penn State.[6]

The District Court properly rejected Penn State's counterfeiting and dilutions claims. Those claims both fail for the same reasons the infringement claims fail—Vintage Brand's historic images are functional when used to ornament merchandise and/or do not function as marks in that context.

Counterfeiting also fails because Vintage Brand never used a "spurious" mark, as the statute requires. The District Court properly concluded that Vintage Brand does not pass off its products as though

---

[6] Commentators are nearly unanimous in their criticism of a merchandising right as incompatible with, and an anticompetitive misuse of, trademark law. *See, e.g.*, Dogan & Lemley, *supra*, at 466-89; John Rothchild, *That Old College Try: Judge-Made Monopolies in the Market for Affinity Goods*, 13 TEX. A&M L. REV. 343 (2025); Michael Grynberg, *Living with the Merchandising Right (or How I Learned to Stop Worrying and Love Free-Riding Stories)*, 25 YALE J.L. & TECH. 1 (2023); Jodi S. Balsam, *Timeout for Sports Trademark Overprotection: Comparing the United States, European Union, and United Kingdom*, 52 CAL. W. INT'L L.J. 351 (2022); Mark Lemley & Mark McKenna, *Owning Mark(et)s*, 109 MICH. L. REV. 137 (2010); Mark Lemley & Mark McKenna, *Irrelevant Confusion*, 62 STAN. L. REV. 413 (2010); Glynn Lunney, Jr., *Trademark Monopolies*, 48 EMORY L.J. 367 (1999); Jessica Litman, *Breakfast with Batman: The Public Interest in the Advertising Age*, 108 YALE L.J. 1717 (1999); Mark Lemley, *The Modern Lanham Act and the Death of Common Sense*, 108 YALE L.J. 1687, 1697 (1999).

they come from Penn State. To the contrary, consumers understand well that Vintage Brand is the source of its own products. Nor are any of Vintage Brand's images substantially indistinguishable from claimed Penn State marks. Penn State inappropriately dissects those images, misrepresenting the way that consumers would actually encounter them.

The District Court likewise properly rejected Penn State's dilution claims. Penn State failed to prove that any of its marks are famous, and Vintage Brand's images do not impair the distinctiveness of Penn State's marks. Those images reference Penn State; Vintage Brand does not create secondary source associations with those marks.

Finally, Penn State did not bring a contributory infringement claim against Sportswear, Vintage Brand's fulfillment vendor. The District Court initially granted judgment as a matter of law on Sportswear's direct liability but reconsidered, expanding the scope of actionable conduct. That was error.

## VI.   ARGUMENT

### A.   <u>Argument on Cross-Appeal</u>

Features are functional when they serve any purpose other than branding. *PIM Brands*, 81 F.4th at 321. That rule keeps trademark law

in its lane, which is "limited to protecting the owner's goodwill and preventing consumers from being confused about the source of a product." *Ezaki*, 986 F.3d at 256. Vintage Brand's historic images are functional because they serve the purpose of allowing consumers to express their support for Penn State—a purpose unrelated to indicating the source of the products bearing the images.

Functionality doctrine's disqualification of features that serve any purpose other than branding is consistent with the Supreme Court's emphasis on trademark use as a defining characteristic of infringement. As the Court said in *Jack Daniel's Properties, Inc. v. VIP Products LLC*, use as a designation of source for a party's own goods is the use "the Lanham Act cares most about." 599 U.S. 140, 153 (2023). That is why the "cardinal sin" under trademark law is to "confuse consumers about source," confusion that "is most likely to arise when someone uses another's trademark as a trademark—meaning, again, as a source identifier—rather than for some other expressive function." *Id.* at 157.

In *Abitron Austria GmbH v. Hetronic International, Inc.*, the Supreme Court held that "infringing 'use in commerce' of a trademark" defines the scope of actionable conduct under the Lanham Act. 600 U.S.

412, 428 (2023). Use in commerce means use of the mark "to 'identify and distinguish [the mark user's] goods . . . and to indicate the source of the goods." *id.* at 428 (quoting 15 U.S.C. § 1127); *see also Jack Daniel's*, 599 U.S. at 146 ("But whatever else it may do, a trademark is not a trademark unless it identifies a product's source (this is a Nike) and distinguishes that source from others (not any other sneaker brand)." Absent use as a mark to identify the source of a party's own goods or services, the Lanham Act's infringement provisions do not apply. *Abitron*, 600 U.S. at 423.

The District Court could have given force to the Lanham Act's distinction between trademark uses and non-trademark use either by declaring Vintage Brand's historic imagery functional when used to ornament merchandise, or by determining that Vintage Brand's use of those images was not trademark use. The District Court erred in failing to do either.

### 1. The District Court Erred by Not Granting Judgment as a Matter of Law on Defendants' Aesthetic Functionality Defense

The evidence unequivocally demonstrates that the historic images Vintage Brand prints on its merchandise serve the non-trademark function of allowing consumers to express their support for Penn State;

the images do not indicate the source of Vintage Brand's products. The District Court erred in failing to find those images functional when used to ornament Vintage Brand's merchandise.

### a.    Posture and Standard of Review

Defendants moved for judgment as a matter of law on their aesthetic functionality defense, Dkt. 324 at 3–7, and renewed that motion following final judgment, Dkt. 371 at 20–21. The District Court denied both motions. JA208–JA209; JA278–JA280.

On review, this Court must view the evidence in the light most favorable to the nonmoving party and determine whether "there is no question of material fact for the jury and any verdict other than the one directed would be erroneous under the governing law." *Galena v. Leone*, 638 F.3d 186, 196 (3d Cir. 2011). "[T]he focus of . . . [the] inquiry is not whether there is literally no evidence supporting the unsuccessful party, but whether there is evidence upon which a reasonable jury could properly base its verdict." *Villanueva v. Brown*, 103 F.3d 1128, 1133 (3d Cir. 1997). While functionality is a fact question, a "judge's common-sense assessment of functionality may suffice." *PIM Brands*, 81 F.4th at 322. Thus, functionality is regularly resolved by a court instead of a jury.

*Id.* at 323 (affirming summary judgment); *Ezaki*, 986 F.3d at 260–61 (same).

### b. A Design is Functional if it is Useful for Anything Beyond Branding

"Functionality is not a high bar." *PIM Brands*, 81 F.4th at 321. Trademark protection "is limited to design choices that serve only to brand a product. If a design choice 'would put competitors at a significant non-reputation-related disadvantage,' then it is functional." *Id.* (quoting *Qualitex Co. v. Jacobson Prods. Co.*, 514 U.S. 159, 165 (1995)). "Conversely, a design is not functional if *all it does* is identify its maker." *Ezaki*, 986 F.3d at 257 (emphasis added). "Even if the design chosen both promotes a brand and also 'makes a product work better,' it is functional and unprotectable." *PIM Brands*, 81 F.4th at 321 (citing *Ezaki*, 986 F.3d at 258).

Features make products work better for many reasons, and that is why this Court has taken a broad view of functionality. For example, this Court declared the design of a chocolate-coated cookie snack functional because the claimed features made the product work better as a snack. *Ezaki*, 986 F.3d at 259. And this Court held that the shape and color of watermelon-flavored candies were functional because those features

28

served the informational function of indicating flavor. *PIM Brands*, 81 F.4th at 322; *see also Inwood v. Ives Labs, Inc.*, 456 U.S. 844, 853 (1982) (color of pills serves the informational function of differentiating types of medicine).

The features at issue in *Ezaki* and *PIM Brands* served different functions (some physical and others informational), but what they had in common was that they served *non-source functions*: those features had a purpose other than branding. *See also Keene Corp. v. Paraflex Indus., Inc.*, 653 F.2d 822, 826 (3d Cir. 1981) (design of wall-mounted luminaire functional because of its architectural compatibility with structure or building on which it is mounted).

Functionality is not about rejecting features that serve particular disfavored functions; to the contrary, *non*-functionality requires proof that the claimed features *only* serve a branding function. *Qualitex*, 514 U.S. at 170 (functionality relevant whenever the claimed feature "serves a significant non-trademark function—whether to distinguish a heart pill from a digestive medicine or to satisfy the noble instinct for giving the right touch of beauty to common and necessary things") (cleaned up).

The District Court refused to apply *PIM Brands* "because that case involved trade dress[.]" JA279. That misses the point of functionality, which is to focus protection on features that serve trademark law's purposes—namely, identifying source—and preventing misuse of trademark law to disable competition regarding features consumers want for non-source-related reasons. But, even if functionality were confined to trade dress cases, it would apply here. This case is fundamentally about use of historic images *as features of merchandise*:

  

JA9639; JA9649; JA10058; *see also Wal-Mart Stores, Inc. v. Samara Bros., Inc.*, 529 U.S. 205, 214 (2000) (discussing trade dress as a "design feature"). Indeed, Vintage Brand's argument throughout this case has focused specifically on Vintage Brand's use of the images to ornament merchandise, distinguishing that use from other uses in other contexts.

*See, e.g.*, JA851–JA859; *see also LTTB LLC v. Redbubble, Inc.*, 840 Fed. App'x 148, 149 (9th Cir. 2021).

