In the

# United States Court of Appeals
## For the Third Circuit

THE PENNSYLVANIA STATE UNIVERSITY,

*Plaintiff-Appellant/Cross-Appellee,*

v.

VINTAGE BRAND LLC, ET AL.,

*Defendants-Appellees/Cross-Appellants.*

On Appeal from the United States District Court
for the Middle District of Pennsylvania, No. 4:21-cv-01091
Honorable Matthew W. Brann, U.S. District Judge

**RESPONSE & REPLY BRIEF OF APPELLANT/CROSS-APPELLEE
THE PENNSYLVANIA STATE UNIVERSITY**

Lucy Jewett Wheatley
Claire Hagan Eller
MCGUIREWOODS LLP
800 East Canal Street
Richmond, VA 23219
T: 804.775.4320
F: 804.698.2017
*lwheatley@mcguirewoods.com*
*celler@mcguirewoods.com*

Brian D. Schmalzbach
MCGUIREWOODS LLP
800 East Canal Street
Richmond, VA 23219
T: 804.775.4746
F: 804.698.2304
*bschmalzbach@mcguirewoods.com*

*Counsel for Plaintiff-Appellant*
*The Pennsylvania State University*

**TABLE OF CONTENTS**

**Page**

INTRODUCTION ........................................................................................1

COUNTERSTATEMENT OF THE ISSUES
      ON CROSS-APPEAL..................................................................3

COUNTERSTATEMENT OF THE CASE
      ON CROSS-APPEAL..................................................................5

    A.    Penn State's Rights in the Asserted Marks Are Broad.................5

    B.    Defendants Sell Merchandise, Not Print-on-Demand
          Services.................................................................................7

    C.    The Record Contains Ample Evidence of Actual
          Confusion..............................................................................9

SUMMARY OF ARGUMENT ....................................................................10

ARGUMENT ON CROSS-APPEAL ...........................................................12

I.    The University Marks Are Not Aesthetically Functional....................12

    A.    The Jury's Verdict Rejecting Defendants' Aesthetic
          Functionality Defense Is Supported by the
          Evidence and Should Be Affirmed. ...............................................14

    B.    Defendants Misstate the Law of Aesthetic Functionality. ........19

        1.    Defendants' Theory Effectively Reads the Word
            "Aesthetic" Out of the Functionality Defense. .................20

        2.    Functionality is a Narrow Defense that Prevents
            Monopolization of Useful Product Designs.....................21

        3.    Courts Consistently Reject Aesthetic Functionality
            for University and Team Marks.........................................25

II.   Defendants' "Trademark Use" Theory Is Foreclosed by
      the Lanham Act and Binding Precedent. ...............................................29

      A.   Defendants' "Trademark Use" Arguments Are
           Legally Incorrect. ...........................................................................29

      B.   Even if "Trademark Use" by Defendants Was Required,
           Judgment as a Matter of Law Was Properly Denied. .................33

III.  The District Court Properly Denied Judgment as a Matter
      of Law on Likelihood of Confusion. ........................................................37

      A.   Defendants Forfeited Any Challenge to Penn State's
           Evidence or the Jury Instructions on Initial Interest
           and Post-Sale Confusion........................................................................38

      B.   The Evidence Supports the Jury's Confusion Verdict. ..............40

           1.   The Jury's Verdict Can Be Upheld Under a
                Point-of-Sale Confusion Theory..........................................40

           2.   A Reasonable Jury Could Find that Defendants'
                Merchandise Was Likely to Cause Initial
                Interest and Post-Sale Confusion........................................42

      C.   Defendants Cannot Show Instructional Error
           Requiring Relief. .............................................................................44

IV.   Sportswear Is Directly Liable for Infringement. ....................................45

      A.   Sportswear, as the Manufacturer and Distributor of
           Defendants' Infringing Goods, is Directly Liable.......................46

           1.   Distributors and Manufacturers of Infringing
                Goods Can Be Directly Liable for Infringement...............46

           2.   The Evidence Proves Sportswear Manufactured
                and Distributed the Infringing Goods. ............................47

      B.   Defendants' Theory that Direct Liability Requires
           "Visibility" to Consumers Is Legally Erroneous. .......................48

V. Defendants' Sufficiency Challenges Are Waived Because Their Post-Trial Motion Was Untimely. ................................................50

ARGUMENT ON REPLY.................................................................................52

I. Defendants' Brief Confirms That Penn State's Counterfeiting Claim Should Have Gone to the Jury. .....................................................52

    A. Defendants Concede That the District Court Applied the Wrong Statutory Provision to the Counterfeiting Claim. ....................................................................................53

    B. Defendants Offer No Support For Their Reading of "Counterfeit Mark." ...............................................................55

    C. Defendants' Arguments On Confusion Were Already Rejected by the Jury.....................................................................58

    D. Defendants Use Substantially Indistinguishable Copies of The University Marks.................................................................58

II. The District Court's Dilution Ruling Cannot Stand. ...........................61

    A. The District Court Applied a Legally Erroneous Test For Blurring, Warranting Reversal. ...............................................62

    B. A Reasonable Jury Could Find Defendants Liable For Dilution By Blurring, Separately Warranting Reversal.............64

    C. The Record Shows, at a Minimum, that Fame is a Disputed Fact. ...................................................................................66

III. Penn State Did Not Waive Its Arguments. .............................................68

    A. Penn State Preserved Its Arguments On Counterfeiting. .........68

    B. Penn State Preserved Its Arguments On Dilution......................69

CONCLUSION .................................................................................................71

**TABLE OF CITATIONS**

**Cases**

*Abitron Austria GmbH v. Hetronic Int'l, Inc.*,
600 U.S. 412 (2023) ............................................................................31

*Alexander v. Riga*,
208 F.3d 419 (3d Cir. 2000) ...............................................................39

*Am. Greetings Corp. v. Dan-Dee Imports, Inc.*,
807 F.2d 1136 (3d Cir. 1986) ..............................................................24

*Au-Tomotive Gold, Inc. v. Volkswagen of Am., Inc.*,
457 F.3d 1062 (9th Cir. 2006) ..............................................24, 25, 28

*Bd. of Supervisors for La. State Univ. v. Smack Apparel Co.*,
550 F.3d 465 (5th Cir. 2008) ..............................................................25

*Beazer E., Inc. v. Mead Corp.*,
412 F.3d 429 (3d Cir. 2005) ...............................................................54

*Bos. Athletic Ass'n v. Sullivan*,
867 F.2d 22 (1st Cir. 1989) .................................................................25

*Brockum Co., a Div. of Krimson Corp. v. Blaylock*,
729 F. Supp. 438 (E.D. Pa. 1990) ......................................................27

*Budinich v. Becton Dickinson & Co.*,
486 U.S. 196 (1988) .............................................................................51

*Checkpoint Sys., Inc. v. Check Point Software Techs., Inc.*,
269 F.3d 270 (3d Cir. 2001) ..............................................40, 42, 43

*Chi. Bears Football Club, Inc. v. 12th Man/Tenn. LLC*,
83 U.S.P.Q.2d 1073, 2007 WL 683778 (T.T.A.B. 2007) ...................26

*Citigroup Inc. v. Cap. City Bank Grp., Inc.*,
637 F.3d 1344 (Fed. Cir. 2011) ..........................................................68

*Citizens Fin. Grp., Inc. v. Citizens Nat'l Bank of Evans City,*
383 F.3d 110 (3d Cir. 2004) ...................................................................41

*City of New York v. Blue Rage, Inc.,*
435 F. Supp. 3d 472 (E.D.N.Y. 2020) ....................................................26

*Coty Inc. v. Cosmopolitan Cosmetics Inc.,*
432 F. Supp. 3d 345 (S.D.N.Y. 2020) ...............................................55, 56

*Donlin v. Philips Lighting N. Am. Corp.,*
581 F.3d 73 (3d Cir. 2009) ..............................................................44, 45

*Dunn v. HOVIC,*
1 F.3d 1371 (3d Cir. 1993), *as modified* (Nov. 26, 1993) ................................39

*Duraco Prods., Inc. v. Joy Plastic Enters., Ltd.,*
40 F.3d 1431 (3d Cir. 1994) ...................................................................22

*Ezaki Glico Kabushiki Kaisha v. Lotte Int'l Am. Corp.,*
986 F.3d 250 (3d Cir. 2021), *as amended* (Mar. 10, 2021) ...................21, 22, 23

*Fisons Horticulture, Inc. v. Vigoro Indus., Inc.,*
30 F.3d 466 (3d Cir. 1994) .....................................................................60

*Ford Motor Co. v. Lloyd Design Corp.,*
184 F. Supp. 2d 665 (E.D. Mich. 2002) ......................................................27

*G.D. Searle & Co. v. Hudson Pharm. Corp.,*
715 F.2d 837 (3d Cir. 1983) ...................................................................21

*Grubbs v. Sheakley Grp., Inc.,*
807 F.3d 785 (6th Cir. 2015) ..................................................................33

*Hurley v. Atl. City Police Dep't,*
174 F.3d 95 (3d Cir. 1999) .....................................................................45

*ICCS USA Corp. v. United States,*
952 F.3d 1325 (Fed. Cir. 2020) ...............................................................56

*In re Aquilino,*
135 F.4th 119 (3d Cir. 2025) ..........................................................68, 69, 70

*In re Lemington Home for the Aged*,
777 F.3d 620 (3d Cir. 2015) ...................................................................14, 15

*In re Mighty Leaf Tea*,
601 F.3d 1342 (Fed. Cir. 2010) ...................................................................6

*In re Sones*,
590 F.3d 1282 (Fed. Cir. 2009) ...................................................................34

*Jack Daniel's Props., Inc. v. VIP Prods. LLC*,
599 U.S. 140 (2023)...................................................................20, 21, 31

*John B. Stetson Co. v. Stephen L. Stetson Co.*,
85 F.2d 586 (2d Cir. 1936) ...................................................................47

*Kairys v. S. Pines Trucking, Inc.*,
75 F.4th 157 (3d Cir. 2023)...................................................................70

*Keene Corp. v. Paraflex Indus., Inc.*,
653 F.2d 822 (3d Cir. 1981) ...................................................................21, 24, 28

*Kelly-Brown v. Winfrey*,
717 F.3d 295 (2d Cir. 2013) ...................................................................32

*Lesende v. Borrero*,
752 F.3d 324 (3d Cir. 2014) ...................................................................39, 51

*Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.*,
799 F.2d 867 (2d Cir. 1986) ...................................................................44

*Lontex Corp. v. Nike, Inc.*,
107 F.4th 139 (3d Cir. 2024) ...................................... 16, 37, 41, 42, 56, 58, 59

*Lontex Corp. v. Nike, Inc.*,
384 F. Supp. 3d 546 (E.D. Pa. 2019)...................................................................59

*Lorillard Tobacco Co. v. Amouri's Grand Foods, Inc.*,
453 F.3d 377 (6th Cir. 2006)...................................................................46, 48, 49

*LTTB LLC v. Redbubble, Inc.,*
  840 F. App'x 148 (9th Cir. 2021) ......................................................28

*McNeil Nutritionals, LLC v. Heartland Sweeteners, LLC,*
  511 F.3d 350 (3d Cir. 2007) ......................................................40, 45

*O. Hommel Co. v. Ferro Corp.,*
  659 F.2d 340 (3d Cir. 1981) ......................................................51

*Ohio State Univ. v. Redbubble, Inc.,*
  989 F.3d 435 (6th Cir. 2021) ......................................................47

*Ohio State Univ. v. Skreened Ltd.,*
  16 F. Supp. 3d 905 (S.D. Ohio 2014)......................................................26

*Pa. State Univ. v. Parshall,*
  2022 WL 2712051 (M.D. Pa. Feb. 17, 2022) ......................................................68

*Parks LLC v. Tyson Foods, Inc.,*
  863 F.3d 220 (3d Cir. 2017) ......................................................67

*Pediatrix Screening, Inc. v. TeleChem Int'l, Inc.,*
  602 F.3d 541 (3d Cir. 2010) ......................................................52

*PIM Brands Inc. v. Haribo of Am. Inc.,*
  81 F.4th 317 (3d Cir. 2023)......................................................21, 23