### c. Consumers Want Penn State-related Images to Show their Support for Penn State

Consumers want products bearing the historic images because the images allow those consumers to express their support for Penn State, not because the images indicate that Penn State is the source of Vintage Brand's products. Both parties' experts concluded that consumers were not confused about the source of Vintage Brand's products—consumers understand that Vintage Brand, and not Penn State, is the source of the merchandise. JA8297–JA8303, JA8776 (trial testimony); *see also* JA627, JA870–JA873 (reports). And the unrebutted evidence from Vintage Brand's expert showed that virtually no one believes that Penn State is responsible for the quality of Vintage Brand's products. JA8809; JA8815; JA8877–JA8878.[7]

That evidence was sufficient for the District Court to have granted judgment as a matter of law to Vintage Brand on its functionality defense. But Penn State's own witnesses also confirmed the functionality

---

[7]  Penn State's trademark-function survey was excluded. JA20-JA33.

of Penn State-related images on merchandise. Stephanie Petulla, Penn State's Director of Licensing, testified that she works to provide "authentic and branded products" to Penn State's "fans, alumni, current students, [and] professors" which "provides them with what they want to have show [sic] their affinity for the University." JA8100. Regarding the goal of using multiple Penn State marks on products, Ms. Petulla said: "I think that it's just fashion. It's a little bit of a trend. But I think really outwardly, people want to have the association to Penn State." JA8137 (discussing JA10330); *see also* JA8220.

Several of Penn State's witnesses testified that their own desire for Penn State merchandise was primarily to show their affection for the school, not because Penn State made the merchandise. Asked why she purchases Penn State-related products, Ms. Petulla said it was "for a number of reasons": she "want[s] to support the university"; she "feel[s] pride in the University and its mission'"; she purchases merchandise for her son because she "secretly wants him to go there"; and she feels "it's a great way to support the university and reinforce the mission." JA8221.

When Penn State's counsel tried to prod Ms. Petulla into a source-related answer, asking her whether "the Penn State brand on a product

signif[ied] quality in any way to [her]," Ms. Petulla simply referenced the

quality of the Penn State generally:

> I believe that it does. When I come to work to do my job every day, I try to do it to the best of my ability, to connect our fans with merchandise that reinforces the mission of the university in a quality way.

JA8221.

Likewise, Jackie Esposito, Penn State's former archivist, testified

that she purchases fan merchandise because of Penn State's "reputation,"

but clarified that's not Penn State's reputation as the source of quality

merchandise but rather its reputation as an educational institution:

> Q. Can you please explain more what you mean by reputation in that context?
>
> A. I personally believe in the value of the education and the research that's done at Penn State. I personally believe that students from working class families should have a university to go to, that first generation students should have a school that's theirs that they can go to that they can have loyalty to. I believe in those things that are part of the mission statement of Penn State. . . . And when I purchase Penn State apparel to give as gifts, it's because I'm proud of the things that Penn State has done. Penn State is responsible for thousands of inventions and innovations, and I am really proud of that record of what Penn State has done since 1855.

JA8004–JA8005.

Finally, Meghan Maffey, the D.C. chapter president discussed *supra*, testified that she wears Penn State apparel because she "ha[s] a lot of school spirit" and wants to express it. JA9381. Tellingly, Ms. Maffey did not consider whether Vintage Brand was licensed until being contacted to serve as a witness. JA9393–JA9394.

All of that evidence confirms what has been clear to commentators for decades: consumers want merchandise, not because the references on that merchandise indicate the source of the products, but because consumers want to say something about themselves and their affinities. Dogan & Lemley, *supra*, at 500 (discussing the "communicative function" of fan merchandise).[8]

### d. Exclusive Use of the Composite Historic Images Puts Competitors at a Significant, Non-reputation Related Disadvantage

Because the images on Vintage Brand's products serve purposes other than branding, giving Penn State exclusive use of those images puts Vintage Brand at a significant, non-reputation-related

---

[8] *See Univ. of Pittsburgh*, 686 F.2d at 1047 & n.20; *International Order of Job's Daughters v. Lindeburg & Co.*, 633 F.2d 912, 918 (9th Cir. 1980); Rothchild, *supra*, at 381-82; Balsam, *supra* at 358–59; James Boyle & Jennifer Jenkins, *Mark of the Devil: The University as Brand Bully*, 31 FORDHAM INTELL. PROP. MEDIA & ENT. L.J. 391, 432 (2020).

disadvantage. *See PIM Brands*, 81 F.4th at 321. Critically, for purposes of determining functionality, "reputation" means reputation as a source of goods, not a general reputation as a university or as the reference of the images. The source of goods is the party responsible for their quality. *Jack Daniel's*, 599 U.S. at 146 ("a mark tells the public who is responsible for a product").

That the historic images include words or symbols that identify the source of *other* goods or services (like educational services or sports-related services) does not mean those words or symbols indicate the source of merchandise bearing the composite images. *See Job's Daughters*, 633 F.2d at 918; *Supreme Assembly,* 676 F.2d at 1082–83; *LTTB*, 840 Fed. App'x at 150. The relevant question is whether exclusive use of the historic images would put competitors at a disadvantage unrelated to their ability to identify who is responsible for the quality of the merchandise bearing those images. The evidence makes clear that exclusive use would do just that.

The District Court concluded that exclusive use of the images would not put Vintage Brand at a "significant, non-reputation-related disadvantage" because companies can still "create a connection between

their goods and Penn State without using Penn State trademarks[.]" JA280 (citing JA8038–JA8081).[9] The availability of alternatives does not make the images nonfunctional, even if the alternatives are reasonable ones. *See Ezaki*, 986 F.3d at 260 ("There are alternative designs, but that does not make Pocky's design non-functional"); *PIM Brands*, 81 F.4th at 321; *Keene*, 653 F.3d at 827; *cf. G.D. Searle & Co. v. Hudson Pharm. Corp.*, 715 F.2d 837, 842 n.12 (3d Cir. 1983) ("The Lanham Act does not compel a competitor to resort to second-best communication."). And it is not even clear how someone would create a connection with Penn State without using Penn State marks, given that Penn State believes that every reference to it constitutes infringement. *See* JA10896–JA10921.

Regardless, the kind of merchandise the District Court imagined would be a poor substitute in a market where consumers want merchandise specifically to show their affinity for particular schools. *See* Rothchild, *supra*, at 381 ("It is an understatement to say that granting a trademark owner complete control over uses of the mark as ornamentation on affinity goods would place competitors at a 'significant'

---

[9]  The District Court relied on testimony by a CLC employee about Penn State's licensing regime—testimony that had nothing to do with the ability to evoke Penn State with other images. JA8038-JA8081.

disadvantage."). As Penn State's own witness testified, "[t]he audience for [Penn State-related] apparel were for people who supported Penn State" and she "wouldn't imagine that the general public would buying [sic] Penn State stuff if they weren't Penn State fans." JA8004.

As this Court said decades ago, "[t]he entire impetus for the sale" of apparel bearing an educational institution's name "is the consumer's desire to identify with [the institution] or, perhaps more realistically, with [the institution's] successful athletic programs." *Univ. of Pittsburgh*, 686 F.2d at 1047. The District Court in that case found on remand that Champion's use of the Pitt name on merchandise was functional— Champion prominently disclosed the true source of those goods (as Vintage Brand did here), and the use of Pitt's name functioned only to "allow the garment's wearer to display his or her support for the school and its athletic teams." *Univ. of Pittsburgh*, 566 F.Supp. at 721; *see also id.* ("Because the Pitt insignia on soft goods serve a functional purpose and largely define a sub market of some size, granting Pitt the relief it seeks would give Pitt a perpetual monopoly over that sub market, precluding any competition in the Pitt insignia soft goods market.").

This reasoning aligns with the Fifth Circuit's and Ninth Circuit's decisions regarding fraternity emblems in *Supreme Assembly,* 676 F.2d at 1083–84, and *Job's Daughters*, 633 F.2d at 919–20, respectively, both of which recognized that consumers sometimes want products adorned with symbols primarily to show their own allegiance with an organization—not because the presence of that symbol tells them anything about who made the product.

Penn State's theory here is nothing more than a claim that every use of its marks on merchandise serves a branding function because consumers now expect that all merchandise is licensed. But that argument is circular—consumers' beliefs about licensing are shaped by the legal rules regarding licensing and trademark owners' efforts to influence those beliefs. Dogan & Lemley, *supra*, at 486–87; JA314–JA315.

The District Court recognized that, for "university-trademarked apparel and merchandise . . . the mark itself is the product." JA301.[10] By definition, the mark is functioning "beyond branding" for the underlying

---

[10] *See also* Boyle & Jenkins, *supra*, at 432 ("[T]he trademark 'Duke' *is* the product. The generic cotton T-shirt that is the substrate for the logo is merely the delivery mechanism.").

tangible good. *PIM Brands*, 81 F.4th at 321; *see also Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23, 37 (2003). Despite this "common-sense assessment of functionality," *PIM Brands*, 81 F.4th at 322, the District Court sent this issue to the jury, and Penn State simply asked the jury to ignore the defense. JA9069. That was error.

> **2. The District Court Erred by Not Granting Judgment as a Matter of Law on, or Failing to Instruct the Jury About, Penn State's Threshold Burden to Establish Vintage Brand's Trademark Use**

Most trademark infringement cases involve two parties that are indisputably using trademarks to identify the source of their respective goods. In those cases, the only question is whether the defendant's use is likely to cause confusion. But not every "use" of a trademark serves that trademark function. Sometimes, marks are just references. In those cases, likelihood of confusion is not the only question, because trademarks are not rights in gross. *Cf. Century 21 Real Estate Corp. v. Lendingtree, Inc.*, 425 F.3d 211, 224 (3d Cir. 2005) (in nominative use context, some *Lapp* factors are "unworkable or not suited or helpful as indicators of confusion").