*Playboy Enters., Inc. v. Netscape Commc'ns Corp.,*
  354 F.3d 1020 (9th Cir. 2004)......................................................23, 32, 33

*Purolator, Inc. v. EFRA Distribs.,*
  687 F.2d 554 (1st Cir. 1982) ......................................................46

*Qualitex Co. v. Jacobson Products Co.,*
  514 U.S. 159 (1995)......................................................22, 23

*Romag Fasteners, Inc. v. Fossil, Inc.,*
  590 U.S. 212 (2020)......................................................50

*Rosenberg v. DVI Receivables XIV, LLC,*
  818 F.3d 1283 (11th Cir. 2016)......................................................50

*Rosetta Stone Ltd. v. Google, Inc.*,
676 F.3d 144 (4th Cir. 2012) ....................................................23

*Savannah Coll. of Art & Design, Inc. v. Sportswear, Inc.*,
983 F.3d 1273 (11th Cir. 2020) ............................................24, 25

*Sazerac Brands, LLC v. Peristyle, LLC*,
892 F.3d 853 (6th Cir. 2018) ...................................................33

*Shalala v. Ill. Council on Long Term Care, Inc.*,
529 U.S. 1 (2000) .....................................................................32

*Standard Terry Mills, Inc. v. Shen Mfg. Co.*,
803 F.2d 778 (3d Cir. 1986) ....................................................20

*Starbucks Corp. v. Wolfe's Borough Coffee, Inc.*,
588 F.3d 97 (2d Cir. 2009) ......................................................63

*State Nat'l Ins. Co. v. Cnty. of Camden*,
824 F.3d 399 (3d Cir. 2016) ....................................................51

*Supreme Assembly, Order of Rainbow for Girls v. J.H. Ray Jewelry Co.*,
676 F.2d 1079 (5th Cir. 1972) ................................................28

*Tarlton v. Exxon*,
688 F.2d 973 (5th Cir. 1982) ...................................................51

*Texas Tech Univ. v. Spiegelberg*,
461 F. Supp. 2d 510 (N.D. Tex. 2006) ....................................26

*Tiffany & Co. v. Costco Wholesale Corp.*,
971 F.3d 74 (2d Cir. 2020) ......................................................32

*Times Mirror Mags., Inc. v. Las Vegas Sports News, L.L.C.*,
212 F.3d 157 (3d Cir. 2000) ........................................63, 65, 67

*United States v. Andrew*,
681 F.3d 509 (3d Cir. 2012) ....................................................45

*United States v. Diallo,*
575 F.3d 252 (3d Cir. 2009) .........................................................48, 56

*United States v. Ellis,*
156 F.3d 493 (3d Cir. 1998) ...............................................................44

*Univ. Book Store v. Bd. of Regents of the Univ. of Wis. Sys.,*
1994 WL 747886 (T.T.A.B. 1994) .....................................................27

*Univ. of Ga. Athletic Ass'n v. Laite,*
756 F.2d 1535 (11th Cir. 1985) .........................................................26

*Univ. of Kansas v. Sinks,*
565 F. Supp. 2d 1216 (D. Kan. 2008) ...............................................26

*Univ. of Pittsburgh v. Champion Prods.,*
686 F.2d 1040 (3d Cir. 1982) ............................................................27

*Univ. of Pittsburgh v. Champion Prods.,*
566 F. Supp. 711 (W.D. Pa. 1983) ....................................................27

*Vans, Inc. v. MSCHF Prod. Studio, Inc.,*
88 F.4th 125 (2d Cir. 2023) ...............................................................18

*VersaTop Support Sys., LLC v. Ga. Expo, Inc.,*
921 F.3d 1364 (Fed. Cir. 2019) ....................................................32, 46

*Villanueva v. Brown,*
103 F.3d 1128 (3d Cir. 1997) ............................................................14

*W.T. Rogers Co., Inc. v. Keene,*
778 F.2d 334 (7th Cir. 1985) .............................................................28

*Weil Ceramics & Glass, Inc. v. Dash,*
878 F.2d 659 (3d Cir. 1989) .........................................................55, 57

*Whitfield v. United States,*
543 U.S. 209 (2005) ......................................................................31, 55

*Y.Y.G.M. SA v. Redbubble, Inc.,*
75 F.4th 995 (9th Cir. 2023) ........................................................59, 60

**Statutes**

15 U.S.C. § 1111.................................................................................36

15 U.S.C. § 1114................................................32, 33, 46, 53, 58

15 U.S.C. § 1115(b)(4) .......................................................................31

15 U.S.C. § 1116(d)(1)(B)(ii).............................................................54

15 U.S.C. § 1117.................................................................................53

15 U.S.C. § 1125.................................................11, 22, 30, 63, 66

15 U.S.C. § 1127...........................................................................30, 57

36 U.S.C. § 220506(c)(4) ..................................................................54

**Regulations**

37 C.F.R. § 2.52(a) ...............................................................................6

**Rules**

Fed. R. Civ. P. 5.1(c) ..........................................................................51

Fed. R. Civ. P. 23(c)(1)(C) .................................................................51

Fed. R. Civ. P. 50................................................................................50

Fed. R. Civ. P. 51................................................................................39

Fed. R. Civ. P. 54(a) ...........................................................................50

Fed. R. Civ. P. 58, advisory committee's note to 2002
    amendment .................................................................................50

Fed. R. Civ. P. 60(b) ...........................................................................51

Fed. R. Civ. P. 62................................................................................51

Fed. R. Civ. P. 79(b)...........................................................................51

**Other Authorities**

Gilson on Trademarks § 2A.04[5][c] (2026. ed.)..............................................23

Gilson on Trademarks § 11.02 (2026 ed.).........................................................49

Joint Statement on Trademark Counterfeiting Legislation,
  130 Cong. Rec. 31673 (1984)...............................................................................57

McCarthy on Trademarks § 23:41 (5th ed. 2025) ............................................60

McCarthy on Trademarks § 25:26 (5th ed. 2025).............................................47

Restatement (Third) of Unfair Competition § 17 (1995).................................12

S. Rep. No. 100-515 (1988) ..................................................................................30

# INTRODUCTION

Defendants' cross-appeal is a policy argument masquerading as an appellate brief. Unable to identify any error in the jury instructions or point to a lack of evidence, Defendants instead ask this Court to rewrite the Lanham Act. They invoke academic commentary, out-of-circuit dicta, and vacated decisions to argue that trademark owners like Penn State who license their marks deserve less protection than those who manufacture their own goods. But that argument ignores the statutory text, conflicts with Supreme Court and Third Circuit precedent, and has been rejected by every court of appeals to consider it.

Vintage Brand's underlying premise is that collegiate licensing (indeed, all brand licensing) is a modern perversion of trademark law. In their view, trademark law offers no protection for licensed trademarks on merchandise, because these trademarks do not indicate who manufactured the product. Trademark law is not, and never has been, so narrow, which is why the Lanham Act expressly permits licensing and why the Trademark Office routinely registers collegiate and professional sports trademarks for use on merchandise.

1

Defendants argue that because fans use Penn State merchandise to signal their allegiance to Penn State, the University Marks on that merchandise are unprotectable. Their reasoning creates a catch-22: the more consumers want products prominently featuring a trademark, the less protectable that trademark becomes. This inverts the foundational principle that a trademark owner holds the goodwill associated with its mark and that infringers may not free ride on that reputation.

Importantly, unlike Penn State—whose counterfeiting and dilution claims were taken from the jury at summary judgment—Vintage Brand had every opportunity to make its arguments at trial. Defendants presented their aesthetic functionality defense, explained their trademark use theory, highlighted their website disclaimers and packaging, and tried to convince the jury that they sell "print-on-demand" products featuring "historic art." The District Court gave Defendants' preferred instruction on aesthetic functionality, over Penn State's objection. Yet the jury squarely and reasonably rejected every one of Defendants' defenses. This Court cannot, as Defendants urge, reweigh the evidence to disturb that finding.

The jury had no opportunity to consider Penn State's counterfeiting and dilution claims. This omission, and not the jury verdict, is the error this

Court should address. Defendants admit that the District Judge got the law wrong on counterfeiting and dilution at summary judgment: Section 32 of the Lanham Act—not Section 34—governs counterfeiting, and mark similarity for purposes of dilution is merely one blurring factor of a multi-factor test, not a threshold requirement. These concessions confirm that the District Court's entry of summary judgment on Penn State's counterfeiting and dilution claims should be reversed.

At bottom, Defendants are asking this Court to break the Lanham Act's core promise to trademark owners—that if they invest in building consumer recognition of their marks, they, and not imitating competitors, will reap the rewards of the goodwill they have earned. Breaking that promise would mean that Defendants, or any competitor, could copy Penn State's marks with impunity, creating a legalized black market for Penn State merchandise. This Court should reject Defendants' invitation to undermine a core tenet of trademark law by affirming the jury's verdict and correcting the errors of law made by the District Court.

**COUNTERSTATEMENT OF THE ISSUES ON CROSS-APPEAL**

Defendants' statement of the issues on cross-appeal issues rests on factual misstatements and misrepresents the Lanham Act. Their framing also

invites this Court to collapse the critical distinction between questions of fact and questions of law. Fairly presented, the issues on cross-appeal are:

(1) Whether sufficient evidence supports the jury's rejection of Defendants' aesthetic functionality affirmative defense, where Defendants offered no evidence that consumers purchase their products for reasons unrelated to Penn State's reputation.

(2) Whether the District Court correctly declined to instruct the jury that "trademark use" was an element of trademark infringement and correctly denied Defendants' motion for judgment as a matter of law on the same theory.

(3) Whether the District Court properly denied judgment as a matter of law on initial interest and post-sale confusion, where Defendants did not object to the admission of evidence on these theories and the evidence was sufficient to support the jury's finding of likely confusion.

(4) Whether the District Court properly denied a new trial based on the jury instructions, where Defendants failed to request instructions on

initial interest or post-sale confusion, and actively opposed Penn State's proposed instructions encompassing those theories.

(5)     Whether Sportswear is directly liable as the manufacturer and distributor of all merchandise bearing the University Marks.

(6)     Whether Defendants failed to preserve their objections to the sufficiency of evidence where they failed to file a Rule 50(b) motion within twenty-eight days of the entry of judgment.

## COUNTERSTATEMENT OF THE CASE ON CROSS-APPEAL

Defendants omitted or misrepresented numerous facts in their Statement of the Case. Penn State raises those omissions and misrepresentations relevant to this appeal below.

### A.     Penn State's Rights in the Asserted Marks Are Broad.

While Defendants acknowledge that Penn State owns rights in each of the University Marks, their brief does not fully reflect the scope of Penn State's rights.

First, with respect to the two word-marks at issue (PENN STATE and THE PENNSYLVANIA STATE UNIVERSITY), Penn State's registrations for these marks are in standard typeface, meaning that Penn State owns rights

in those marks regardless of the color, font, or stylization used. JA4095–JA4110; JA4164–JA4180.[1] Therefore, Penn State's registration for PENN STATE is legally identical to the use of PENN STATE in any font.

Second, the statement that "Vintage Brand never used either of Penn State's modern logos" is highly misleading. It is correct that Penn State owns additional trademarks that are not accused in this case, including design marks that the University uses with academics and with athletics. But the University Marks at issue here are all trademarks that Penn State uses extensively on merchandise, as shown by the following examples:

  

   

---

[1] *In re Mighty Leaf Tea*, 601 F.3d 1342, 1348 (Fed. Cir. 2010) (affirming decision that trademark registration for words in standard character format applied to various renditions of that mark); 37 C.F.R. § 2.52(a) (describing meaning of standard character marks).








JA9964; JA10004; JA10283; JA10285; JA10287; JA10297; JA10299; JA10302; JA10308; JA10310; JA10319; JA10330; JA10332; JA10334; JA10336. It is simply not the case that the University Marks at issue are historical artifacts; they are beloved and vibrant symbols of the University's present-day goodwill.