### a. Posture and Standard of Review

Vintage Brand moved for judgment as a matter of law on the ground that Penn State failed to prove that Vintage Brand was using the historic artwork as trademarks. Dkt. 311 at 4 n.1; Dkt. 371 at 17–19; JA8421–JA8424. Thus, this Court must first determine whether Defendants were entitled to judgment as a matter of law. Part VI.A.1.a, *supra.*

Additionally, Defendants proposed that the jury be instructed on Penn State's predicate burden to prove Vintage Brand's use of historic images was a trademark use. JA7720. The District Court declined to give that instruction. JA8991–JA8992. That was error. This Court should reverse because the jury charge did not apprise the jury of the issues and applicable law. *Smith v. Borough of Wilkinsburg*, 147 F.3d 272, 275 (3d Cir. 1998).

### b. Penn State Did Not Carry Its Burden to Establish that Vintage Brand used the Historic Images as Trademarks

This Court's approach to functionality resonates with the Supreme Court's emphasis on trademark use as a defining characteristic of the scope of the Lanham Act. The Court's cases recognize that infringement requires use of a mark to identify the source of the defendant's own goods

or services. *Jack Daniel's* 599 U.S. at 153, 157; *Abitron*, 600 U.S. at 423, 428.

The District Court denied Vintage Brand's motion regarding trademark use because it believed that a threshold trademark use requirement would "add an extra element" to an infringement claim that is "not required by the statute." JA276. But that conclusion is inconsistent with the Lanham Act's text and Supreme Court precedent.

Both infringement provisions in the Lanham Act define the offending use as a "use in commerce." Section 32 of the Lanham Act provides a cause of action against any person who shall "*use in commerce* any reproduction, counterfeit, copy, or colorable imitation of a registered mark" that "is likely to cause confusion[.]" 15 U.S.C. § 1114(1)(a) (emphasis added). Similarly, liability under Section 43 attaches where a person "*uses in commerce* any word, term," etc. that "is likely to cause confusion[.]" 15 U.S.C. § 1125(a)(1) (emphasis added). Use in commerce is a defined term in the statute; it means "the bona fide *use of a mark* in the ordinary course of trade[.]" 15 U.S.C. § 1127 (emphasis added). A "mark" (a trademark) is a "word, name, symbol, or device" that is used "to indicate the source" of the goods with which it's used. *Id*.

Thus, the text of the Lanham Act defines infringement as (a) use of a mark to indicate the source of the defendant's goods (b) which is likely to cause confusion. This is exactly how the Supreme Court interpreted the statute in *Abitron*, 600 U.S. 412. As the Court said, "Congress proscribed the use of a mark in commerce under certain conditions," *id.* at 423, making actionably only "use in commerce," which the statute defines as use of the mark "to 'identify and distinguish [the mark user's] goods . . . and to indicate the source of the goods,'" *id.* at 428 (quoting 15 U.S.C. § 1127). It is that "infringing 'use in commerce' of a trademark" that creates the boundary of actionable conduct. *Id.* Absent use of a mark as a trademark, the Lanham Act's infringement provisions do not apply. *Id.* at 429 (Jackson, J., concurring) ("Congress's statutory scheme embodies a distinction between trademark uses (use of a symbol or equivalent to identify or brand [a defendant's] goods or services) and non-trademark uses (use of a symbol—even the same one—in a non-source-identifying way.") (cleaned up).

Trademark use also takes center stage in *Jack Daniel's*, 599 U.S. 140. That case concerned the scope of *Rogers v. Grimaldi*, which shields

certain uses of a mark from ordinary likelihood of confusion analysis.[11] The Court concluded that *Rogers* does not apply in cases where the defendant has used a mark "as a designation of source *for the infringer's own goods*," the way the "Lanham Act most cares about." *Id.* at 153 (emphasis added). "The cardinal sin under the law . . . is to confuse consumers about source—to make (some of) them think that one producer's products are another's. And that kind of confusion is most likely to arise when someone uses another's trademark as a trademark— meaning, again, as a source identifier—rather than for some other expressive function." *Id.* at 157.[12]

The Sixth Circuit correctly treats trademark use as a threshold question that must be resolved prior to engaging in the likelihood of confusion analysis. *See Grubbs v. Sheakley Grp., Inc.*, 807 F.3d 785, 793

---

[11] That framework derives from the Second Circuit's decision in *Rogers v. Grimaldi*, 875 F.2d 994 (2d Cir. 1989), which held that use of a mark in the title of a so-called expressive work is exempted from Lanham Act liability as long as the use is artistically relevant and not explicitly misleading.

[12] *See* Transcript of Oral Argument at 12:4-12, 599 U.S. 140 (Mar. 22, 2023) (Jackson, J.) ("[I]s the artist using this mark as a source identifier, . . . if they aren't, then I guess the Lanham Act doesn't apply because . . . the Lanham Act worries about confusion that arises from use of a mark as a source identifier.").

(6th Cir. 2015). Other courts have filtered trademark function through a variety of related doctrines. *See, e.g.*, *Mattel, Inc. v. MCA Records, Inc.*, 296 F.3d 894, 900 (9th Cir. 2002) (a term originating as a trademark may become "imbued with [an] expressive value" such that it "assumes a role outside the bounds of trademark law"); *New Kids on the Block v. News Am. Pub., Inc.*, 971 F.2d 302, 307 (9th Cir. 1992) (describing "non-trademark use of a mark" as "a use to which the infringement laws simply do not apply"); *Job's Daughters*, 633 F.2d at 918–19; *Supreme Assembly*, 676 F.2d at 1083–84; *LTTB*, 840 Fed. App'x at 149.

Whatever it's called, trademark use is a predicate for infringement. Only use of a mark to indicate the source of a party's own products is actionable, and the District Court erred in failing to instruct the jury regarding that distinct requirement. Allowing Vintage Brand to argue the issue as a matter of likelihood of confusion was not sufficient, because likelihood of confusion is a separate requirement.

### c.     The Evidence Did Not Demonstrate that Vintage Brand Made Trademark Use

The evidence at trial regarding aesthetic functionality, Part VI.A.1.c, *supra*, is also relevant to whether Penn State carried its burden to establish Vintage Brand used the historic images to indicate the source

of its products. There is no evidence that Vintage Brand's images inform consumers about the quality of the underlying tangible good. *Dastar*, 539 U.S. at 37. The empirical evidence shows the opposite—consumers understand that Vintage Brand, and not Penn State, is the source of the merchandise.

When denying Defendants' motion, the District Court pointed to the testimony of Penn State's survey expert. JA278 (citing JA8297–JA8300). But the District Court excluded Mr. Franklyn's purported "trademark function" survey. JA20–JA33. His trial testimony focused on confusion—primarily, confusion about sponsorship, affiliation, and licensure. JA8290–JA8294; JA8297–JA8300; *see also Jack Daniel's*, 599 U.S. 163–65 (Sotomayor, J., concurring) (instructing courts to scrutinize the methods and purposes of trademark surveys, particularly in atypical use cases).[13]

---

[13] The District Court noted that Vintage Brand inadvertently used the S-Lion design with a ™ symbol next to it. JA278; *see also* JA8601–JA8602. But that is weak circumstantial evidence—which relates to only the unregistered S-Lion design and not to the various other images—does not outweigh the witness testimony and Dr. Erdem's survey. Part VI.A.1.c, *supra.*

### 3. The District Court Erred by Allowing the Jury to Consider Initial Interest and Post-Sale Confusion

This was a point-of-sale confusion case. That was the only theory Penn State pleaded, JA333–JA410, and the only type of confusion for which Mr. Franklyn tested, JA8325.

Defendants were surprised, then, when Penn State offered testimony and evidence relating to (but not sufficient to prove) initial interest and post-sale confusion. The District Court denied Defendants' motion for judgment as a matter of law on those two theories of confusion, but Penn State did not request, and the District Court did not include in its charge, a jury instruction regarding those types of confusion.

As a result, the jury was invited by Penn State to consider evidence suggesting types of confusion that were not at issue without having instruction or guidance about the relevance of that evidence or limitations on those theories. That could only have confused the jury and warrants reversal.

#### a. Posture and Standard of Review

Defendants moved for judgment as a matter of law on post-sale and initial-interest confusion. Dkt. 311 at 10–15. Defendants renewed that motion following the presentation of evidence, JA8885–JA8886, and after

final judgment, Dkt. 371 at 13–17. The Court denied those motions. JA208; JA271–JA275. This Court reviews that decision *de novo*. Part VI.A.1.a, *supra*.

Penn State never requested an instruction on initial interest or post-sale confusion, and as a result, the jury charge made no reference to either theory of infringement. JA7793–JA7841. There was nothing in the charge despite Penn State acknowledging that it was pursuing those theories, JA8996, and despite Defense counsel's timely objection to the lack of a post-sale instruction, JA9051. Defendants' objection and its motions put the District Court on notice of Defendants' position. *Larry V. Muko, Inc. v. Sw. Pennsylvania Bldg. & Const. Trades Council*, 670 F.2d 421, 425 n.1 (3d Cir. 1982). Because the omissions from the jury instructions arise from a legal error (failure to enter judgment as a matter of law) it is reviewed *de novo*. *O'Brien v. Middle E. Forum*, 57 F.4th 110, 117 (3d Cir. 2023).

### b. Penn State Pursued Post-Sale and Initial Interest Theories

Invoking initial interest confusion, Stephanie Petulla testified about an exhibit she created by conducting a Google search for the phrase "penn state *vintage brand*":



JA10017; JA8176–JA8178. In its summation, Penn State urged the jury to consider that evidence sufficient to establish likely confusion—apparently on the ground that consumers would be confused about the search results. JA9064.