## B.      Defendants Sell Merchandise, Not Print-on-Demand Services.

Defendants repeatedly characterize their products as "print-on-demand" merchandise. Defs. Br. 4, 6, 7. The Vintage Brand website was not designed to offer print-on-demand services, making Defendants' characterization misleading. The Vintage Brand website shows merchandise available for sale as-is. JA4977 (Hartvigson testimony confirming that

Defendants' "website shows the images actually on products," not separately available). Customers visiting the Vintage Brand website could not customize products or make creative decisions about the merchandise. *Id.*; *see, e.g.*, JA10022, JA10088. Example screenshots from the website show that, from the perspective of a consumer visiting the site, Defendants offered and sold *merchandise*, with no customization options, not print-on-demand services or images that a customer could apply to a blank product.





JA10022; JA10088.

### C. The Record Contains Ample Evidence of Actual Confusion.

Defendants state boldly: "The record is devoid of any actual confusion." Defs. Br. 16. That is incorrect. Professor Franklyn's likelihood of confusion study showed "substantial risk of consumer confusion," with net confusion rates of 27-39%. JA8253; JA8302–JA8303. Dr. Erdem's survey showed similar gross confusion levels of 30-44%, and 87% of respondents believed Defendants were required to have Penn State's permission. JA8842–

JA8846; JA8307; JA8813–JA8814. And the only actual consumer who testified about visiting Defendants' website, Meghan Maffey, stated she believed Defendants had been authorized to use the University Marks. JA9391–JA9393.

## SUMMARY OF ARGUMENT

This Court should affirm the jury's verdict on trademark infringement, deny Defendants' cross-appeal in its entirety, and reverse the District Court's grant of summary judgment on counterfeiting and dilution.

**I. Aesthetic Functionality**. Defendants' appeal is a sufficiency-of-the-evidence challenge. Because aesthetic functionality is a question of fact, they can prevail only by demonstrating that no reasonable jury could have rejected this defense. Defendants fail to meet this burden. Penn State provided ample evidence at trial rebutting functionality, while Defendants presented virtually none supporting it. Defendants' legal arguments are designed to convince this Court that the University Marks are *per se* functional, but functionality requires a "*significant*" competitive

10

disadvantage "*unrelated* to recognition or reputation"—and Defendants' claimed disadvantage is entirely recognition- and reputation-based.

**II. Trademark Use.** Defendants' argument that Penn State was required to prove Defendants used the University Marks "as trademarks" has no basis in the Lanham Act. The statute imposes liability for the use of "any word, term, name, symbol" that causes confusion, not for use of a "trademark." 15 U.S.C. § 1125(a)(1). The Supreme Court's decisions in *Jack Daniel's* and *Abitron* do not support Defendants' novel theory, and the Second Circuit has squarely rejected it. Even if such a requirement existed, the evidence at trial—including Defendants' use of the ™ symbol with Penn State marks and their own licensing agreement—was sufficient for the jury to find trademark use.

**III. Likelihood of Confusion.** Defendants' challenge to the jury's confusion finding fails for three reasons. *First*, Defendants waived any objection to the jury's confusion instructions by failing to object at trial. *Second*, initial-interest, point-of-sale, and post-sale confusion are not separate claims, and Defendants do not contest the sufficiency of the evidence for

point-of-sale confusion, which alone sustains the verdict. *Third*, the evidence at trial supported confusion under any theory.

**IV. Sportswear's Direct Liability.** Sportswear manufactured and shipped every piece of infringing merchandise bearing the University Marks. The Lanham Act imposes liability for "distribution" of infringing goods, and it is well-settled that manufacturers who affix infringing marks are directly liable. Defendants' theory that direct liability requires "visibility" to consumers has no support in the statute or case law.

**V. Waiver.** Defendants' cross-appeal can in fact be dismissed in its entirety, as Defendants have waived all of their arguments. Defendants first failed to preserve their objections on initial interest and post-sale confusion at trial. Defendants then waived their remaining challenges by failing to file a timely Rule 50(b) motion.

**ARGUMENT ON CROSS-APPEAL**

## I.     The University Marks Are Not Aesthetically Functional.

Aesthetic functionality is a narrow defense designed to prevent the monopolization of decorative features under the guise of trademark law — precluding, for example, a claim of trademark rights in a heart-shaped box for chocolates. Restatement (Third) of Unfair Competition § 17, illus. 8

(1995). It has no application to arbitrary word marks and logos with no inherent aesthetic utility. Penn State pressed this point below, but the District Court gave Defendants the legal framework they asked for. No matter: the jury rejected the defense.

Undeterred—and unable to prevail even under the favorable legal framework the District Court adopted at their urging—Defendants now ask this Court to go further still, embracing an expansive and novel view of aesthetic functionality that would render the University Marks, and indeed any licensed trademarks, *per se* aesthetically functional. These arguments are wrong on the merits and beside the point on appeal. Whether any evidence supported the jury verdict, not Defendants' preferred legal framework, is the sole issue before this Court on aesthetic functionality.

The jury's decision was well supported under the instruction given by the district judge, an instruction Defendants approved. Defendants offered no evidence that Penn State's marks are essential to a product's use or purpose, and no evidence that protecting those marks would impose a significant non-reputation-related competitive disadvantage. Having tried and lost this defense on the facts, Defendants now ask this Court to win it for them by changing the law. The verdict should be affirmed.

**A.** **The Jury's Verdict Rejecting Defendants' Aesthetic Functionality Defense Is Supported by the Evidence and Should Be Affirmed.**

As Defendants concede, functionality is a question of fact on which the jury's verdict can be overturned only if, viewing the evidence in Penn State's favor, the jury would have no reasonable basis to reject this defense. Defs. Br. 27 (*citing Villanueva v. Brown*, 103 F.3d 1128, 1133 (3d Cir. 1997)). A jury verdict can be set aside only where "'the record is critically deficient of that minimum quantity of evidence from which a jury might reasonably afford relief.'" *In re Lemington Home for the Aged*, 777 F.3d 620, 626 (3d Cir. 2015). The question is not whether there is *no* evidence supporting Vintage Brand, but whether there is *any* evidence that supports a verdict for Penn State. *Id.* Defendants cannot meet that demanding standard.

Defendants presented their aesthetic functionality defense at trial over Penn State's objections. JA178–JA191. The District Court instructed the jury that to succeed, Defendants had to prove:

> [T]hat the images in dispute here that it used are essential to the use or purpose of Vintage Brand's goods or affect the cost or quality of those goods; [or] that protection of the features as trademarks would impose a significant non-reputation-related competitive disadvantage upon Vintage Brand.

JA7827. The Court further instructed that aesthetic functionality "is generally limited to product features that serve an aesthetic purpose independent of any source-identifying function." *Id.* Defendants did not object to that instruction and do not challenge it on appeal. JA9029. Their appeal focuses solely on whether judgment as a matter of law should have been granted on the second prong, arguing that any reasonable jury must have found that enforcing the University Marks puts Defendants at a significant, non-reputation-related competitive disadvantage. Defs. Br. 26–39.

The record shows that the jury had at least three independent and reasonable bases to reject the aesthetic functionality defense, any one of which suffices to affirm.

*First*, the jury could reasonably find that Defendants failed to prove any competitive disadvantage from being barred from using the University Marks. Although Defendants make sweeping declarations about why consumers purchase their products, they presented no evidence at trial on this point, testifying at trial that Defendants do not know who their customers are, have no target customer, and have conducted no research regarding customer demographics or purchasing motivations. JA9401;

JA9407; JA9359–JA9360. From this evidentiary void, the jury could reasonably conclude that Defendants failed to carry their burden, which alone provides a sufficient basis to affirm. *Lontex Corp. v. Nike, Inc.*, 107 F.4th 139, 151 (3d Cir. 2024).

*Second*, even if Defendants faced some competitive disadvantage, the jury could reasonably find that disadvantage was not "significant." The evidence showed that competitors, including Vintage Brand itself, can and do sell products referencing Penn State without appropriating the University Marks. Penn State's Director of Licensing Stephanie Petulla testified and offered visual examples that:

- Defendants have sold merchandise referencing Penn State without using the University Marks and that Penn State does not seek to stop such uses. JA8179–JA8180; JA10337–JA10340.

- A local State College store named Lions Pride is free to use that business name along with a logo depicting a lion cub because—while that name and logo evoke Penn State—those symbols are not Penn State trademarks. JA8112–JA8114; JA9453–JA9456.

- The colors blue and white and the phrase "We Are" are often used to signal Penn State by fans, but the University does not claim those as trademarks, and competitors are free to use them. JA8180–JA8181.

This evidence showed the jury that competitors can create merchandise for consumers who want to express affiliation with Penn State without

16

infringing the University Marks. These examples alone demonstrate that any competitive disadvantage is not "significant."

*Third,* the jury had ample basis to conclude that any disadvantage was connected to Penn State's reputation—which, as instructed by the district court, meant the defense should be rejected. Defendants offered no evidence that consumers purchase their merchandise because they find the Penn State Marks aesthetically pleasing independent of their association with Penn State. To the contrary, trial evidence demonstrated that consumer demand is driven by Penn State's reputation, including its reputation for quality. Multiple witnesses testified that the University takes significant measures to ensure product quality and that consumers associate the University with merchandise quality. JA7988; JA7991; JA7997–JA7998; JA8000–JA8001; JA8032–JA8033; JA8069–JA8073; JA8104–JA8106; JA8014. This evidence shows that any competitive disadvantage Defendants face stems directly from Penn State's reputation and goodwill—precisely the type of reputation-related advantage the jury was instructed to disregard.

The jury also had evidence that the University Marks did not serve an aesthetic purpose inseparable from their source-identifying function. Caroline Gummo, the owner of the State College, PA based store The Family

Clothesline, testified that the Marks alone signal the University's authorization, making additional licensing verification unnecessary. JA8391–JA8392. Ms. Maffey, the then President of the Washington D.C. Chapter of the Penn State Alumni Association, testified similarly that when she saw Penn State products on Defendants' website, she assumed they were licensed because "if it has the logo on it, it's trademarked through the University." JA9394.

Defendants offer no real explanation of how the trial record *requires* a finding of aesthetic functionality. The only trial evidence they cite is testimony from three Penn State witnesses who confirmed that one reason they purchase Penn State merchandise is to support Penn State. Defs. Br. 31–34. Far from establishing aesthetic functionality, this testimony undercuts it: each witness linked the purchasing decision to Penn State's reputation and their belief that the purchase would support Penn State as the source of the merchandise. JA8004–JA8005; JA8221; JA9381; JA9393–JA9394. That is textbook source identification, not a competitive need unrelated to reputation. *Vans, Inc. v. MSCHF Prod. Studio, Inc.*, 88 F.4th 125, 139 (2d Cir. 2023) (defendant "used Vans' trademarks in a source-identifying manner" by seeking to "benefit from the 'good will' that Vans … had generated"). And

18

viewed in Penn State's favor, the purchasing motivations of three witnesses hardly establish the "significant" competitive disadvantage Defendants must prove.

In all, the jury had ample evidence on which to conclude that Defendants had not met their burden on aesthetic functionality. Given this record, and because Defendants bore the burden of proof on aesthetic functionality, there is no basis to reverse the verdict.

**B.      Defendants Misstate the Law of Aesthetic Functionality.**

As demonstrated above, the trial record amply supports the jury's rejection of the aesthetic functionality defense. Hamstrung by their lack of evidence, Defendants resort to their only remaining option: convert this issue of fact to one of law by urging this Court to adopt an aesthetic functionality standard so expansive it would create a *per se* rule that licensed marks on merchandise are functional. The Court should disregard Defendants' legal argument because it is irrelevant; Defendants do not contend that the jury or the District Court applied the wrong legal standard. Moreover, no court has adopted Defendants' view of aesthetic functionality, and for good reason: it conflicts with the Lanham Act, Supreme Court precedent, and the authority of every circuit.

**1. Defendants' Theory Effectively Reads the Word "Aesthetic" Out of the Functionality Defense.**

Defendants contend that designs are "functional" if they are "useful for anything beyond branding." Defs. Br. 28. But that reads the word "aesthetic" out of the aesthetic functionality defense. True aesthetic functionality requires that consumers value a design for its inherent aesthetic appeal, independent of its source-identifying significance. *See, e.g., Standard Terry Mills, Inc. v. Shen Mfg. Co.*, 803 F.2d 778, 781 (3d Cir. 1986) (design was aesthetically functional where it was "generic" in the industry, a "favorite pattern for kitchen textiles," and "compatible with contemporary kitchen décor"). Defendants' argument proves the opposite: they contend consumers want the merchandise because it signifies Penn State. That is not aesthetics—that is reputation, and trading on another's reputation is precisely what the Lanham Act prohibits.