Penn State's counsel also made argument and elicited testimony about seeing an individual walking "down the street" wearing Vintage Brand's products. JA7922; JA8096; *see also* JA9063 (closing argument about a "display case" showing side-by-side products). That evidence could only be relevant to a post-sale confusion theory; it has nothing to do with consumer perception at the point of sale.

### c. The Court Erred by Failing to Grant Judgment as a Matter of Law and also Failing to Instruct the Jury

With respect to initial interest confusion, a plaintiff must show a "bait and switch" that "will affect the buying decisions of consumers in the market for the goods, effectively allowing the competitor to get its foot

in the door by confusing consumers." *Checkpoint Sys., Inc. v. Check Point Software Techs., Inc.*, 269 F.3d 270, 294 (3d Cir. 2001). This requires proving an intentional deception that leads to consumer *confusion* at the point of initial interest—not mere diversion. *1-800 Contacts, Inc. v. JAND, Inc.*, 119 F.4th 234, 247 (2d Cir. 2024); *Network Automation, Inc. v. Advanced Sys. Concepts, Inc.*, 638 F.3d 1137, 1149 (9th Cir. 2011).

Penn State did not offer sufficient evidence for its initial interest theory. Ms. Petulla conceded she crafted the Google search ("penn state *vintage brand*") to search *for* Vintage Brand. JA8203. Thus, the only evidence of a "bait and switch" scheme is an example of affirmatively seeking the "bait."[14] Additionally, courts have rejected the notion that search engine listings have meaningful evidentiary value if they are not expressly misleading. *Multi Time Mach., Inc. v. Amazon.com, Inc.*, 804 F.3d 930, 937–38 (9th Cir. 2015); *Toyota Motor Sales, U.S.A., Inc. v. Tabari*, 610 F.3d 1171, 1179 (9th Cir. 2010) ("[C]onsumers don't form any

---

[14] Even if the Google search results were relevant to point-of-sale confusion, Defendants were still entitled to judgment on initial interest confusion, and the failure to instruct the jury could only have confused it.

firm expectations about the sponsorship of a website until they've seen the landing page—if then.").

Regarding post-sale confusion, the District Court correctly observed that theory is "reserved for cases where the junior use of the mark makes substantially inferior products; most cases involve luxury brands." JA30–JA31 (n.158). That is not this case. Indeed, at the summary judgment stage, the District Court remarked that this case did not "involve a theory of post-sale confusion[.]" JA30.

Penn State's own trial evidence demonstrated there is no meaningful difference in the quality of the parties' products—much less a substantial difference comparable to a luxury good and its cheap knockoff. Licensed merchandise can be purchased at retailers ranging from Neiman Marcus to 7-Eleven, and that merchandise varies in both price and quality. JA8201–JA8203. Ms. Gummo, owner of a licensed retailer, testified that one of Vintage Brand's products felt like "a Hanes, Gildan, or a Jersey product." JA8396. Penn State licenses products printed on Hanes t-shirts. JA8638–JA8639 (discussing JA9655); JA9615–JA9621.

Thus, the District Court erred by failing to grant Defendants judgment as a matter of law on Penn State's post-sale and initial interest theories. Compounding that error, the District Court failed to charge the jury about either of those theories, meaning the jury considered evidence and argument suggestive of these theories without any guidance regarding their application.

Given the omissions from the jury charge, a new trial is required unless "there is a high probability that the [erroneous instruction] did not affect the outcome of the case." *O'Brien v. Middle E. Forum*, 57 F.4th 110, 121 (3d Cir. 2023). This Court cannot say there is not a high probability that the failure to instruct the jury on the limits of post-sale and initial interest confusion did not affect the jury's finding that confusion is likely—the issue at the heart of the case. Indeed, Penn State invoked those types of confusion during its summation, when urging the jury to find confusion is likely. JA9063–JA9064.

## 4. The District Court Erred by Refusing to Grant Judgment as a Matter of Law on Sportswear's Direct Liability

Parties who are not direct infringers may be held contributorily liable if they intentionally induce another to infringe a trademark, or if

they continue to supply their products to others they know or have reason to know are engaging in trademark infringement. *Inwood*, 456 U.S. at 854. Penn State did not bring a contributory infringement claim against Sportswear. JA333–JA410. Penn State, instead, claimed that Sportswear was directly liable for the white-label fulfillment services it provided to Vintage Brand pursuant to an arms'-length fulfillment agreement.

The District Court initially granted judgment as a matter of law as to Sportswear because it was a "classic middleman." JA8439. But the District Court reconsidered that decision, relying on case law suggesting that middlemen can be subject to direct liability when consumers would view the middlemen as the true sellers of infringing goods. Those cases are inapposite because Sportswear is invisible to consumers, who would therefore not see it as the true seller of Vintage Brand's goods. The District Court's expansion of direct liability is erroneous and must be reversed.

### a.    Posture and Standard of Review

Sportswear renewed its request for judgment as a matter of law as to its direct liability. Dkt. 371 at 4–10. The District Court denied that

motion. JA265–JA267. This Court reviews that decision *de novo*. Part VI.A.1.a, *supra*.

### b. Sportswear was an Invisible Middleman in Transactions Between Vintage Brand and Its Customers

Sportswear and Vintage Brand are different businesses with different websites. JA9405.

Sportswear was founded in the Hartvigson family garage in 2003, but it has operated its own manufacturing facility for several years. JA8532–JA8533; JA8539–JA8540. Since 2010, it has operated out of a 91,000-square foot facility in Kentucky that has 100-200 employees and uses sophisticated printing equipment and software. JA8540; JA8551; JA9075. Sportswear does not sell any products that bear Vintage Brand's historic imagery; it sells print-on-demand products related to K-through-12 schools and their sports teams. JA8533–JA8535; JA9405.

Vintage Brand purchases historic memorabilia and curates the imagery for printing on Vintage Brand-branded products. JA9405. Mr. Hartvigson came up with the idea for Vintage Brand in 2017. JA8551. It is a small business; it has no employees but three owners who do not receive a salary but instead receive draws. JA9340; JA9346; JA9356–

JA9357. Vintage Brand's products are only sold on its website. JA8573. Sales of Vintage Brand products are completed through Vintage Brand, and products are shipped in Vintage Brand packaging. JA8573; JA9435–JA9438.

From 2018 to 2021, Sportswear printed and shipped products Vintage Brand's consumers purchased through the Vintage Brand website. JA8603; JA8605–JA8607. Vintage Brand provided Sportswear with historic images for printing, JA9397, and Vintage Brand collected payment from consumers. JA8607–JA8608; JA9399–JA9400. Vintage Brand paid Sportswear to fulfill Vintage Brand orders pursuant to the arm's-length fulfillment agreement. JA8603–JA8604; JA9753–JA9769.

Sportswear does not sell, promote, or advertise Vintage Brand's products. It does nothing to hold out Vintage Brand's products as its own. At every point, the products are held out as Vintage Brand products. Vintage Brand is responsible for the goods, not Sportswear. As far as consumers know, Sportswear has no connection to Vintage Brand's goods.

### c. Direct Liability for Trademark Infringement Attaches to True Sellers, not Invisible Middlemen

Sportswear provides what are commonly known as "white-label" fulfillment services—it fulfills orders by printing and shipping articles sold under another's brand. White-label fulfillment service providers can be compared to other transactional intermediaries, like Amazon, which facilitates the sales of third-party products and ship the products to consumers. But Amazon is not directly "liable for trademark infringement based on its sales and shipment of [allegedly infringing] physical items" because "Amazon is not the seller of the alleged infringing products." *Milo & Gabby, LLC v. Amazon.com, Inc.*, 2015 WL 4394673, at *6 (W.D. Wash. July 16, 2015), *aff'd*, 693 Fed. Appx. 879 (Fed. Cir. 2017). So long as intermediaries like Amazon clearly indicate the source of the allegedly infringing products and do not hold themselves out as the source of those products, they are not directly liable. *Tiffany (NJ) Inc. v. eBay Inc.*, 600 F.3d 93, 103 (2d Cir. 2010) (eBay is not directly liable because "none of eBay's uses of the mark suggested that Tiffany affiliated itself *with eBay* or endorsed the sale of its products *through eBay's website*" (emphasis added)).

Many district courts have applied this rule. *E.g.*, *Atari Interactive, Inc. v. Printify, Inc.*, 714 F.Supp.3d 225, 234 (S.D.N.Y. 2024); *King Spider LLC v. Panda (Hong Kong) Tech. Co., Ltd.*, 2025 WL 89123, at *6 (S.D.N.Y. Jan. 14, 2025); *KAWS, Inc. v. Printify Inc.*, 2024 WL 3916493, at *5 (S.D. Fla. Aug. 23, 2024); *Vans, Inc. v. Walmart, Inc.*, 2023 WL 6922833, at *4–5 (C.D. Cal. Oct. 11, 2023).

The District Court in this case relied on *Ohio State University v. Redbubble, Inc.*, 989 F.3d 435 (6th Cir. 2021). JA203. Redbubble "allowed artists to create clothing designs hosted on its website; upon sale, Redbubble printed the clothing with the designs, shipped it to customers, *and affixed a Redbubble tag*." JA203 (emphasis added) (citing *Redbubble*, 989 F.3d at 440–41). That last fact was critical:

> [O]ne key distinction between a direct seller who "uses" a trademark under the Act and a mere facilitator of sales who does not is the degree to which the party represents itself, rather than a third-party vendor, as the seller, or somehow identifies the goods as its own.

*Redbubble*, 989 F.3d at 448. And that is precisely what differentiates Redbubble from Sportswear.