Defendants' view that marks lose protection whenever they serve any purpose beyond branding also conflicts with binding authority. In *Jack Daniel's Properties, Inc. v. VIP Products LLC*, the Supreme Court recognized that trademarks routinely serve multiple functions simultaneously: they "catch a consumer's eye, appeal to his fancies, and convey every manner of

20

message." 599 U.S. 140, 146 (2023); *Keene Corp. v. Paraflex Indus., Inc.*, 653 F.2d 822, 826 (3d Cir. 1981) (rejecting argument that design was functional because it attracted consumers). That Penn State's marks may "appeal to the fancies" of fans who want to show school spirit does not strip them of protection—if it did, no popular trademark would survive.

> **2. Functionality is a Narrow Defense that Prevents Monopolization of Useful Product Designs.**

The Third Circuit has applied functionality analysis only in the product design context—involving candy shapes, biscuit sticks, drug tablets, and luminaire designs—as Defendants' own authority confirms. *See PIM Brands Inc. v. Haribo of Am. Inc.*, 81 F.4th 317, 321–23 (3d Cir. 2023); *Ezaki Glico Kabushiki Kaisha v. Lotte Int'l Am. Corp.*, 986 F.3d 250, 256–58 (3d Cir. 2021), *as amended* (Mar. 10, 2021); *G.D. Searle & Co. v. Hudson Pharm. Corp.*, 715 F.2d 837, 841–43 (3d Cir. 1983); *Keene*, 653 F.2d at 826.

Defendants invite the Court to conflate inherently distinctive trademarks with product design, but the distinction is critical. Product design features inevitably raise the question of distinguishing protectable elements under the Lanham Act from utilitarian ones belonging to patent law. *See Keene*, 653 F.2d at 825. Ordinary trademarks present no such

challenge. *See Duraco Prods., Inc. v. Joy Plastic Enters., Ltd.*, 40 F.3d 1431, 1441 (3d Cir. 1994) (noting that the trademark taxonomy "does not fit the quite different considerations applicable to product configurations" and that unlike a "product feature" an "arbitrary name … functions primarily to denote the product's source"). The Lanham Act codifies this distinction, requiring proof of non-functionality to enforce unregistered trade dress—but not trademark—rights. 15 U.S.C. § 1125(a)(3). The University Marks are inherently distinctive registered trademarks—not product designs—and applying functionality analysis to them would collapse the very distinction the law requires.

Even assuming the functionality defense applies to word and logo marks, Defendants misconstrue the test. This Circuit applies a standard derived from *Qualitex Co. v. Jacobson Products Co.*, 514 U.S. 159, 169 (1995): whether a feature is "essential to the use or purpose" or "affects [the] cost or quality" of the product, *id.*, or whether exclusive use would "put competitors at a non-reputation related disadvantage," *Ezaki Glico*, 986 F.3d at 257. Critically, *Qualitex* excludes reputation- or recognition-based advantages from the calculus, 514 U.S. at 169, reflecting trademark law's purpose of protecting "the financial, reputation-related rewards associated with a

desirable product," *id.* at 164. Because the only "function" of most trademarks is to identify source and symbolize the markholder's reputation, the test is logically incompatible with trademarks like Penn State's that lack independent aesthetic appeal apart from their source-identifying role. Gilson on Trademarks § 2A.04[5][c] (2026 ed.).

Moreover, functionality is assessed from the perspective of the trademark owner — not the accused infringer. *PIM Brands*, 81 F.4th at 320-21. This rule ensures that courts evaluate whether a mark's features are inherently utilitarian — not whether the mark owner has successfully built up enough goodwill in the mark to create a competitive advantage. That Penn State's marks make Defendants' merchandise more marketable does not render them functional to Penn State. *See Playboy Enters., Inc. v. Netscape Commc'ns Corp.*, 354 F.3d 1020, 1031 (9th Cir. 2004) ("[t]he fact that the marks make defendants' computer program more functional is irrelevant"); *Rosetta Stone Ltd. v. Google, Inc.*, 676 F.3d 144, 162 (4th Cir. 2012) (utility of mark to accused infringer "irrelevant" where mark was not essential to mark holder's own products).

Defendants narrow "unrelated to reputation" to mean only the mark holder's reputation as a source of the particular goods at issue, overlooking

that any functional disadvantage must also be unrelated to the mark's *recognition*. Defs. Br. 34–35. They cite no support for this limitation—and *Qualitex* nowhere suggests it. Instead "recognition" refers to a trademark's ability to symbolize the mark holder, while "reputation" encompasses the mark holder's goodwill—i.e., the reason consumers desire to affiliate themselves with a mark holder like Penn State. *See Savannah Coll. of Art & Design, Inc. v. Sportswear, Inc.*, 983 F.3d 1273, 1285 (11th Cir. 2020) ("The very nature of school memorabilia relies upon the goodwill, reputation, and affiliation people associate with that school.").[2]

The case law is uniform. A "feature is not functional merely because it makes the product more attractive to consumers." *Am. Greetings Corp. v. Dan-Dee Imports, Inc.*, 807 F.2d 1136, 1142 (3d Cir. 1986). Defendants' view would mean "[t]he more appealing the design, the less protection it would receive"—punishing trademark owners for the very recognition the Lanham Act rewards. *Keene*, 653 F.2d at 825. Even the Ninth Circuit—which has gone the farthest in recognizing aesthetic functionality—rejected this precise theory in *Au-Tomotive Gold, Inc. v. Volkswagen of America, Inc.*, 457 F.3d 1062,

---

[2] That case involved one of the same defendants (Sportswear) at issue here.

24

1073 (9th Cir. 2006). In that case, the defendant argued it could not compete without using the plaintiff's marks because consumers wanted branded accessories that matched their branded vehicles. The court reversed, holding the "alleged aesthetic function is indistinguishable from and tied to the mark's source-identifying nature." *Id.* at 1073–74. Defendants' argument is identical: they contend consumers buy these products because they bear marks recognized as Penn State's—a concession that the marks function as trademarks, not that they are aesthetically functional. Defendants confirmed as much by accepting the *Qualitex* standard in the jury instructions without objection—endorsing the very framework that defeats their defense.

### 3. Courts Consistently Reject Aesthetic Functionality for University and Team Marks.

Courts have consistently declined to deem team and university trademarks "aesthetically functional." The Fifth Circuit held that university colors and indicia "had no significance other than to identify with the Universities and were therefore nonfunctional." *Bd. of Supervisors for La. State Univ. v. Smack Apparel Co.*, 550 F.3d 465, 486–88 (5th Cir. 2008). The Eleventh Circuit reached the same conclusion in *Savannah College of Art & Design, Inc.*, 983 F.3d at 1285. *See also Bos. Athletic Ass'n v. Sullivan*, 867 F.2d 22, 35 (1st Cir.

25

1989) (rejecting argument that third-party use of BOSTON MARATHON trademarks on t-shirts was permissible because it was not being used as a source identifier); *Univ. of Ga. Athletic Ass'n v. Laite*, 756 F.2d 1535, 1546–47 & n.28 (11th Cir. 1985) (rejecting analysis in *International Order of Job's Daughters v. Lindeburg & Co.*, 633 F.2d 912 (9th Cir. 1980) and holding that use of university marks on beer cans to appeal to fans of the university was trademark infringement).

District courts have uniformly followed suit. *See, e.g.*, *City of New York v. Blue Rage, Inc.*, 435 F. Supp. 3d 472, 491 (E.D.N.Y. 2020) (rejecting argument that NYPD and FDNY marks on t-shirts were aesthetically functional); *Ohio State Univ. v. Skreened Ltd.*, 16 F. Supp. 3d 905, 919 (S.D. Ohio 2014) (rejecting aesthetic functionality for university logo on t-shirts); *Univ. of Kansas v. Sinks*, 565 F. Supp. 2d 1216, 1261 (D. Kan. 2008) (university trademarks on t-shirts not functional); *Chi. Bears Football Club, Inc. v. 12th Man/Tenn. LLC*, 83 U.S.P.Q.2d 1073, 2007 WL 683778, at *14 (T.T.A.B. 2007) (holding that consumer desire for a team logo, regardless of knowledge of quality or sponsorship, did not render the logo aesthetically functional); *Texas Tech Univ. v. Spiegelberg*, 461 F. Supp. 2d 510, 520 (N.D. Tex. 2006) (holding that a college color scheme on apparel did not affect how it worked, its cost, or

quality and so the color scheme was not functional); *Ford Motor Co. v. Lloyd Design Corp.*, 184 F. Supp. 2d 665, 673–74 (E.D. Mich. 2002) (rejecting argument that FORD trademark was aesthetically functional); *Brockum Co., a Div. of Krimson Corp. v. Blaylock*, 729 F. Supp. 438, 445 (E.D. Pa. 1990) (holding that use of ROLLING STONES on t-shirts was not functional).

The cases Defendants cite are irrelevant or unpersuasive. Defendants' reliance on the *University of Pittsburgh v. Champion Products* decisions (Defs. Br. 19–20, 37) is misplaced. 686 F.2d 1040 (3d Cir. 1982). The Third Circuit's decision was decided on "very narrow" grounds limited to laches, with the Court deliberately avoiding aesthetic functionality. *Id.* at 1044, 1047–49. The district court's post-remand decision was vacated[3] and rested on materially different facts, including Champion's half-century of unobjected-to sales, and the lack of confusion evidence. *Univ. of Pittsburgh v. Champion Prods.*, 566 F. Supp. 711, 712–16 (W.D. Pa. 1983). Here, by contrast, Penn State has consistently enforced its trademark rights (JA7994–JA7996), and the jury found likelihood of confusion.

---

[3] The district court's decision being vacated is confirmed by more contemporary sources. *E.g.*, *Univ. Book Store v. Bd. of Regents of the Univ. of Wis. Sys.*, 1994 WL 747886, at *5, (T.T.A.B. 1994).

The out-of-circuit cases Defendants cite are unpersuasive and do not support overturning a jury verdict on a sufficiency challenge. Defendants' focus on *Job's Daughters* (Defs. Br. 34–38), but that decision predates the applicable Supreme Court authority such as *Qualitex*, has been widely criticized, and is not good law in this Circuit. *See*, *e.g.*, *Keene*, 653 F.2d at 825 (rejecting Ninth Circuit's broad view of aesthetic functionality); *W.T. Rogers Co., Inc. v. Keene*, 778 F.2d 334, 340 (7th Cir. 1985) (expressly rejecting *Job's Daughters*); *Au-Tomotive Gold*, 457 F.3d at 1069 (explaining that *Job's Daughters* was a "unique case" and that its "broad language was soon clarified and narrowed."). *LTTB LLC v. Redbubble, Inc.*, 840 F. App'x 148, 152 (9th Cir. 2021), is a non-precedential opinion that turned on the inherent functionality of the humorous pun LETTUCE TURNIP THE BEET. And, like the *University of Pittsburgh* case, *Supreme Assembly, Order of Rainbow for Girls v. J.H. Ray Jewelry Co.*, 676 F.2d 1079, 1084 (5th Cir. 1972), did not address functionality.

The lesson from the overwhelming weight of authority is clear: the jury verdict that the University Marks are not functional was entirely reasonable and should not be disturbed.

**II. Defendants' "Trademark Use" Theory Is Foreclosed by the Lanham Act and Binding Precedent.**

Defendants ask this Court to overturn its own precedent and require that Penn State prove Defendants used the University Marks "as trademarks." Their theory finds no support in the Lanham Act, conflicts with Supreme Court precedent, and has been rejected by courts nationwide. Even if this Court were inclined to create a new element in the test for trademark infringement, there was sufficient evidence at trial to show Defendants used the University Marks "as trademarks," precluding judgment as a matter of law.