Redbubble was directly liable because it held itself out to consumers as the seller; not only did Redbubble deliver infringing goods "in

Redbubble packaging with Redbubble tags," it also "classifie[d] its goods as 'Redbubble products' and ma[de] clothes identifiable as 'Redbubble garments.'" *Id*. Images from the *Redbubble* litigation show a Redbubble-branded webpage (left) and packaging (right), as well as a shipping label (bottom) identifying the source as "An Artist On Redbubble":

 



*Ohio State University v. Redbubble, Inc.*, Case 2:17-cv-01092 (S.D. Ohio), Dkt. 17-3 at 47, 58, 64.

Sportswear's involvement in the sale of Vintage Brand's products was nothing like Redbubble's. Sportswear printed products selected by Vintage Brand customers from Vintage Brand's website (below, top); Sportswear attached Vintage Brand tags to those products (middle); and it shipped those products in Vintage Brand packaging (bottom):








JA9435; JA9438; JA9440; JA10126.

Unlike Redbubble, Sportswear never "represented itself, rather than [Vintage Brand], as the seller," or otherwise "identified the goods as its own." *Redbubble*, 989 F.3d at 448. The District Court's approach collapses the distinction between direct and secondary liability and would subject all sorts of invisible intermediaries to direct liability, substantially disrupting settled business models. This Court should reject that approach.

**B.    Response to Penn State's Appeal**

**1.    Standard of Review**

This Court reviews a grant of summary judgment *de novo* and applies "the same standard the District Court applied." *Alcoa, Inc. v. United States*, 509 F.3d 173, 175 (3d Cir. 2007). The moving party satisfies its burden by either submitting undisputed material facts that entitle it to judgment or by demonstrating the party bearing the burden of proof has not made a sufficient showing. *Mall Chevrolet, Inc. v. Gen. Motors LLC*, 99 F.4th 622, 630 (3d Cir. 2024).

**2.    The District Court Appropriately Granted Summary Judgment on Penn State's Counterfeiting Claim**

The District Court correctly ruled that the Lanham Act limits counterfeiting remedies to cases involving true source confusion; those remedies are not available in ordinary infringement cases alleging only confusion regarding sponsorship or approval. JA76. As the District Court noted, "[c]ounterfeiting is an attempt to make consumers believe that certain goods are the genuine article, not that the goods are made by a different company that has been endorsed by the mark holder." JA77–JA78. There was "simply no evidence from which a jury could conclude that Vintage Brand used Penn State's Marks in a manner deceptively

suggesting an erroneous origin or that the goods were fake Penn State goods." JA78.

Penn State's argument that there was a triable issue regarding confusion as to source is wrong, but this Court need not even consider that argument because Penn State never made it below. Its argument that counterfeiting is simply trademark infringement with a higher standard of similarity is newly framed on appeal (making it improper). It is also wrong. MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 25:15 (5th ed.) (hereinafter "MCCARTHY") ("Even if the conflicting marks are identical, a plausible claim of 'counterfeiting' requires much more than just an allegation of a likelihood of confusion."). Counterfeiting requires use of a "spurious" mark; Penn State's interpretation reads that limitation out of the statute.

The District Court's grant of summary judgment was proper even if this Court accepts Penn State's rewriting of the Lanham Act, because Vintage Brand's composite historic images are not identical with or substantially indistinguishable from any of Penn State's registered trademarks. *See Lontex Corp. v. Nike, Inc.*, 107 F.4th 139, 158–59 (3d Cir.

2024) (affirming 12(b)(6) dismissal of counterfeiting claim where defendant used identical mark as part of longer product names).

### a. Penn State Forfeited its Argument that There Was a Triable Issue Regarding Source Confusion

Penn State's summary judgment opposition contained one paragraph on counterfeiting. JA7258–JA7259. That paragraph was devoted entirely to the incorrect argument that counterfeiting claims are not limited to cases of source confusion. JA7258–JA7259. Now, Penn State contends that there was evidence to create a triable issue that consumers perceive Penn State as the manufacturer of Vintage Brand's goods. Br. at 59–62.

"[T]he argument presented in the Court of Appeals must depend on both the same legal rule and the same facts as the argument presented in the District Court." *United States v. Joseph*, 730 F.3d 336, 342 (3d Cir. 2013). The degree of particularity is "exacting." *Id.* at 337. And because Federal Rule of Civil Procedure 56(c)(3) only requires courts to consider cited materials, a party cannot ascribe error to a failure to consider uncited evidence.

Penn State cited no evidence on counterfeiting when opposing summary judgment, JA7258–JA7259, and its appeal fails for that reason.

But Penn State fares no better even if its briefing in support of its own summary judgment motion permits appellate review. Penn State's affirmative brief also contained only one paragraph on counterfeiting, Dkt. 114 at 24–25, which cited evidence about Vintage Brand's printing and scanning of memorabilia (JA10827–JA10829) and a table that compared Vintage Brand's designs to Penn State's marks (JA10896–JA10921). Penn State's reply included two pages on willfulness. Dkt. 158 at 19–21.

On appeal, Penn State argues "[t]here was direct evidence on confusion as to manufacturing origin through Penn State's expert," David Franklyn. Br. at 59. Penn State did not introduce evidence from its expert when opposing summary judgment on counterfeiting, and it does not even cite Mr. Franklyn's own survey here—probably because he concluded that "[t]he overwhelming majority of respondents . . . recognize Vintage Brand as the company that makes" its products. JA627. On appeal, Penn State cites Mr. Franklyn's *rebuttal* of Vintage Brand's expert, Dr. Erdem, in which Mr. Franklyn inappropriately re-coded Dr. Erdem's survey results to inflate confusion numbers in her test cell while

failing to make the same adjustments to responses in the control condition. JA721–JA722; JA869.

Penn State also argues that its incontestable registrations created a fact issue about source confusion. Br. at 60–61. That argument misrepresents incontestability, which impacts certain presumptions regarding validity and ownership but says nothing about likelihood of confusion. 15 U.S.C. § 1115(b); *KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.*, 543 U.S. 111, 117 (2004) ("Although an incontestable registration is conclusive evidence . . . of the registrant's exclusive right to use the . . . mark in commerce, § 1115(b), the plaintiff's success is still subject to proof of infringement as defined in section 1114. And that, as just noted, requires a showing that the defendant's actual practice is likely to produce confusion in the minds of consumers about the origin of the goods or services in question.") (cleaned up).

Finally, Penn State points to evidence it submitted relevant to the *Lapp* factors and argues that evidence is "applicable to the likelihood of confusion test generally, including confusion as to manufacturing origin." Br. at 61–62. Penn State did not cite that evidence in its counterfeiting arguments below. Even if it had, the mere existence of a triable issue as

to *some kind* of confusion does not mean there was a triable issue regarding actual source confusion specifically. Penn State ignores that both parties' experts concluded consumers were not confused about the source of Vintage Brand's products, JA870–JA873, JA627, and the unrebutted evidence of Dr. Erdem's survey showed that consumers do not believe Penn State is responsible for the quality of Vintage Brand's products. JA878.

### b.  Counterfeiting is Not Simply Trademark Infringement with Greater Similarity of Marks

Penn State plays fast and loose with the text of the Lanham Act to argue that counterfeiting is trademark infringement with a higher degree of similarity of the marks. That reading would radically expand the scope of the counterfeiting remedies, which Congress limited to "hard core" or "first degree" trademark infringement. *Gucci Am., Inc. v. Guess?, Inc.*, 868 F.Supp.2d 207, 242 (S.D.N.Y. 2012) (quoting MCCARTHY § 25:10); *see also* S. Rep. 98-526, at 3 (1984) (counterfeiting remedies "do[] not reach routine business disputes about arguable instances of trademark infringement").

Penn State faults the District Court for focusing on the definition of counterfeiting in Section 34 of the Lanham Act, 15 U.S.C. § 1116,

emphasizing that Section 32, 15 U.S.C. § 1114, creates causes of action for both infringement and counterfeiting. Br. at 31. This is a bait and switch: Section 32 does create a cause of action for counterfeiting, but the special remedies Penn State wants are provided for in Section 35, 15 U.S.C. § 1117(b). Section 35 incorporates Section 34's definition by reference.

Section 35 provides for enhanced remedies in cases "involving use of a counterfeit mark or designation (*as defined in section 1116(d)* of [the Lanham Act])." 15 U.S.C. § 1117(b) (emphasis added). Under 15 U.S.C § 1116(d), a "counterfeit mark" means "a counterfeit of a mark that is registered on the principal register in the United States Patent and Trademark Office for such goods or services sold, offered for sale, or distributed and that is in use . . . ." 15 U.S.C. § 1116(d)(1)(B)(i). "Counterfeit" is defined generally to mean "a spurious mark which is identical with, or substantially indistinguishable from, a registered mark." 15 U.S.C. § 1127. Putting those definitions together, the Lanham Act limits counterfeiting remedies to cases involving use of a spurious mark which is identical with, or substantially indistinguishable from, a

registered mark for the same goods or services identified in the registration.