**A. Defendants' "Trademark Use" Arguments Are Legally Incorrect.**

In assigning error, Defendants ask this Court to adopt a new test for trademark infringement that adds an additional element to a plaintiff's prima facie case: requiring that the plaintiff prove that the defendant used a mark "as a trademark." Defs. Br. 40–41.

The Lanham Act itself forecloses Defendants' position. Sections 1114(1)(a) and 1125(a)(1)—the operative provisions creating causes of action for trademark infringement—impose liability when "any word, term, name, symbol, or device" is used in commerce in a manner likely to cause

confusion. 15 U.S.C. § 1125(a)(1). Congress chose this expansive language deliberately: liability turns on the *use* of a confusingly similar designation, not on whether that designation independently qualifies as a "trademark." Defendants' attempt to graft an additional requirement onto these provisions finds no support in the statutory text.

Nor does § 1127 supply the limitation Defendants seek. Section 1127 defines "use in commerce" as "the bona fide use of a mark in the ordinary course of trade, and not made merely to reserve a right in a mark." 15 U.S.C. § 1127. By its terms, this definition addresses the trademark *registration* process—not the question of what conduct constitutes infringement. The legislative history confirms this: Congress explained that "the revised definition [of 'use in commerce'] is intended to apply to all aspects of the trademark registration process," while "use of any type will continue to be considered in an infringement action." S. Rep. No. 100-515, at 44–45 (1988). Section 1127's definition thus has no bearing on the infringement analysis.

Other Lanham Act provisions confirm that when Congress intends a claim or defense to turn on a defendant's use of a trademark, it says so expressly. For example, the statutory fair use defense requires "use[] otherwise than as a mark" as a prerequisite—language that would be

entirely superfluous if "use[] otherwise than as a mark" alone were sufficient to defeat infringement. 15 U.S.C. § 1115(b)(4). Where Congress demonstrates that it knows how to impose a requirement, its choice not to do so elsewhere must be respected. *See Whitfield v. United States*, 543 U.S. 209, 216–17 (2005).

Defendants' invocation of Supreme Court precedent fares no better. In *Jack Daniel's Properties*, the Supreme Court held that a threshold First Amendment test does *not* apply when an infringer uses a mark "as a trademark." 599 U.S. at 156–57, 59. If, as Defendants contend, infringement could never occur absent "trademark use," then infringement would necessarily entail use of a mark as a trademark—and the threshold First Amendment test would never apply. The Court's holding that the test applies in some instances thus presupposes that infringement can occur without "trademark use."

Defendants' reliance on *Abitron Austria GmbH v. Hetronic International, Inc.*, 600 U.S. 412 (2023), is equally unavailing. *Abitron* addressed only the Lanham Act's territorial reach, *id.* at 415, and the Court expressly declined to elaborate on the meaning of "use in commerce." *Id.* at 428 & n.6; *see also id.* at 429 (Jackson, J., concurring) ("The Court has no need to elaborate today upon what it means to 'use a trademark in commerce[.]'"). Because neither

31

*Jack Daniel's* nor *Abitron* imposed a new element for trademark infringement, Defendants' efforts to cherry-pick isolated language as *sub silentio* creating one should be rejected. *See Shalala v. Ill. Council on Long Term Care, Inc.*, 529 U.S. 1, 18 (2000).

The weight of appellate authority reinforces this conclusion. The Second Circuit has squarely rejected Defendants' position: "We … decline to adopt the rule that Lanham Act plaintiffs must show that the defendant was using the allegedly infringing content 'as a mark' as a threshold issue in order to establish consumer confusion." *Kelly-Brown v. Winfrey*, 717 F.3d 295, 305–08 (2d Cir. 2013); *see also Tiffany & Co. v. Costco Wholesale Corp.*, 971 F.3d 74, 95 n.18 (2d Cir. 2020) ("Terms not used as a mark may still generate confusion … and therefore constitute trademark infringement."). The Federal Circuit has likewise confirmed that the § 1114 "use in commerce" definition does not apply to infringement claims. *VersaTop Support Sys., LLC v. Ga. Expo, Inc.*, 921 F.3d 1364, 1370–72 (Fed. Cir. 2019) (holding: "the district court in this case incorrectly applied the definition of 'use in commerce' that is included in the statute for purposes of trademark registration. This definition does not apply to trademark infringement."); *see also Playboy*

*Enters., Inc.*, 354 F.3d at 1024 n.11 (declining to apply "use in commerce" provision in § 1114 in an infringement case).

Defendants urge this Court to follow the Sixth Circuit. Defs. Br. 43–44 (citing *Grubbs v. Sheakley Grp., Inc.*, 807 F.3d 785, 793 (6th Cir. 2015)). But the Sixth Circuit has itself questioned this approach: in *Sazerac Brands, LLC v. Peristyle, LLC*, 892 F.3d 853, 859 (6th Cir. 2018), the court "acknowledge[d]" that "we might wish to reconsider whether our test respects the language of the statute." When even the Sixth Circuit has flagged the infirmities of this approach, this Court has no reason to adopt it.

Accordingly, Penn State was not required to prove in its prima facie case that Defendants were using the University Marks "as trademarks." The District Court did not err by declining to instruct the jury on this point.

### B. Even if "Trademark Use" by Defendants Was Required, Judgment as a Matter of Law Was Properly Denied.

Even if, *arguendo*, Defendants' legal position was accepted, Defendants' request for judgment as a matter of law was properly denied because the evidence at trial was sufficient to find that Defendants used the University Marks as trademarks.

*First*, Defendants identified the S Lion as a trademark by using that mark on their "products" with the ™ symbol:



JA10052. Given that this ™ symbol is a specific notation to indicate the user's claim of trademark rights, a jury could find that Defendants have themselves claimed to use the University Marks as trademarks. *In re Sones*, 590 F.3d 1282, 1289 (Fed. Cir. 2009) (use of ™ symbol probative of trademark use).

*Second*, the Licensing and Fulfillment Agreement between Vintage Brand and Sportswear states that "the Marks and Content designate products endorsed, approved or sponsored by VINTAGE BRAND" and that Vintage Brand has "goodwill" in the Content. JA9753. Chad Hartvigson testified that "Content" in that Agreement meant "the art on the shirts." JA8730–JA8731. A jury could reasonably interpret this evidence as proving that Defendants believed and intended that they were using the University

Marks as indicators that Vintage Brand was the source of the products, i.e., as trademarks.

*Third*, the evidence showed that Defendants use their own asserted VINTAGE BRAND trademarks in the same manner they use the University Marks, including in large graphics on the front of t-shirts:



JA10080. Further, this same evidence shows that Defendants use the ® registration symbol with their VINTAGE BRAND mark appearing on the front of their merchandise, again showing Defendants treating these uses as trademark uses:



JA10080; JA10327. This symbol is a method of giving notice of a mark holder's trademark registration. 15 U.S.C. § 1111. Similarly, while Defendants argue on appeal that "trademark use" of a mark involves placing a mark on the inside neck of a t-shirt (Defs. Br. 12), Defendants' own branded merchandise does not consistently include such markings, undermining their arguments about what is required to show "trademark use":



JA10327-JA10328. A jury could reasonably construe this evidence as showing that Defendants' treatment of their own merchandise shows that their parallel use of the University Marks similarly constitutes "trademark use."

In all, the jury had sufficient evidence to find that Defendants used the University Marks as trademarks, meaning that the District Court properly denied judgment as a matter of law here. *Lontex*, 107 F.4th at 151 (judgment as a matter of law improper where evidence construed in verdict winner's favor would provide legally sufficient basis to support verdict).

III.    **The District Court Properly Denied Judgment as a Matter of Law on Likelihood of Confusion.**

Defendants seek to overturn the jury's infringement verdict by arguing that the jury instructions and evidence were insufficient with respect to initial interest and post-sale confusion. This argument fails for four independent reasons: (1) Defendants waived any challenge to the jury instructions on these theories; (2) the verdict can be sustained on point-of-sale confusion alone, which Defendants do not contest was supported by sufficient evidence; (3) in any event, the trial evidence amply supported the

37

jury's finding of likely confusion under each type of confusion; and (4) the instructions were not erroneous.

### A. Defendants Forfeited Any Challenge to Penn State's Evidence or the Jury Instructions on Initial Interest and Post-Sale Confusion.

Defendants argue that Penn State improperly invited the jury "to consider evidence suggesting [initial interest and post-sale] confusion . . . without having instruction or guidance." Defs. Br. 46. But Defendants forfeited these objections by failing to raise them below.

First, Defendants identify three pieces of evidence they now characterize as relating to initial interest and post-sale confusion: (1) Stephanie Petulla's Google search testimony, JA8176–JA8178; (2) Exhibit P-209, a screenshot of that search, JA10017; and (3) Scott Howell's testimony regarding whether observers can see labels on strangers' merchandise, JA8096. Defendants did not object to any of this evidence at trial. *See* JA8176– JA8178; JA8095–JA8096.

Second, Defendants never requested jury instructions on initial interest or post-sale confusion—and in fact *opposed* Penn State's proposed instructions that would encompass these theories. *See* ECF 278 at 72 n.33; JA8995–JA8996; JA8998–JA9002. Having failed to request such instructions

and having objected to their inclusion, Defendants cannot now complain that the District Court should have issued them. *See Lesende v. Borrero*, 752 F.3d 324, 337 (3d Cir. 2014) (party cannot complain of error it "encouraged or prompted"); *Alexander v. Riga*, 208 F.3d 419, 426 (3d Cir. 2000) (failing to challenge jury instructions below waives such challenge); *see* Fed. R. Civ. P. 51(c)(1), (d)(1)(B) (to preserve objection based on "failure to give an instruction," party must "properly request[]" that instruction to district court and object distinctly on the record to failure to provide that instruction).

Defendants claim they "timely object[ed] to the lack of a post-sale instruction," Defs. Br. 47 (citing JA9051). But the transcript reveals only a brief objection to Penn State's closing argument in advance of that argument—not a request for jury instructions as Rule 51 requires. And even that objection was waived when Defendants failed to object to specific statements during the closing or request a mistrial. *Dunn v. HOVIC*, 1 F.3d 1371, 1377 (3d Cir. 1993), *as modified* (Nov. 26, 1993) (party waived objection to statements opposing counsel made in closing argument by "fail[ing] to make a timely objection").

**B.      The Evidence Supports the Jury's Confusion Verdict.**

Even setting aside waiver, the jury's verdict is fully supported by the trial evidence.

**1.      The Jury's Verdict Can Be Upheld Under a Point-of-Sale Confusion Theory.**

In seeking relief based on alleged deficiencies in proof of initial interest and post-sale confusion, Defendants presume that these are separate claims requiring distinct proof. Defs. Br. 46–48. That premise is incorrect.

First, initial interest, point-of-sale, and post-sale confusion are not separate claims for relief—they are simply different forms of confusion occurring at separate points in time. The elements of trademark infringement remain the same regardless of which type is at issue. This Court has made clear that courts should apply the same *Lapp* factors to assess likelihood of confusion in point-of-sale confusion, initial interest confusion, and post-sale confusion cases. *Checkpoint Sys., Inc. v. Check Point Software Techs., Inc.*, 269 F.3d 270, 292, 297 (3d Cir. 2001); *McNeil Nutritionals, LLC v. Heartland Sweeteners, LLC*, 511 F.3d 350, 358 (3d Cir. 2007).

Because all forms of confusion are assessed under the same *Lapp* factors, judgment as a matter of law was properly denied if the evidence

supports any one of the confusion theories. Defendants do not contest the sufficiency of the evidence under a point-of-sale theory. *See generally* Defs. Br. 46–51. That alone is dispositive. In *Lontex*, this Court held that where evidence was sufficient to establish one theory of confusion, the defendant "was not entitled to judgment as a matter of law and we need not reach" the alternative theory. 107 F.4th at 155 n.3. The same logic applies here: because unchallenged evidence supports point-of-sale confusion, this Court need not reach initial-interest or post-sale confusion at all.

*Second*, Defendants defeat their own argument. They contend the evidence of initial-interest and post-sale confusion was insufficient and that the jury instructions did not address those theories. Defs. Br. 48–51. If that is true, then there was no error and no harm: the jury necessarily based its verdict on point-of-sale confusion, the one theory Defendants concede was sufficiently supported. Juries are presumed to follow their instructions, *Citizens Fin. Grp., Inc. v. Citizens Nat'l Bank of Evans City*, 383 F.3d 110, 133 (3d Cir. 2004), and Defendants cannot have it both ways: they cannot argue the jury was never asked to consider these alternative theories and simultaneously claim those theories infected the verdict.