Courts have correctly understood these definitions to substantially limit the universe of infringement cases for which enhanced remedies are available. One way it does that is by requiring greater similarity of the marks (a limitation that comes from the Lanham Act's general definition of counterfeit marks, not from Section 32). *Lontex*, 107 F.4th at 158–59. But that is not the only limiting condition.[15]

Counterfeiting is also limited to the use of "spurious marks." 15 U.S.C. § 1127. The statute does not define "spurious," but courts, including in this Circuit, rely on the definition in Black's Law Dictionary: "deceptively suggesting a false origin; fake." *Spurious*, BLACK'S LAW DICTIONARY (12th ed.); *see also Lontex Corp. v. Nike, Inc.*, 384 F.Supp.3d 546, 555 (E.D. Pa. 2019), *aff'd*, 107 F.4th 139 (3d Cir. 2024); *Cohen & Co., Ltd. v. Cohen & Co. Inc.*, 2022 WL 5250271, at *3 (E.D. Pa. Oct. 6, 2022);

---

[15] Penn State cites *Motel 6 Operating LP v. HI Hotel Grp. LLC*, 670 F. App'x 759 (3d Cir. 2016). That unpublished order (in an appeal in which the defendants did not participate) says nothing about why the court believed the district court had interpreted the Lanham Act too narrowly and otherwise has nothing to do with Penn State's argument here. *G6 Hospitality Franchising LLC v. Hi Hotel Group, LLC*, 171 F.Supp.3d 340, 347 (M.D. Pa. 2016).

*Coty Inc. v. Cosmopolitan Cosmetics Inc.*, 432 F.Supp.3d 345, 352 (S.D.N.Y. 2020); *GMA Accessories, Inc. v. BOP, LLC*, 765 F.Supp.2d 457, 472 (S.D.N.Y. 2011), *aff'd*, 558 Fed. App'x 116 (2d Cir. 2014). That definition of "spurious" is consistent with legislative history. *See* Joint Statement on Trademark Counterfeiting Legislation, 130 Cong. Rec. 31673, 31675 (1984) ("'spurious' means 'not genuine or authentic'"); S. Rep. 98-526, at 4 (a counterfeit mark "defrauds purchasers, who pay for brand-name quality and take home only a fake").

Penn State gives the word "spurious" no meaning. While it criticizes the District Court's definition of that term, Penn State offers no alternative—it suggests simply that a mark can be spurious if it falsely conveys approval by the trademark owner. Br. at 39. But that just repeats the argument that counterfeiting requires likelihood of confusion, making the requirement of a "spurious" mark mere surplusage. *Broselow v. Fisher*, 319 F.3d 605, 611 (3d Cir. 2003) ("statutes should be read to avoid surplusage"). It is not surplusage; it is an important way Congress distinguished counterfeiting from ordinary infringement.

Penn State also misrepresents the 1962 Amendments to the Lanham Act, claiming that Congress meant to expand the scope of

infringement when it removed the reference to confusion of "purchasers as to the source of origin of such goods or services" from Section 32. Br. at 33 (citing *Weil Ceramics & Glass, Inc. v. Dash*, 878 F.2d 659, 681 (3d Cir. 1989) (Becker, J., concurring)). Congress did not intend that change to expand anything—the legislative history makes clear the amendment was merely "a housekeeping measure designed to make minimal substantive changes in the trademark law." S. Rep. 87-2107 (1962).[16] But whatever Congress intended with respect to *infringement* claims, Penn State cannot invoke the statute's special counterfeiting remedies without facing the definition of *counterfeiting*. Counterfeiting is not just infringement with greater similarity; "a plausible claim of 'counterfeiting' requires much more," including use of a spurious mark. MCCARTHY § 25:15. And a mark cannot be "spurious" if it is not used to indicate the origin of goods, even if use of that term might cause confusion about "affiliation, connection, . . . association[,] . . . sponsorship or approval." *Tiffany & Co. v. Costco Wholesale Corp.*, 971 F.3d 74, 95 n.18.[17]

---

[16] For a thorough debunking of Penn State's argument about the 1962 Amendments, *see* Lunney, *supra*, at 470–75.

[17] The Second Circuit rejected the lower court's reasoning that use of an identical mark with intent to cause confusion necessarily constituted

### c. The District Court Properly Applied the Lanham Act's Strict Statutory Limits on Counterfeiting

The District Court correctly referenced these controlling definitions when it dismissed Penn State's counterfeiting claim. Counterfeiting requires confusion regarding actual source. *Tiffany*, 971 F.3d at 95 n.18; *Illinois Tool Works Inc. v. J-B Weld Co., LLC*, 469 F.Supp.3d 4, 10 (D. Conn. 2020) (counterfeiting requires that "customers believe they are getting one product when they are in fact getting another") (citing *Gucci*, 868 F.Supp.2d at 287 (counterfeiting requires that a mark is "used to pass off the infringer's product as the original") (cleaned up)).

Penn State relies on *ICCS USA Corp. v. United States*, 952 F.3d 1325 (Fed. Cir. 2020), a certification mark case, to argue that counterfeiting doesn't require confusion about origin. But that case actually supports Vintage Brand. The Federal Circuit applied the Black's Law Dictionary definition of "spurious" and held that an unapproved use of a certification mark was "spurious" because its use "falsely communicated to consumers that the" goods "had already passed the [certification mark owner's] safety standards and requirements[.]" *Id.* at

---

counterfeiting—exactly the argument Penn State makes here. *Id.* at 95.

1332. The mark was spurious because it undermined the core function of a certification mark, sending the false signal that particular characteristics of the goods met the certifier's requirements. The core function of a trademark is to indicate responsibility for quality; a mark is spurious only when it falsely conveys information about who is responsible for that quality. *Jack Daniel's*, 599 U.S. at 146 ("a mark tells the public who is responsible for a product").

Vintage Brand did not use a "spurious" mark because the historic imagery it printed on products did not indicate the actual source of those products. Vintage Brand's own trademark appears on every page of its website and on the packaging of its goods. JA938; JA942; JA1109–JA1142; JA1098–JA1106. Both parties' experts concluded that consumers overwhelmingly recognize that Vintage Brand is the source of its products; consumers do not think Penn State is the source. JA870–JA873; JA627. And the unrebutted evidence offered by Vintage Brand's expert showed that consumers do not believe Penn State is responsible for the quality of Vintage Brand's goods. JA878.

These conclusions are no surprise, because Penn State is an educational institution. It does not make merchandise. Penn State has

hundreds of licensees who print its marks on a range of products. JA3405; JA3395; JA3390; JA3626; JA3436–JA3463; JA5955–JA5982. The companies that make those licensed products are the source of the products. At most, the presence of Penn State imagery indicates some kind of business relationship with Penn State, not that Penn State is responsible for products' quality. Indeed, Penn State licensees sell products at a wide range of different price and quality points. *E.g.*, *compare* JA4116 ($13.99 t-shirt), JA3981 ($30.00 hoodie) *with* JA3940 ($42.99 t-shirt), JA4306 ($75.00 hoodie). There is no particular quality indicated by the presence of Penn State marks on a t-shirt.

The weak signal, if any, sent by ornamenting a t-shirt with Penn State imagery is the reason CLC and Penn State view licensees' use of the "Official Label" as imperative, JA3632, JA3676, and why consumers are instructed to look for the Official Label, JA3668–JA3670, JA7206, JA7211, JA10599. Vintage Brand never used the "Official Label" or advertised its goods as "official," unlike Penn State's licensees. JA3576; JA3579; JA3582; JA3586; JA3613.

Vintage Brand also never used Penn State's primary logos, and Vintage Brand's products have never been intermingled with goods

bearing those logos, unlike Penn State's licensees. JA3401–JA3407, JA3595–JA3624, JA3681–JA3706, JA5985–JA5986, JA5988–JA5992, JA6093–JA6095, JA6115–JA6116, JA6130–JA6137. And Vintage Brand's website contains numerous prominent disclaimers. Part IV.A, *supra.*

### d. Vintage Brand's Composite Historic Imagery is not Substantially Indistinguishable from Penn State's Marks

Penn State's argument that counterfeiting is no more than trademark infringement with a substantially indistinguishable mark leads it to water down the similarity requirement, detaching it from the purpose of the counterfeiting remedies, which is to address the most egregious cases of passing off.

In Penn State's view, mere reproduction of the words "Penn State" within composite images constitutes counterfeiting, regardless of other features contained within the images or the context in which products bearing the images appear. Indeed, Penn State illustrates its comparisons of Vintage Brand's images and Penn State's marks by cropping images:

| Penn State Registration and Goods Covered | Example of Defendants' Product Bearing Mark |
| --- | --- |
| PENN STATE<br><br>(JA4096; JA4104) |  |

Br. at 25.

That presentation violates the principle of anti-dissection applicable even to ordinary infringement cases. *Estate of P.D. Beckwith, Inc., v. Comm'r of Patents*, 252 U.S. 538, 545–46 (1920); MᴄCᴀʀᴛʜʏ § 23:41.

This Court has emphasized the importance of anti-dissection in the counterfeiting context, where the standard is "identical or substantially indistinguishable." 15 U.S.C. § 1127. In *Lontex*, this Court affirmed the 12(b)(6) dismissal of the plaintiff's counterfeiting claim based on Nike's use of COOL COMPRESSION in connection with clothing. 107 F.4th at 158–59. It did so even while affirming the jury's finding that Nike infringed Lontex's rights in its COOL COMPRESSION mark. *Id.* at 153–55.

There was no plausible claim that Nike was using a substantially indistinguishable mark—even though, just like here, one could zoom in on Nike's use and highlight the identical words. This Court "measure[s] the similarity of two marks by comparing the overall impression ordinary consumers would have upon encountering the marks," and that overall impression comes from a mark's "appearance as a whole, not from its elements separated and considered in detail." *Id.* at 158–59 (cleaned up).