Therefore, this Court can affirm the jury's verdict based on point-of-sale confusion.

### 2. A Reasonable Jury Could Find that Defendants' Merchandise Was Likely to Cause Initial Interest and Post-Sale Confusion.

Even if the Court reaches the merits of Defendants' evidentiary arguments, those arguments fail. In challenging the District Court's denial of judgment as a matter of law, Defendants bear a heavy burden: they must show that no reasonable jury could have found likely confusion based on the trial evidence. *Lontex*, 107 F.4th at 151. Defendants fall far short of that standard because they improperly analyze the evidence, failing to construe it in Penn State's favor as required.

Defendants' arguments regarding initial interest confusion misconstrue both the doctrine and the evidence. Initial interest confusion occurs when a defendant's use of a trademark diverts consumer attention to the defendant's products, even if confusion is dispelled before purchase. *Checkpoint Sys.*, 269 F.3d at 292. Ms. Petulla testified that a Google search showed Vintage Brand and Penn State products side-by-side, and that links to Vintage Brand products contained nothing indicating it was an unauthorized seller. JA8176–JA8178. A reasonable jury could find that

42

consumers searching for Penn State merchandise would be diverted to Vintage Brand's products—precisely the "bait and switch" that initial interest confusion doctrine addresses. *Checkpoint Sys.*, 269 F.3d at 294.

Moreover, the Google search evidence is also relevant to point-of-sale confusion. Clicking the search results took consumers directly to Vintage Brand's product pages, and substantial trial evidence showed consumers found Defendants' website confusing. JA8302–JA8303; JA8842–JA8846; JA9391–JA9394. The jury could reasonably find "bait" with no "switch"—unlike in classic initial interest confusion, consumers here remained confused throughout the purchasing process and beyond. This evidence supports the verdict regardless of which temporal theory of confusion the Court applies.

With respect to post-sale confusion, Defendants misconstrue both the law and the evidence. Post-sale confusion occurs when observers who see a defendant's products are confused as to their association with the trademark owner. *Checkpoint Sys.*, 269 F.3d at 297–98. Multiple witnesses testified that observers could not distinguish Defendants' merchandise from authorized Penn State products. JA8096; JA8186. This evidence directly supports post-

sale confusion: observers seeing Defendants' merchandise being worn would have no way to know the products were unauthorized.

To the extent Defendants argue that post-sale confusion requires proof of inferior quality, that argument misstates the law. *See Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.*, 799 F.2d 867, 872–73, 875 (2d Cir. 1986). Even if quality were relevant, the jury heard evidence that Defendants' products were of inferior quality, including testimony that their merchandise felt "plasticky" and "like a sheet of plastic" compared to authorized products. JA8155; JA8158–JA8159; JA8396.

Therefore, while the Court need not reach the merits of Defendants' evidentiary arguments concerning initial interest and post-sale confusion, the record is sufficient to find confusion on those grounds in addition to point-of-sale.

## C.  Defendants Cannot Show Instructional Error Requiring Relief.

Even if not forfeited, Defendants' challenge to the jury instructions fails. Jury instructions constitute reversible error only if they fail "to 'fairly and adequately' present the issues in the case without confusing or misleading the jury." *Donlin v. Philips Lighting N. Am. Corp.*, 581 F.3d 73, 79 (3d Cir. 2009) (quoting *United States v. Ellis*, 156 F.3d 493, 498 n.7 (3d Cir.

1998)). The instructions here did exactly that: they walked the jury through every *Lapp* factor—the governing standard for likelihood of confusion. JA9135–JA9145; *McNeil Nutritionals*, 511 F.3d at 358. Defendants identify no specific language that was wrong or improperly omitted, and that alone dooms their claim. *Donlin*, 581 F.3d at 79.

Any error would also be harmless. Where a verdict rests on multiple grounds, courts presume the jury relied on the adequately supported one. *See United States v. Andrew*, 681 F.3d 509, 521 (3d Cir. 2012); *Hurley v. Atl. City Police Dep't*, 174 F.3d 95, 120–22 (3d Cir. 1999). Because sufficient evidence supports point-of-sale confusion, any alleged error was harmless. *Hurley*, 174 F.3d at 120–21.

## IV.  Sportswear Is Directly Liable for Infringement.

Defendants' final gambit seeks to shield Sportswear—the company that manufactured, printed, and shipped every piece of infringing merchandise—from direct liability. Defendants argue that Sportswear merely provides "white-label fulfillment" services and cannot be directly liable for trademark infringement, regardless of its role. Def. Br. 55. Their theory, that direct liability requires "visibility" to consumers, has no basis in law. The Lanham Act expressly imposes liability on manufacturers and

distributors, and that is precisely what Sportswear was. The District Court

correctly denied judgment as a matter of law, and the jury's verdict should

stand.

    **A.**    **Sportswear, as the Manufacturer and Distributor of Defendants' Infringing Goods, is Directly Liable.**

    **1.**    **Distributors and Manufacturers of Infringing Goods Can Be Directly Liable for Infringement.**

Defendants' argument fails under the statute's plain language. Section

32 imposes liability on anyone who uses a reproduction or counterfeit "of a

registered mark in connection with the sale, offering for sale, distribution,

or advertising of any goods or services." 15 U.S.C. § 1114(1)(a). Each

enumerated act is independently sufficient, and courts have consistently

imposed direct liability on sellers, advertisers, and distributors alike. *See,*

*e.g.*, *Lorillard Tobacco Co. v. Amouri's Grand Foods, Inc.*, 453 F.3d 377, 381 (6th

Cir. 2006); *VersaTop Support Sys., LLC*, 921 F.3d at 1371–72; *Purolator, Inc. v.*

*EFRA Distribs.*, 687 F.2d 554, 560 (1st Cir. 1982).

Direct liability likewise extends to *manufacturing*—indeed, that is

where it began. Infringement was historically limited to "those who actually

create, manufacture[,] or package the infringing items," *Lorillard*, 453 F.3d at

381; the expansion of liability to sellers and distributors supplemented that

baseline, not replaced it. *See Ohio State Univ. v. Redbubble, Inc.*, 989 F.3d 435, 447 (6th Cir. 2021); *John B. Stetson Co. v. Stephen L. Stetson Co.*, 85 F.2d 586, 588 (2d Cir. 1936) ("If [manufacturers] participated in the manufacture of the hats which carried the infringing mark, they are infringers of the trademark."); McCarthy on Trademarks § 25:26 (5th ed. 2025) (statutory definition of infringement "includes any manufacturer, supplier, dealer, printer, publisher or broadcaster who uses the infringing mark").

**2. The Evidence Proves Sportswear Manufactured and Distributed the Infringing Goods.**

Here, the evidence is sufficient to support the jury's finding that Sportswear is directly liable for infringement. The evidence of Sportswear's involvement includes:

- Sportswear manufactured, printed, and shipped to customers all products sold through Vintage Brand's website. JA7949– JA7950 (Stipulation 8). JA8603–JA8604.

- Sportswear employees performed Vintage Brand's tasks of collecting, curating, and preparing the infringing versions of the University Marks to be used on merchandise. JA7948; JA8553.

- Sportswear alone affixed the Penn State logos and images to the Vintage Brand merchandise. JA8719.

- Sportswear provided all customer service related to Vintage

47

Brand's sales. JA7949–JA7950 (Stipulation 8).

This evidence—which is undisputed and directly from Defendants' own testimony—confirms that Sportswear acted as a manufacturer and distributor and therefore is directly liable. *Lorillard*, 453 F.3d at 381.

**B.    Defendants' Theory that Direct Liability Requires "Visibility" to Consumers Is Legally Erroneous.**

Defendants further argue that Sportswear cannot be directly liable here because it is "invisible" to consumers. Def. Br. 55–59. Under their theory, a party cannot be directly liable if it does not publicly represent itself as the seller or source of goods. *Id.* at 59.

Defendants' argument is incorrect. In a related context, this Court has already held that liability for "use" of an infringing mark is not limited to retailers who display the goods for sale. *See United States v. Diallo*, 575 F.3d 252, 260 (3d Cir. 2009) ("Regardless of whether the goods bearing the counterfeit marks are physically located in a kiosk at a shopping mall or in a remote warehouse, the trafficker may still be prosecuted if he knowingly uses the mark on or in connection with a good."). Nor does liability hinge on customers knowing the identity of the infringing manufacturer or shipper. In fact, in a classic trademark infringement case the customer believes the

*trademark owner* (not the infringer) manufactured the item and affixed its trademark. Gilson on Trademarks § 11.02 (2026 ed.) (any seller in distribution chain can be liable for direct infringement, even without altering product). Defendants' theory is plainly not the law.

Defendants' misreading of *Redbubble* further exposes the frailty of their argument. Defs. Br. 56–59. Unlike Sportswear, Redbubble did not manufacture goods sold on its website. *Redbubble*, 989 F.3d at 446–48. The court considered Redbubble's branding solely to reject its claim of being an eBay-like "passive facilitator"—not to establish "visibility" as a prerequisite for direct liability. *Id.* at 447–48. The court reaffirmed that "the creator or manufacturer of the offending goods" is directly liable. *Id.* at 447.

Finally, Defendants' "invisible middleman" theory fails to the extent it equates Sportswear with a passive print-on-demand service. Defs. Br. 58–59. The Vintage Brand website displayed finished merchandise for sale with no customization options. JA9435; JA4977. From a consumer's perspective, the website offered and sold existing merchandise. That Sportswear did not manufacture products until purchase reflects Defendants' operational planning; it does not limit their direct liability. JA8551; JA8603–JA8604; *see Lorillard*, 453 F.3d at 381.

## V. Defendants' Sufficiency Challenges Are Waived Because Their Post-Trial Motion Was Untimely.

Rule 50(b) states: "No later than 28 days after *the entry of judgment . . .* the movant may file a renewed motion for judgment as a matter of law." Fed. R. Civ. P. 50(b) (emphasis added). Rule 50 means what it says: "entry of judgment" under Rule 58 triggers the 28-day deadline. *See* Fed. R. Civ. P. 58, advisory committee's note to 2002 amendment. "[I]n interpreting the federal rules, we look first to their plain language." *Rosenberg v. DVI Receivables XIV, LLC*, 818 F.3d 1283, 1287 (11th Cir. 2016). Defendants filed their post-trial motion 282 days after entry of judgment. JA7850. *Compare* JA7850 (judgment entered November 19, 2024) *with* JA256 (motion filed July 9, 2025). The motion was untimely and Defendants' sufficiency-of-the-evidence challenges should be dismissed.

The District Court found Defendants' motion timely, holding Rule 50's deadline is triggered only by *final* judgment. JA258–JA261. But courts should not "read into statutes words that aren't there." *Romag Fasteners, Inc. v. Fossil, Inc.*, 590 U.S. 212, 215 (2020). Rule 50 refers to "entry of judgment" — not final judgment. Rule 54 confirms the distinction: it defines "judgment" to "*include*[] a decree and any order from which an appeal lies," Fed. R. Civ.

P. 54(a) (emphasis added), while separately using "final judgment" in Rule 54(b). If the terms were synonymous, this distinction would be superfluous. *See also* Fed. R. Civ. P. 5.1(c); 23(c)(1)(C); 60(b); 62(c)(1), (d), & (h); 79(b) (using "final judgment").

This Court has recognized that "entry of judgment" does not require final judgment. In *State National Insurance Co. v. County of Camden*, 824 F.3d 399 (3d Cir. 2016), this Court held that a Rule 59 motion directed at a "judgment" dismissing a particular party was required to be filed within 28 days of the date of that judgment—not from the date of "final judgment" resolving all claims against all parties. *Id.* at 410; *see also Tarlton v. Exxon*, 688 F.2d 973, 977–79 (5th Cir. 1982); *Lesende*, 752 F.3d at 334 (favorably citing *Tarlton*).