This Court concluded that "an ordinary consumer viewing the entirety of the 'Cool Compression' marks used by Nike and Lontex would not find the marks identical or substantially indistinguishable." *Id.* Nike used those words along with its other identifiers, such that "consumers saw Nike's use of 'Cool Compression' in the context of Nike's iconic brands" whereas the plaintiff "did not include Nike branding alongside its trademark." *Id.*[18]

---

[18] The district court in that case denied leave to amend the counterfeiting claim as futile, even though Lontex provided examples of Nike's use of the COOL COMPRESSION mark alone because those examples still did not indicate consumers "would perceive Nike's COOL COMPRESSION *products* to be Lontex's COOL COMPRESSION *products.*" *Lontex*, 384 F.Supp.3d at 561 (emphasis added).

The Southern District of New York illustrated the rigor of the counterfeiting standard when it rejected Colgate's claim against an importer of toothpaste that used packaging (top) that imitated Colgate's registered trade dress (bottom):





*Colgate-Palmolive Co. v. J.M.D. All-Star Imp. & Exp. Inc.*, Case No. 1:06-cv-02857-LLS (S.D.N.Y.), Dkt. 78-12. The court granted summary judgment even though it recognized that the "boxes were quite similar"— they were not substantially indistinguishable. *Colgate-Palmolive Co. v. J.M.D. All-Star Imp. & Exp. Inc.*, 486 F.Supp.2d 286, 290–91 (S.D.N.Y.

2007); *see also Gucci*, 868 F.Supp.2d at 242; *Coty Inc. v. Excell Brands, LLC*, 277 F.Supp.3d 425, 468 (S.D.N.Y. 2017); *cf. Arcona, Inc. v. Farmacy Beauty, LLC*, 976 F.3d 1074, 1079–80 (9th Cir. 2020) (refusing to presume confusion as precursor to counterfeiting claim despite identical EYE DEW mark because products were different).

### e. A Mark-by-Mark Comparison Establishes Defendants Cannot be Liable for Counterfeiting

Trademark law precludes dissection of composites when assessing similarity of marks. Nevertheless, Penn State crops distinct elements of Vintage Brand's composite images in a misleading effort to show that those images are substantially indistinguishable from Penn State's registered trademarks. Br. at 25–29; *see also* JA7176–JA7191; JA10896–JA10921.

To take one example, Penn State owns registrations for PENN STATE. JA1564–JA1914; JA1915–JA2062. But Vintage Brand never made the words PENN STATE available alone. JA944. Vintage Brand's images are composites, some of which include the words PENN STATE:

  

 

JA1020; JA1024; JA1095; JA1138; JA1142; JA1050.

Those composite images are not plausibly substantially indistinguishable from the Penn State's marks. That is why Penn State crops Vintage Brand's images and enlarges certain elements:

| Penn State Registration and Goods Covered | Example of Defendants' Product Bearing Mark | Example of Genuine Penn State Product Bearing Mark |
|---|---|---|
| NITTANY LION (JA4242; JA4249) | (JA5060) | (JA4204) |

Br. at 28.

Penn State does the same thing in claiming counterfeiting of THE PENNSYLVANIA STATE UNIVERSITY mark, its seal design, its Nittany Lion rock design, and its Pozniak Lion design. Br. at 25–28.[19] In each case, Penn State impermissibly dissects out elements of easily distinguishable designs:

| Vintage Brand Images | Penn State's Marks |
|---|---|
|  JA1008  JA1010 |  JA3225   JA3386<br><br>THE PENNSYLVANIA STATE UNIVERSITY |

_____

[19] Penn State also owns a trademark registration for this mark, covering only "frankfurters":  . JA2853. Vintage Brand has never used that mark, nor has it been in the business of selling frankfurters. JA945.

| Vintage Brand Images | Penn State's Marks |
|:---:|:---:|
|  JA1222 <br>  JA1008 |  JA2713 |
|  JA1194 |  JA2993 |

Penn State relies on the same dissection in its comparisons of products (which, of course is not a legally relevant comparison, as counterfeiting requires comparison with Penn States registered marks).

In none of these cases is Vintage Brand's composite design substantially indistinguishable from Penn State's claimed mark; Penn State illegitimately isolates individual features to compare. Br. at 26.



| Vintage Brand Mug | Licensed Mug |
|:---:|:---:|
| JA5210 | JA4455 |
| **Vintage Brand Pennant** | **Licensed Pennant** |
| JA5829 | JA4461 |

| Vintage Brand T-Shirt | Licensed T-Shirt |
|:---:|:---:|
|  |  |
| JA1130 | JA4204 |
| Vintage Brand T-Shirt | "Licensed"[20] T-Shirt |
|  | <br><br>JA4278 |
| JA1165 | |

---

[20] The only "official" Pozniak lion merchandise is the uniform used by the Lion Ambassadors—student campus ambassadors—and swag for the wrestling club. JA1286–JA1288; JA1393; JA1407. The Pozniak lion is not part of the Penn State's merchandising program. JA1290; JA3228–JA3234; JA1449–JA1563; JA3017–JA3023; JA4265–JA4302. Vintage Brand was not selling counterfeit Lion Ambassador uniforms or wrestling club swag. *See Arcona*, 976 F.3d at 1079-80.

Finally, Penn State for the first time on appeal argues Vintage Brand's S-Lion constitutes counterfeiting of PENN STATE. Br. at 25.



This argument takes dissection to a new level. Penn State does not own a registration for the S-Lion.[21] JA346; JA3806. Thus, there can be no counterfeiting. 15 U.S.C. § 1127 (counterfeit is identical to a "registered mark"). Penn State knows this; it did not include the S-Lion in its counterfeiting claim. JA366.

Penn State claims that Vintage Brand's S-Lion is counterfeit because it contains the words PENN STATE. If it were true that the S-Lion was substantially indistinguishable from PENN STATE, then the S-Lion could not be a legally distinct trademark. It is only because the S-Lion is *not the same mark* as PENN STATE that Penn State could possibly have distinct rights in the S-Lion mark. This argument is a transparent window into Penn State's view of its rights—it believes it

---

[21] The S-Lion is in Penn State's illegitimate trademark warehousing program. JA1268-JA1270; JA3229.

owns rights in gross in any reference to it, and that reproduction of the words PENN STATE is always counterfeiting, even when those words are part of another mark it claims to own separately.

### 3. The District Court Appropriately Granted Summary Judgment on Dilution

Penn State urges this Court to apply dilution laws broadly, requiring neither substantial similarity of an accused mark nor proof that use of the accused mark is likely to impair a famous mark's distinctiveness. Courts and commentators caution against this approach. MCCARTHY §§ 24:69–24:70. It is also contrary to the Lanham Act, 15 U.S.C. § 1125(c).

#### a. Dilution by Blurring Requires an Impairment, not a Strengthening, of Distinctiveness

Dilution by blurring "should be applied with care and caution, with judges demanding that plaintiff make out its case with a clearly articulated explanation of how the elements of dilution are met, supported by persuasive evidence." MCCARTHY § 24:70.

Blurring requires consumers "associating both the plaintiff and the defendant with the famous mark." *Times Mirror Magazines, Inc. v. Las Vegas Sports News, L.L.C.*, 212 F.3d 157, 168 (3d Cir. 2000); *see also* MCCARTHY § 24:115. But "'[b]lurring' is not a necessary consequence of

mental association." *Moseley v. V Secret Catalogue, Inc.*, 537 U.S. 418, 434 (2003). The "association" must "impair[] the distinctiveness" of the famous mark. 15 U.S.C. § 1125(c)(2)(B); *see also* MCCARTHY § 24:117 ("The two elements of 'association' and 'blurring' are separate and distinct.").

An association impairs distinctiveness only where it would lead a consumer to "recogni[ze] that a mark associated with the plaintiff is now also in use *as an identifying symbol* by another." RESTATEMENT (THIRD) OF UNFAIR COMPETITION § 25 cmt.f (1995) (emphasis added). The Ninth Circuit has used the example of "Tylenol"-branded snowboards. *Mattel,* 296 F.3d at 903. Although "no one suspects that the maker of analgesics has entered into the snowboard business," the Tylenol mark's distinctiveness would be impaired because the word "Tylenol" will "bring to mind two products, not one." *Id.*

Penn State conflates association and impairment of distinctiveness, assuming the latter always follows the former. Br. at 20 ("by creating an association with Penn State, Defendants were creating a likelihood of dilution"). Penn State relies on *Visa International Service Association v. JSL Corp.*, 610 F.3d 1088, 1090-92 (9th Cir. 2010). However, that

decision ignored the statutory impairment requirement. "The court was in error in ignoring the issue of impairment. Neither strength of the famous mark nor similarity between the marks says anything about the issue of whether this defendant's use is likely to impair the distinctiveness of the plaintiff's mark." MCCARTHY § 24:118.

Litigants must prove impairment of distinctiveness with evidence, not conjecture. MCCARTHY § 24:119 (Courts "should demand to see . . . survey evidence to prove a case of dilution by blurring."). The District Court determined that Penn State "pointe[d] to no evidence" of impairment of distinctiveness and reasoned that "consumers are likely buying Vintage Brand's Penn State-related goods because they wish to express some form of affiliation with Penn State[.]" JA84. Far from impairing distinctiveness—such as Tylenol-branded snowboards—this use "*strengthens* the degree to which consumers associate" the mark with Penn State. *Id.*[22]

---

[22] Penn State briefly argues the District Court required "actual" rather than "likely" dilution. Br. at 57. The Pennsylvania statute demands the former, 54 Pa. Cons. Stat. § 1124, while the TDRA requires the latter, 15 U.S.C. § 1125(c)(2)(B). The District Court acknowledged this, JA80, and nothing indicates an incorrect application of those standards.

### b. The TDRA Did Not Alter the Emphasis on a Substantially Similar Diluting Mark

Penn State argues that the TDRA changed the law such that a court should not emphasize the degree of similarity between the accused mark and the famous mark.[23] Br. at 51–53. Penn State did not make this argument below. JA7261. This Court should not wade into this unpreserved issue. Part VI.B.2.a, *supra*.