The District Court relied on *O. Hommel Co. v. Ferro Corp.*, 659 F.2d 340 (3d Cir. 1981), which held that a Rule 50(b) motion was timely when filed within the then-applicable deadline following a judgment on attorneys' fees, rather than from entry of judgment on the jury verdict. *O. Hommel*, however, was overruled in *Budinich v. Becton Dickinson & Co.*, 486 U.S. 196, 200–01 (1988). To the extent that this Court determines that *O. Hommel* remains good law, Penn State respectfully requests that this Court determine that *O.*

*Hommel* is inconsistent with the Federal Rules and hold that the time period for filing Rule 50 motions commences with the filing of judgment.

Because Defendants' post-trial motion was untimely, all requests for relief based on sufficiency of the evidence must be dismissed. *Pediatrix Screening, Inc. v. TeleChem Int'l, Inc.*, 602 F.3d 541, 545 (3d Cir. 2010).

## ARGUMENT ON REPLY

Whereas Defendants were able to fully present their defenses to the jury, Penn State was denied that opportunity with respect to two of its key claims, counterfeiting and dilution. Defendants' response brief confirms the correctness of Penn State's arguments and exposes the weakness of Defendants' position.

### I. Defendants' Brief Confirms That Penn State's Counterfeiting Claim Should Have Gone to the Jury.

Defendants' response on counterfeiting is long on argument and short on law. Unable to answer Penn State's statutory analysis, Defendants instead attack a position Penn State never took—that anyone who "references" Penn State on merchandise is a counterfeiter. Penn State's actual position is far more modest and entirely orthodox: Defendants' unauthorized use of near-identical reproductions of Penn State's registered trademarks, in a manner

the jury found likely to cause confusion, makes them counterfeiters. That is

not a "misuse of trademark law." It is trademark law.

### A. Defendants Concede That the District Court Applied the Wrong Statutory Provision to the Counterfeiting Claim.

Defendants accuse Penn State of playing "fast and loose with the text

of the Lanham Act," yet in the same breath concede Penn State's primary

statutory point—that Section 32 (and not Section 34 as asserted by the

District Court) "does create a cause of action for counterfeiting." Defs. Br. 66.

Vintage Brand further admits that the same provision in Section 32 (15 U.S.C.

§ 1114(1)(a)) also governs trademark infringement. Defs. Br. 41. These

concessions are fatal to Defendants' position—once it is acknowledged that

Section 32 governs both claims, there is no textual basis for imposing a

narrower confusion standard on counterfeiting than on infringement.

Defendants attempt to gloss over the District Court's critical error by

discussing Section 35, 15 U.S.C. § 1117(b) of the Lanham Act, which sets out

the damages available for "use of a counterfeit mark." This argument does

not address the issue at summary judgment, which was liability and not

damages. JA918–920; Dkt. 114 at 34 (Penn State's summary judgment motion

on liability only). Nor does it cure the District Court's error—Section 35

makes no mention whatsoever of likelihood of confusion, and it certainly does not purport to limit the scope of actionable confusion in counterfeiting cases. Defendants' obfuscation cannot shore up its argument—under the Lanham Act, trademark infringement and counterfeiting are subject to the same test for likelihood of confusion.

Defendants ignore the remaining text of the Lanham Act, which also refutes its argument. Penn State's opening brief (at 40–41) demonstrated that the carve-out for authorized manufacturers in 15 U.S.C. § 1116(d)(1)(B)(ii) is superfluous under Defendants' definition of "counterfeit," and designations that "falsely represent[] association with, or authorization" are expressly included under the definition of "counterfeit mark." 15 U.S.C. § 1116(d)(1)(B)(ii); 36 U.S.C. § 220506(c)(4). Defendants have conceded both points by leaving them entirely unaddressed. *See Beazer E., Inc. v. Mead Corp.*, 412 F.3d 429, 437 n.11 (3d Cir. 2005) (by failing to respond to argument, appellee waives non-obvious objections).

Penn State also noted that Congress's 1962 amendment to Section 32 deleted the requirement that confusion relate to "the source of origin of such goods or services," a change intended to "broaden the scope of the Act." PSU Br. 33. Defendants attempt to downplay this amendment as a mere

"housekeeping" measure.[4] However, if this language is so meaningless that its removal is "housekeeping," then Defendants' entire argument collapses. After all, Defendants' (and the District Court's) argument hinges on the word "origin" in the Black's Law Dictionary definition of "spurious." Defs. Br. 67. Congress would not remove an express "source of origin" requirement from the counterfeiting provision while embedding an identical limitation in an undefined term. *See Whitfield*, 543 U.S. at 216–17. This contradictory position is fatal to Defendants' argument.

### B.    Defendants Offer No Support for Their Reading of "Counterfeit Mark."

Defendants offer no authority for their argument that "counterfeit" limits counterfeiting claims to confusion as to manufacturing origin. They ignore *Weil Ceramics*, where this Court construed "counterfeit" to "have [the] readily comprehensible ordinary meaning[]"of items that are not "genuine." 878 F.2d at 671. Their handful of out-of-Circuit citations only undermine their position. *See* Defs. Br. 67-70. For example, in *Coty Inc. v. Cosmopolitan*

---

[4] Defendants invoke Professor Lunney's law review article as a "thorough debunking" of Penn State's argument. Defs. Br. 69 n.16. However, academic commentary is less persuasive than the statutory text and this Court's precedent in *Weil Ceramics & Glass, Inc. v. Dash*, 878 F.2d 659, 681 (3d Cir. 1989) (Becker, J., concurring).

*Cosmetics Inc.*, 432 F. Supp. 3d 345, 353 (S.D.N.Y. 2020), the court held that even a product *manufactured by the trademark owner* could be "counterfeit" if sold without authorization—refuting Defendants' argument.

Defendants also fail to address the appellate authority establishing that counterfeit products can create confusion as to authorization, not just manufacturing origin. *See, e.g., Diallo*, 575 F.3d at 261 ("The intended purpose of a trademark, be it genuine or spurious, is to convey that the good meets the design and manufacturing specifications of the lawful owner of the trademark, not only at the time the mark is first affixed or attached to the good, but throughout the lifetime of that good."); PSU Br. 35–36. Nor do they reconcile *Lontex*'s binding holding that counterfeiting is a "type[] of trademark infringement" that "requires greater similarity between marks" with the district court's analysis. 107 F.4th at 158.[5] And Defendants misconstrue *ICCS USA Corp. v. United States*, 952 F.3d 1325 (Fed. Cir. 2020), which stands for the proposition that a "counterfeit" mark includes those giving the false impression of approval, even without confusion as to

---

[5] In fact, Defendants make no attempt to explain what the test for counterfeiting is, or what factors should be applied to prove or disprove a likelihood of confusion as to manufacturing origin.

manufacturing origin—squarely encompassing Defendants' use of the University Marks.

Defendants fail to locate any authority for their theory that the term "spurious" in the definition of "counterfeit" requires confusion as to manufacturing origin.[6] Penn State construes "spurious" to mean "not genuine or authentic," which is consistent with *Weil Ceramics*, and the legislative history. *See Weil Ceramics*, 878 F.2d at 671 n.16. This construction does not, as Defendants argue, give the term no meaning. Instead, it makes "spurious" essential to the definition of a counterfeit—without it, the definition encompasses the trademark holder's own genuine marks. *See* 15 U.S.C. § 1127; PSU Br. 37–43. Defendants' marks are plainly "spurious": they are unauthorized reproductions of Penn State's registered trademarks placed on Defendants' products without Penn State's knowledge or consent.

Defendants' authority (and lack thereof) confirms the District Court had no basis to dismiss Penn State's counterfeiting claims.

---

[6] Defendants concede that the legislative history defines "spurious" as "not genuine or authentic." *See* Defs. Br. 68 (citing Joint Statement on Trademark Counterfeiting Legislation, 130 Cong. Rec. 31673, 31675 (1984)).

### C. Defendants' Arguments On Confusion Were Already Rejected by the Jury.

Lacking any support in the Lanham Act or the case law for its position, Defendants instead make the same likelihood of confusion arguments that the jury already rejected. Defs. Br. 70–84. Their position—that Defendants' website and packaging preclude confusion as a matter of law is wrong, and at best these arguments would have created a factual dispute precluding summary judgment. PSU Br. 58–62. But likelihood of confusion has now been decided by the jury, and Defendants do not dispute that this is the law of the case. JA7842–7847; PSU Br. 45. Because the confusion test for infringement and counterfeiting under 15 U.S.C. § 1114 is identical, Defendants' confusion arguments are irrelevant; that question was resolved at trial.

### D. Defendants Use Substantially Indistinguishable Copies of The University Marks.

The marks on Defendants' products are "identical or substantially indistinguishable," *Lontex*, 107 F.4th at 158–59, from Penn State's registered marks by design—Defendants quite literally copied their images from genuine Penn State merchandise. Yet Defendants take the baffling position that copying **more** of Penn State's intellectual property—both registered

trademarks and unregistered designs—somehow immunizes it from counterfeiting liability. It does not.

Defendants arrive at this conclusion by distorting *Lontex*. There, the plaintiff owned a trademark in COOL COMPRESSION, and Nike used that phrase as part of the unified marks PRO COOL COMPRESSION or NIKE PRO COOL COMPRESSION, surrounded by Nike's own branding. *Lontex*, 107 F.4th at 149; *Lontex Corp. v. Nike, Inc.*, 384 F. Supp. 3d 546, 557 (E.D. Pa. 2019). This Court found that the "overall impression" created by Nike's products was not "substantially indistinguishable"—in other words, it was easy to tell which product was which. *Lontex*, 107 F.4th at 158–59. The critical difference is that Nike surrounded the plaintiff's mark with Nike's own branding. *Id.* at 159. Defendants surrounded Penn State's marks with *more Penn State marks*.

This distinction is determinative. By surrounding the University Marks with other University Marks and related imagery, Defendants' products offer an "overall impression" that is "substantially indistinguishable" from that created by genuine Penn State products. Observed side-by-side, it is impossible to tell which is genuine and which is a Vintage Brand copy. *E.g.*, PSU Br. 1, 25–29; *see Y.Y.G.M. SA v. Redbubble,*

*Inc.*, 75 F.4th 995, 1004 (9th Cir. 2023) (holding that "counterfeit goods" need not be "exact replicas of existing merchandise"). Nor does the "Vintage Brand" name printed inside the collar save Defendants—genuine Penn State products routinely feature the trademarks of Penn State's licensed manufacturers, so additional brand names also appear on authentic products. *E.g.*, JA4191; JA4203; JA4204; JA4305; JA4308; JA4310; JA4315.

Defendants' "anti-dissection" argument fares no better. The anti-dissection rule prevents *over-parsing* of marks. McCarthy on Trademarks § 23:41 (5th ed. 2025). It does not shield an infringer from liability simply because it copied *additional* marks or design elements alongside the registered mark. To the contrary, "[a] subsequent user may not avoid likely confusion by appropriating another's entire mark and adding descriptive or non-descriptive matter to it." *Fisons Horticulture, Inc. v. Vigoro Indus., Inc.*, 30 F.3d 466, 476–78 (3d Cir. 1994) (quoting McCarthy 23:15[8] (3d ed. 1992)).

Defendants' interpretation would effectively immunize any counterfeiter who places additional designs alongside a copy of a registered mark; i.e., the more trademarks an infringer copies, the safer it becomes. That cannot be the law. A registered mark is entitled to protection whether it appears in isolation on a blank t-shirt or embedded within a design that

copies still more of the trademark owner's intellectual property. The Lanham Act does not offer a volume discount on infringement.

## II. The District Court's Dilution Ruling Cannot Stand.

Defendants' dilution arguments rest on concessions that are fatal to their position. Defendants admit that mark similarity is just one factor in the Trademark Dilution Revision Act's ("TDRA") multifactor test for blurring—yet they defend a ruling that treated similarity as a threshold requirement and stopped the analysis there. That concession alone requires reversal. Defendants' argument on the merits fares no better: their central claim is that they taught consumers PENN STATE can appear on merchandise without Penn State's involvement. That is not a defense to dilution—it is a textbook description of it. Finally, Defendants' fallback argument on fame asks this Court to ignore the summary judgment record, which established that PENN STATE is one of the most widely recognized collegiate marks in the country. The District Court's dilution ruling should be reversed.