Penn State's position is also wrong on the merits. Congress passed the TDRA in response to the Supreme Court's holding in *Moseley* that the pre-TDRA statute required "actual dilution." 537 U.S. at 433. Congress's intent was to allow claims premised on a "likely" dilution and to clarify other aspects of dilution law (*e.g.*, precluding niche fame) unrelated to the required similarity. H.R. Rep. 109-23, at 3–6 (2005).

The pre-TDRA statute did not require substantially similar marks. 15 U.S.C. § 1125(c) (2000). Courts nonetheless emphasized the degree of similarity because the purported harm of blurring is the multiplicity of associations. *See Luigino's, Inc. v. Stouffer Corp.*, 170 F.3d 827, 832 (8th Cir. 1999). The TDRA illustrates the import of similarity by defining

---

[23] This argument is inapplicable to the Pennsylvania statute, 54 Pa. Cons. Stat. § 1124, which is based on the pre-TDRA federal statute.

"dilution by blurring" as the "association *arising from the similarity* between a mark . . . and a famous mark that impairs the distinctiveness of the famous mark." 15 U.S.C. § 1125(c)(2)(B) (emphasis added). It explicitly instructs courts to consider the "degree of similarity" in evaluating likelihood of dilution by blurring. *Id*. § 1125(c)(2)(B)(1).

Penn State cites *Starbucks Corp. v. Wolfe's Borough Coffee, Inc.*, 588 F.3d 97, 107–09 (2d Cir. 2009), and its progeny *Levi Strauss & Co. v. Abercrombie & Fitch Trading Co.*, 633 F.3d 1158, 1171-73 (9th Cir. 2011). But those cases, even if correct[24] only hold that substantial similarity is not a threshold requirement; neither stands for the proposition that the degree of similarity is not important. *Levi*, 633 F.3d at 1173 n.12; *Starbucks*, 588 F.3d at 108.[25]

The District Court did not treat substantial similarity as a threshold; it appropriately analyzed the similarity of the historic images

---

[24] Neither decision explains how blurring can occur absent an accused mark being perceived *as the famous mark*. MCCARTHY 24:116.

[25] Commentators routinely emphasize that similarity is critical to the analysis. MCCARTHY § 24:116 ("dilution by blurring cannot be possible without a substantial similarity of the marks"); CALLMANN ON UNFAIR COMPETITION, TRADEMARKS & MONOPOLIES § 22:24 (4th ed.) ("the requirement of substantial similarity has not been changed by the [TDRA]").

and the PENN STATE mark based on "Vintage Brand's use" of its images in context, which resulted in the District Court correctly concluding that "no dilution has occurred here." JA83.

### c. The District Court Appropriately Found No Issues of Material Fact

Penn State's summary judgment brief contained one paragraph on similarity for dilution purposes. JA7261. Its only citation to the record is irrelevant and possibly a miscite. JA11025 (discussing trademark registrations). It's scattershot arguments on appeal all fail.

First, Penn State emphasizes the historic images came "from vintage Penn State merchandise." Br. at 63. But that does not make the images any more or less similar to the PENN STATE mark—the relevant comparison.

Second, the District Court was correct not to dissect Vintage Brand's images, which should be evaluated as a whole. The dilution claims are premised on the PENN STATE word mark alone. JA369–JA372. Penn State's dissection of the S-Lion is particularly inappropriate for the reasons discussed above. Parts VI.C.2.d and VI.C.2.e, *supra*.

Third, this Court's blurring precedent, *Times Mirror*, 212 F.3d at 169, and the case on which Penn State relies, *Starbucks*, 736 F.3d at 209,

both emphasize context in comparing the marks. *See also Pharmacia Corp. v. Alcon Labs., Inc.*, 201 F.Supp.2d 335, 379 (D.N.J. 2002). Penn State's implication that the District Court erred in considering context is wrong.

Fourth, Penn State criticizes the District Court for referencing Vintage Brand's use of its house mark, noting that a few of its official licensees also use house marks on their websites. Br. at 66. But that says nothing about whether Vintage Brand's images are likely to impair the distinctiveness of the PENN STATE mark. The District Court reviewed Vintage Brand's use holistically—including the unique composite images, use of its house mark and name, and disclaimers—and concluded that those things together "distinguish Vintage Brand's use" of the mark. JA83. Whether Penn State's licensees' also use house marks on their site is irrelevant to the question of whether Vintage Brand's images create additional associations with PENN STATE.

Penn State challenges the effectiveness of Vintage Brand's disclaimers. This argument is misleading. *See* Part IV.A at n.2, *supra*. But regardless, even if the disclaimers do not dispel *confusion*, that does not mean they do not meaningfully differentiate Vintage Brand's use,

particularly where Penn State's licensees affirmatively state they are officially licensed and use the "Official Label." Part IV.B, *supra*.

### d. Penn State Failed to Proffer Evidence of Fame

The District Court suggested Penn State failed to establish the fame of PENN STATE. JA80 & n.353. Both parties briefed this issue. JA7260–JA7261; Dkt. 115 at 35–40; Dkt. 155 at 14–17. Thus, this Court can affirm on this basis. *Guthrie v. Lady Jane Collieries, Inc.*, 722 F.2d 1141, 1145 n.1 (3d Cir. 1983).

Fame "is a rigorous standard" limiting "protection only to highly distinctive marks that are well-known throughout the country." *Green v. Fornario*, 486 F.3d 100, 105 (3d Cir. 2007). Dilution fame "is difficult to prove." *Coach Servs., Inc. v. Triumph Learning LLC*, 668 F.3d 1356, 1373 (Fed. Cir. 2012). Courts "frequently grant summary judgment in favor of defendants" on this issue. *Navajo Nation v. Urban Outfitters, Inc.*, 2016 WL 3475342, at *4 (D.N.M. May 13, 2016) (collecting cases).

Penn State offered three pieces of evidence regarding fame, JA7261, two of which were stricken. JA41–44. Penn State's sole remaining piece of evidence was the size of its alumni base, as established by the

unstricken portion of paragraph 6 of Stephanie Petulla's declaration. JA40–JA41; JA10760 (citing JA3886).

That paragraph establishes that "more than 740,000 Americans . . . are themselves Penn State alumni," which is less than 1% of the niche market of U.S. college graduates. JA7260–JA7261. First, these statistics are, at most, evidence of recognition of Penn State as an institution; they do not show that PENN STATE, specifically, is a famous mark for that institution. Second, even if the population size can be considered evidence of the fame of the mark, 1% of a limited segment of the U.S. population does not show the mark is a "household name," *Coach*, 668 F.3d at 1372, for the "general consuming public." Nor can Penn State rely on the mark's supposed fame with college graduates or sports fans because "the TDRA eliminated the possibility of 'niche fame[.]'" *Coach*, 668 F.3d at 1372; *see also Univ. of Texas at Austin v. KST Elec., Ltd.*, 550 F.Supp.2d 657, 677–78 (W.D. Tex. 2008). The mark must be famous among the "general consuming public." 15 U.S.C. § 1125(c)(2)(A). The PENN STATE mark is not.

Finally, Penn State points to a finding of fame in prior litigation, Br. at 48 n.8, but that was the result of the defendant's failure to respond

to Requests for Admission. *Pennsylvania State Univ. v. Parshall*, 2022 WL 2712051, at *10 (M.D. Pa. Feb. 17, 2022).

## VII.   CONCLUSION

Defendants request that this Court affirm the grant of summary judgment on Penn State's counterfeiting and dilution claims and reverse the denial of Defendants' motion for judgment as a matter of law.

Dated: March 12, 2026.

Respectfully submitted,

By: */s/Joshua D. Harms*
Joshua D. Harms
Wash. Bar No. 55679
John T. Fetters
Wash Bar No. 40800
STOKES LAWRENCE, P.S.
1420 Fifth Avenue, Suite 3000
Seattle, Washington 98101
Phone: (206) 626-6000
Joshua.Harms@stokeslaw.com
John.Fetters@stokeslaw.com

By: */s/ Mark P. McKenna*
Mark P. McKenna
Illinois I.D. No. 6272699
LEX LUMINA PLLC
745 Fifth Avenue, Suite 500
New York, New York 101501
Phone: (646) 898-2055
Mark@lex-lumina.com

*Attorneys for Vintage Brand LLC, Sportswear, Inc.*
*and Chad Hartvigson*

# COMBINED CERTIFICATIONS

1.     At least one of the attorneys whose names appear on the foregoing brief, including the undersigned, is a member of the bar of this Court, as required by Local Rule 28.3(d).

2.     This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 28.1(e)(2)(B), because it contains 15,300 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

3.     This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in a proportionately spaced typeface using Microsoft Word in Century Schoolbook size 14 font.

4.     The text of the electronic version of this Brief filed on ECF is identical to the text of the paper copies filed with the Court.

5.     The electronic version of this Brief filed on ECF was virus checked using Windows Defender ATP v.4.18.26010.5, and no virus was detected.

6.     On this 12th day of March, 2026, I filed the foregoing Brief with the Clerk of the Court using the CM/ECF System, which will send notice of such filing to all registered CM/ECF users, and thereafter caused seven copies of the foregoing Brief to be served via United States First Class Mail, on the following:

Clerk's Office
U.S. Court of Appeals for the Third Circuit
21400 U.S. Courthouse
601 Market St.
Philadelphia, PA 19106-1790

DATED: March 12, 2026

By: */s/ Joshua D. Harms*
Joshua D. Harms