**A.    The District Court Applied a Legally Erroneous Test for Blurring, Warranting Reversal.**

While Defendants argue that the District Court did not err, their arguments are unpersuasive.

*First*, Defendants concede that the TDRA's dilution standard treats the similarity of marks as one factor in the multi-factor analysis on blurring, and that substantial similarity is not a threshold requirement. Defs. Br. 87–89. To protect their summary judgment ruling, Defendants assert that the District Court "did not treat substantial similarity as a threshold." Defs. Br. 88. But that argument is contradicted by the District Court's opinion, which plainly states: "Penn State's dilution claims fail for two reasons[, the first being] the mark as used by Vintage Brand is not substantially similar to Penn State's Mark." JA80; *see also* JA80–JA81 (stating that the law requires a dilution plaintiff to "be threatened by a very similar, if not identical mark") (quoting a pre-TDRA decision). By treating similarity as a stand-alone threshold rather than weighing it as one factor, the District Court applied the wrong legal standard—and Defendants concede as much.

*Second*, Defendants—like the District Court—contend that because consumers still associate PENN STATE with Penn State, there is no blurring.

Defs. Br. 84–86. But dilution by blurring is an "association arising from the similarity" between a junior mark and a famous mark that "impairs the distinctiveness" of the famous mark. 15 U.S.C. § 1125(c)(2)(B). The question is not whether consumers still think of Penn State when they encounter the words PENN STATE—of course they do—but whether the unauthorized use weakens the mark's capacity to identify Penn State **alone** as its source. *See Starbucks Corp. v. Wolfe's Borough Coffee, Inc.*, 588 F.3d 97, 109 (2d Cir. 2009) (dilution can occur even absent any confusion or consumer association between plaintiff's mark and the defendant).

Defendants' own description of their business model proves the point. They claim their customers buy to express allegiance to Penn State but know the goods come from Defendants, not from Penn State. That is not a defense to blurring—it is a description of it. Blurring occurs when a famous mark that once evoked a single source begins to evoke two. *Times Mirror Mags., Inc. v. Las Vegas Sports News, L.L.C.*, 212 F.3d 157, 168 (3d Cir. 2000). Defendants admit they have created exactly that second, unauthorized association—a parallel channel of PENN STATE-branded goods unconnected to Penn State, which not only creates blurring with respect to Penn State's established trademark rights within such goods, but also with

63

respect to the classes of services in which Penn State's trademark rights famously extend: education and athletics. That the University's name recognition survives does not save Defendants; it simply means the erosion is not yet complete.

## B. A Reasonable Jury Could Find Defendants Liable For Dilution By Blurring, Separately Warranting Reversal.

Even setting aside the District Court's legal errors, the summary judgment record contained ample evidence to create triable issues on dilution by blurring. Defendants argue that the District Court correctly found no material disputes of fact. Defs. Br. 89–91. That argument fails.

First, Defendants' reliance on their own branding and website disclaimers does not defeat dilution—it confirms it. The District Court improperly credited Defendants' evidence while ignoring Penn State's countervailing evidence that retailer and manufacturer marks are common in connection with authorized merchandise, that Defendants' disclaimers were intentionally hidden and ineffective, and that Defendants' own expert confirmed the disclaimers did not work. PSU Br. 63–65. Even accepting Defendants' characterization, their argument backfires: if the disclaimers teach consumers that PENN STATE is merely art unaffiliated with the

University, that proves blurring, not mitigates it. *Times Mirror*, 212 F.3d at 168. Defendants' disclaimers actively instruct consumers to treat PENN STATE as an ornamental feature available for use by anyone, thereby undermining the mark's exclusive source-identifying power. PSU Br. 56 n.9.

Second, Defendants contend their merchandise is not "similar" to the PENN STATE mark because their designs are "composites" incorporating multiple elements. Defs. Br. 89–90. But every element in these composites is Penn State-related, and every image came from authentic Penn State memorabilia. PSU Br. 65–66; JA6342, JA6351, ¶¶ 74–76, 92; JA4973–JA4976 (98:17–25, 99:2–3, 115:10–25). Defendants' argument amounts to the claim that copying one Penn State mark might dilute, but copying several at once does not. The opposite is true.

Third, the record contains substantial evidence on the statutory blurring factors that the District Court improperly resolved against Penn State. There is evidence that Defendants intended to create an association with the PENN STATE Mark (they deliberately curated Penn State-specific products to attract Penn State fans), that the PENN STATE Mark is highly distinctive and widely recognized (supported by incontestable federal registrations and extensive merchandising), and that Penn State engages in

substantially exclusive use of the mark (through decades of active licensing and enforcement). PSU Br. 68–69. Rather than allowing a jury to weigh this evidence, the District Court resolved these factual disputes itself—precisely what Rule 56 forbids.

### C. The Record Shows, at a Minimum, that Fame is a Disputed Fact.

PENN STATE is a household name, and one would be hard-pressed to find anyone in the United States who has never heard of it. Yet, grasping at straws, Defendants ask this Court to ignore common sense and find as a matter of law that no reasonable jury could find that PENN STATE is famous. Def. Br. 91–93.

To analyze fame, the Lanham Act directs the court to consider: (i) the duration, extent, and geographic reach of the marks' advertising and publicity; (ii) the amount, volume, and geographic extent of sales of goods or services offered under the mark; (iii) the extent of actual recognition of the mark; and (iv) whether the mark is registered on the principal register. 15 U.S.C. § 1125(c)(2)(A). Defendants' argument on fame overlooks significant evidence in the summary judgment record on each of these factors.

Pertinent to these factors, and considered in the light most favorable to Penn State, the record shows:

- Penn State has exclusively used the PENN STATE Mark for at least four decades. JA3888; JA3890; JA3920–JA4093.

- Both parties' expert surveys found widespread recognition of Penn State. JA631–JA633; JA721–JA722, ¶ 28 & figs. 6a–6b.[7]

- Penn State uses its PENN STATE Mark on a large variety of merchandise that is sold to consumers nationwide. JA3888; JA3920–JA4093.

- Penn State invests significant resources in promoting and protecting the PENN STATE Mark. JA3888.

- Penn State's rights in the PENN STATE Mark are covered by multiple federal registrations which Penn State has owned for decades. JA7341–7346; JA4095–JA4110.

- The University has more than 740,000 living alumni located around the world. JA3886; JA3902–JA3903.

- Almost one percent of all college graduates in the United States are Penn State alumni. JA3886.

On this record, a jury could reasonably find PENN STATE famous under the TDRA's statutory factors. *Times Mirror*, 212 F.3d at 165–67 (evidence of long extensive use, advertising, and registrations supported

---

[7] Likelihood of confusion surveys are probative of consumer recognition. *Parks LLC v. Tyson Foods, Inc.*, 863 F.3d 220, 232–33 (3d Cir. 2017) ("[An Eveready] survey . . . can also indicate secondary meaning by showing a high degree of familiarity with the senior mark.").

fame ). Indeed, another court in this Circuit has already found PENN STATE "indisputably famous." *Pa. State Univ. v. Parshall*, 2022 WL 2712051, at *16 (M.D. Pa. Feb. 17, 2022); *see Citigroup Inc. v. Cap. City Bank Grp., Inc.*, 637 F.3d 1344, 1348 (Fed. Cir. 2011) (prior judicial finding of fame relevant to fame).

## III. Penn State Did Not Waive Its Arguments.

Unable to defend the District Court's legal errors, Defendants resort to forfeiture arguments. Each fails. Penn State made the same arguments below that it makes here, and all are fully preserved.

### A. Penn State Preserved Its Arguments On Counterfeiting.

Defendants raise two forfeiture arguments with respect to counterfeiting. Neither has merit.

*First*, Penn State preserved its source-confusion argument. Preservation requires only that "the lower court be fairly put on notice as to the substance of the issue." *In re Aquilino*, 135 F.4th 119, 129–30 (3d Cir. 2025) (quotations omitted). Penn State's summary judgment briefing submitted significant evidence of source confusion and explicitly incorporated that evidence into its counterfeiting arguments. Dkt. 114 at 34; JA7258–JA7259. Defendants concede this evidence was submitted but argue Penn State forfeited by not reciting it over again under a "Counterfeiting" heading.

Defs. Br. 62–64. That hypertechnical argument fails. Preservation "does not demand the incantation of particular words"; it requires fair notice—which the District Court had. *In re Aquilino*, 135 F.4th at 129.

*Second*, Penn State's argument that counterfeiting is trademark infringement with a higher similarity standard is not "newly framed on appeal." Defs. Br. 61. Penn State argued at summary judgment that "[a] finding of intentional trademark infringement using an identical or near identical mark is sufficient to show counterfeiting," ECF 114 at 25, and that Vintage Brand's "use of the University Marks is identical to Penn State's use . . . . This, by definition, is counterfeiting," JA7259. The District Court ruled on this precise question, rejecting "Penn State's desired interpretation of the statute." JA77. That ruling is reviewable de novo.

## B. Penn State Preserved Its Arguments On Dilution.

Defendants assert that Penn State failed to preserve its argument that the TDRA does not require a threshold similarity test between the accused and famous mark. Defs. Br. 87. The argument fails for three reasons.

*First*, Defendants misstate Penn State's position. Penn State does not contend similarity is irrelevant—only that it is not a threshold requirement.

PSU Br. 51–53. This Court need not address preservation of an argument Penn State is not making.

*Second*, Penn State preserved its challenge to the District Court's similarity analysis. Penn State argued below that Defendants' similarity-based arguments were incorrect and that other statutory factors—registrations, length of use, and enforcement history—supported liability. JA7261–JA7262. The District Court was on notice of Penn State's position that the TDRA's factor-based test governs. *See In re Aquilino*, 135 F.4th at 129–30.

Third, even if Penn State had not raised the issue, "[p]arties cannot forfeit the application of 'controlling law.'" *Kairys v. S. Pines Trucking, Inc.*, 75 F.4th 157, 160 (3d Cir. 2023). The District Court adopted a pre-TDRA "substantial similarity" threshold, holding that dilution fails unless the marks are "essentially the same." JA80–JA83. Whether the Court applied the correct statutory standard is reviewable regardless of preservation.

## CONCLUSION

For these reasons, this Court should affirm the jury verdict, reverse the District Court's grant of summary judgment for Defendants on counterfeiting and dilution, enter judgment in Penn State's favor on counterfeiting, and remand the case for further proceedings on dilution and damages.

Dated: April 27, 2026

Respectfully submitted,

*/s/ Lucy Jewett Wheatley*
Lucy Jewett Wheatley
VA Bar No. 77459
Claire Hagan Eller
VA Bar No. 90077
MCGUIREWOODS LLP
800 East Canal Street
Richmond, VA 23219
T: 804.775.4320
F: 804.698.2017
*lwheatley@mcguirewoods.com*
*celler@mcguirewoods.com*

Brian D. Schmalzbach
VA Bar No. 88544
MCGUIREWOODS LLP
800 East Canal Street
Richmond, VA 23219
T: 804.775.4746
F: 804.698.2304
*bschmalzbach@mcguirewoods.com*

*Counsel for Plaintiff-Appellant The Pennsylvania State University*

71

# CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B)(i) because:

- This brief contains 12,997 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface and type style requirements of Fed. R. App. P. 32(a)(5) and Fed. R. App. P. 32(a)(6) because:

- This brief has been prepared in a proportionally spaced 14-point Book Antiqua font using Microsoft Word.

The text of the electronic brief is identical to the text in the paper copies.

At least one of the attorneys whose names appear on this brief is a member of the bar of this Court.

The electronic version of this brief has been scanned for viruses using CrowdStrike Falcon Sensor, Version 7.28.20006.0, and no virus was detected.

*/s/ Lucy Jewett Wheatley*
Lucy Jewett Wheatley

# CERTIFICATE OF SERVICE

I hereby certify that on April 27, 2026 the foregoing was filed with the Clerk of the United States Court of Appeals for the Third Circuit using the appellate CM/ECF system, which will also serve counsel of record.

/s/ Lucy Jewett Wheatley
Lucy Jewett Wheatley