Nos. 25-2398, 25-2494

# IN THE
# UNITED STATES COURT OF APPEALS
# FOR THE THIRD CIRCUIT

THE PENNSYLVANIA STATE UNIVERSITY,

*Plaintiff-Appellant/Cross-Appellee,*

v.

VINTAGE BRAND, LLC, *et al.,*

*Defendants-Appellees/Cross-Appellants.*

On appeal from the United States District Court
for the Middle District of Pennsylvania, No. 4:21-cv-01091
Honorable Matthew W. Brann, U.S. District Judge

## BRIEF OF AMICUS CURIAE
## COLLEGIATE LICENSING COMPANY
## IN SUPPORT OF PLAINTIFF-APPELLANT

**KILPATRICK TOWNSEND &
STOCKTON LLP**
R. Charles Henn Jr.
Alexander H. Weathersby
1100 Peachtree Street, Suite 2800
Atlanta, Georgia 30309
Telephone: (404) 815-6500
chenn@ktslaw.com
aweathersby@ktslaw.com

*Attorneys for Amicus Curiae CLC*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Local Appellate Rule 26.1, Amicus Curiae Collegiate Licensing Company ("CLC") states that it is wholly owned by Learfield Communications, LLC ("Learfield"). No publicly traded company owns more than 10% of Learfield's stock.

# TABLE OF CONTENTS

I.   The Lanham Act's Express Terms Foreclose the Professors' Proposed Erasure of Trademark Rights ............................................. 5

    A.   The Lanham Act Protects Against Misleading Attributions of "Sponsorship" and "Affiliation" ...................... 6

    B.   The Lanham Act Endorses Licensing as a Means of Protecting Goodwill ............................................................. 8

    C.   The Proposed Framework Constitutes a Sea Change that Only Congress May Enact ............................................. 9

II.  Binding and Persuasive Precedent Affirm the Statutory Prohibition Against Confusion as to Sponsorship and Affiliation ................................................................................ 10

    A.   The Circuits Have Categorically Affirmed the Role of Trademarks in Signifying Sponsorship and Affiliation ....... 11

    B.   The Lanham Act Rights of Sponsorship and Affiliation Affirm, Rather Than Undermine, Consumers' Self-Expression ........................................................................ 14

    C.   Trademark Law's Doctrinal Carveouts Support Countervailing Interests—the Professors' Proposed Erasure of Sponsorship and Associational Rights Has Little Benefit ........................................................................ 20

III. The Professors' "Culturally Significant Institutions" Test Is Unworkably Vague ................................................................... 27

    A.   No One Agrees on What a "Culturally Significant Institution" Is ................................................................. 27

    B.   Adopting The Professors' Proposed Test Would Create a Legal Patchwork Nightmare ............................................ 30

IV.  Protecting Sponsorship and Associational Rights Preserves a Licensing System that Benefits Institutions, Consumers, and the Public ................................................................................ 31

    A.   Licensing is Essential to Institutions ................................ 32

    B.   Licensing is Essential for Consumers ............................... 33

    C.   Licensing Is Essential for the Public ................................ 35

# TABLE OF AUTHORITIES

**Cases**                                                              **Page(s)**

*A.J. Canfield Co. v. Honickman*,
    808 F.2d 291 (3d Cir. 1986) .......................................................................... 7

*Abercrombie & Fitch Stores, Inc. v. Am. Eagle Outfitters, Inc.*,
    280 F.3d 619 (6th Cir. 2002) ...................................................................... 25

*Board of Supervisors for Louisiana State University Agricultural & Mechanical College v. Smack Apparel Co.*,
    550 F.3d 465 (5th Cir. 2008) ............................................................... *passim*

*Boston Athletic Ass'n v. Sullivan*,
    867 F.2d 22 (1st Cir. 1989) ........................................................................ 14

*Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd.*,
    604 F.2d 200 (2d Cir. 1979) ............................................................ 13, 14, 34

*Doeblers' Penn. Hybrids, Inc. v. Doebler*,
    442 F.3d 812 (3d Cir. 2006) ...................................................................... 34

*Jack Daniel's Properties, Inc. v. VIP Products LLC*,
    599 U.S. 140 (2023) ......................................................................... 22, 29, 35

*Miss. Band of Choctaw Indians v. Holyfield*,
    490 U.S. 30 (1989) ..................................................................................... 31

*Qualitex Co. v. Jacobson Prods. Co., Inc.*,
    514 U.S. 159 (1995) ................................................................................... 24

*Rickard v. Auto Publisher, Inc.*,
    735 F.2d 450 (11th Cir. 1984) ................................................................... 31

*Rogers v. Grimaldi*,
    875 F.2d 994 (2d Cir. 1989) ................................................................. 22, 29

*Rosetta Stone Ltd. v. Google, Inc.*,
    676 F.3d 144 (4th Cir. 2012) ..................................................................... 24

*Savannah Coll. of Art & Design, Inc. v. Sportswear, Inc.*,
    983 F.3d 1273 (11th Cir. 2020)............................................9, 13, 16, 33

*Tiffany (NJ) Inc. v. eBay Inc.*,
    600 F.3d 93 (2d Cir. 2010) ....................................................29

*TrafFix Devices, Inc. v. Marketing Displays, Inc.*,
    532 U.S. 23 (2001) ..........................................................23, 25

*United States v. Gen. Battery Corp., Inc.*,
    423 F.3d 294 (3d Cir. 2005) ..................................................31

*University of Georgia Athletic Ass'n v. Laite*,
    756 F.2d 1535 (11th Cir. 1985)..........................................13, 16, 17

*University of Pittsburgh v. Champion Products, Inc.*,
    686 F.2d 1040 (3d Cir. 1982) .........................................11, 12, 15

*Vidal v. Elster*,
    602 U.S. 286 (2024) ...........................................................4

*Wallerstein v. Christian Feigenspan, Inc.*,
    215 F. 919 (3d Cir. 1914) ....................................................31

**Statutes**

15 U.S.C. .................................................................*passim*

15 U.S.C. § 5 ..................................................................8

15 U.S.C. § 43(a) ...........................................................7, 17

15 U.S.C. § 43(a)(1)(A).........................................................6

15 U.S.C. § 45 ................................................................7

15 U.S.C. § 1052(e)(5)........................................................24

15 U.S.C. § 1055................................................................8

15 U.S.C. § 1125(a) ..........................................................10

15 U.S.C. § 1125(a)(1)(A)....................................................6, 7

15 U.S.C. § 1127 ............................................................................. 5, 7, 8

Trademark Clarification Act of 1984 .......................................................... 7

**Rules and Regulations**

Fed. R. of App. P. 29(a)(5) ...................................................................... 38

Fed. R. of App. P. 32(a) ........................................................................... 38

Fed. R. of App. P. 32(a)(4)-(6) ................................................................ 38

Fed. R. of App. P. 32(a)(7)(B) ................................................................. 38

TRC Report, 77 Trademark Rep. 375, 426–36 (1987) ............................ 17

**Other Authorities**

*ESPN College Gameday Posters*, James Madison University
 Libraries Special Collections (May 4, 2026),
 https://ead.lib.virginia.edu/vivaxtf/view?docId=oai/JMU/re
 positories_4_resources_693.xml;query=2024 .................................... 30

Matthew B. Kugler, *The Materiality of Sponsorship
 Confusion*, 50 U.C. Davis L. Rev. 1911 (2017) .................................... 18

# **INTEREST OF AMICUS CURIAE**

CLC is an agency that serves institutions of higher education by managing their trademark licensing programs. CLC helps institutions vet potential licensees, promote licensed products, protect licensed indicia through quality-control and enforcement measures, and generate revenue through licensing relationships.

CLC has developed a deep understanding of the landscape of licensed merchandising, including the legal interests at stake and the benefits to trademark owners, consumers, and the general public of a legally sanctioned licensing regime. These interests are directly implicated in the present appeal and directly threatened by the positions suggested in the brief of Amici Curiae Trademark Law Professors (the "Professors").

Pursuant to FRAP 29(a)(4)(E), CLC states that no Party's counsel authored this brief and no person other than CLC and its counsel (including any Party or Party's counsel) contributed money to fund preparing or submitting this brief. Pursuant to FRAP 29(a)(2), all Parties consent to CLC's filing this amicus brief.

## SUMMARY OF ARGUMENT

The Professors ask this Court to create a new and ambiguous carveout from the Lanham Act's prohibition on trademark infringement for "expressive uses" of marks belonging to "culturally significant institutions." ECF No. 54 ("Professors' Br."). This carveout would strip an unspecified number of "institutions" of all but the narrowest rights in trademarks they have owned and developed for sometimes hundreds of years. The Professors propose a novel test with three elements: whether (1) use of a trademark is of "necessary . . . to convey a message about the university, team, or cultural institution"; (2) the use is "reasonable in scope"; and (3) the defendant took "no affirmative steps to mislead."[1] Professors' Br. at 4. Adopting such a test would excise statutory entitlements from the plain text of the Lanham Act, defy the will of Congress, create a circuit split, and wreak havoc among "institutions" and the licensing industry nationwide.

The Professors justify their proposed test by arguing that, while the Lanham Act prohibits misattributions of source, no one believes that

---

[1] Below, the jury found that Defendants willfully infringed almost all trademarks asserted in this case. JA7842–7849. Thus, if the Court were to adopt the Professors' new test, it would be doing so only to affirm the verdict against a willful infringer, routing its analysis through an exception that simply doesn't apply.

institutions are the "source" of products like those manufactured by the Appellee. This argument assumes—without citing *any* evidence—that consumers automatically discredit institutions as being the source of merchandise bearing their own branded indicia. This assumption defies decades of case law, legislative intent, empirical research to the contrary, and common sense. *Infra* Part  II.B.

But even setting aside this assumption, the Professors' effort to cabin trademark rights to consumers' beliefs about "source" misreads the Lanham Act. The Professors erroneously circumscribe the Act's definition of "source" to mean "product manufacturer." Worse, they clip the Act's express prohibitions against misattributions of *sponsorship* and *affiliation*—prohibitions added by Congress in 1988.

Circuit decisions, including a published decision of this Court, have affirmed institutions' and the public's right against misleading attributions of sponsorship and affiliation. Institutions are entitled to control the use of their branding indicia, whether they manufacture the goods bearing their marks, endorse the manufacture of such goods, or are merely affiliated with the use in question. This is settled law.

Further, trademark law's doctrinal counterweights that the Professors reference—First Amendment expression, functionality, and fair use—do not justify such a broad divestiture of trademark rights. Each of these doctrines entails important interests that reinforce the communicative purpose of trademarks or safeguard a countervailing interest like patent law. By contrast, the Professors' "expressive use" carveout robs countless institutions of their trademark rights with little concomitant benefit.

Finally, the test is unworkable. The "expressive uses" of the trademarks of "culturally significant institutions" know no bounds. At what level of significance, or of culture, does an institution become "culturally significant?" Countless brands have expressive value to consumers, and this expressive value has long been *protected* by trademark law. But under the Professors' new formulation, such brands would lose control over the use and dissemination of their trademarks. The result the Professors seek would harm companies, harm brands, harm consumers, and gut the Lanham Act.

At bottom, the Professors ignore "the established connection between a trademark and its protection of the markholder's reputation."

*Vidal v. Elster*, 602 U.S. 286, 305 (2024). The Professors' test would deprive principally our most treasured institutions of the valuable right to control the use and dissemination of insignia that indisputably signify them. Other "culturally *insignificant*" institutions would be left with the full panoply of rights that the law of trademark protects. The Professors' proposed test subverts trademark law's core purposes.

## ARGUMENT

### I. The Lanham Act's Express Terms Foreclose the Professors' Proposed Erasure of Trademark Rights

The Lanham Act forecloses the Professors' attempt to reduce trademark protection to confusion about who physically manufactures a product. The Act defines a trademark as "any word, name, symbol, or device" used to "identify and distinguish" goods and "to indicate the source of the goods, *even if that source is unknown*." 15 U.S.C. § 1127 (emphasis added). A trademark's significance does not depend on whether consumers can identify the producer of a product. What matters is whether the mark identifies the entity standing behind the goods, and the quality, reputation, and accountability that entity represents. This is especially true in the university-merchandise context, where the

institution's name, colors, and symbols are what make the product desirable in the first place. *See infra* Part II.E.

The Professors' proposed carveout excises critical language from the statute by disregarding the prohibition against misleading designations of "sponsorship" and "affiliation." 15 U.S.C. § 1125(a)(1)(A). Their position would also unsettle the licensing systems the Act contemplates and protects, through which trademark owners control the quality, integrity, and reputation of goods bearing their marks. And because Congress has chosen to protect against confusion as to affiliation, sponsorship, approval, and related forms of association, any contrary rule would be a judicial revision of the statute. That's better left to Congress.

## A. The Lanham Act Protects Against Misleading Attributions of "Sponsorship" and "Affiliation"

The Professors' position misreads the Lanham Act. Section 43(a)(1)(A) does not merely prohibit false statements about who manufactured a product. It reaches any use of a mark likely to cause confusion "as to the affiliation, connection, or association" of one person with another, or "as to the origin, sponsorship, or approval" of goods or services. 15 U.S.C. § 1125(a)(1)(A).

That language forecloses the Professors' arguments. If the statute were concerned solely with who stitched or sold a garment, Congress would have had no reason to separately prohibit confusion as to "affiliation," "connection," "association," "sponsorship," or "approval." *Id.* Congress's 1988 revision of Section 43(a) confirms that this broader understanding is not incidental—it is statutory design. By 1988, courts had long applied Section 43(a) to reach confusion about sponsorship, endorsement, and affiliation, and Congress amended the text to codify that rule. *See infra* Part II.B.2.

Section 45 of the Act confirms that trademarks denote more than manufacture. In the Trademark Clarification Act of 1984, Congress defined a trademark as a designation that identifies and distinguishes goods and indicates their "source," "even if that source is unknown." 15 U.S.C. § 1127. That language would make little sense if "source" referred only to the manufacturer. Consumers often do not know, and do not care, which entity physically assembled a shirt or printed a logo. *A.J. Canfield Co. v. Honickman,* 808 F.2d 291, 300 (3d Cir. 1986) ("[A] term may function as an indicator of source and therefore as a valid trademark, even though consumers may not know the name of the manufacturer or

producer of the product."). Consumers care about the commercial and reputational source signified by the mark itself: the entity whose goodwill makes the product desirable and marketable.

## B. The Lanham Act Endorses Licensing as a Means of Protecting Goodwill

Congress codified licensing as a *feature* of trademark law. Section 5 provides that when a registered mark "is or may be used legitimately by related companies," that use "shall inure to the benefit of the registrant" and "shall not affect the validity of such mark," so long as it does not deceive the public. 15 U.S.C. § 1055. "[R]elated company" is defined broadly to include "any person whose use of a mark is controlled by the owner of the mark with respect to the nature and quality of the goods or services on or in connection with which the mark is used." 15 U.S.C. § 1127. In other words, trademark owners may license their marks if they retain enough control to preserve the mark's meaning and prevent consumer deception.

This statutory design is especially important for universities. Their marks reflect decades of investment in academics, athletics, student life, alumni engagement, and public service, and the institution remains responsible for how its symbols are presented and what goods bear, or do

not bear, them. Licensing is the mechanism by which universities carry out that responsibility by setting and enforcing standards for design, materials, manufacturing, marketing, distribution, and regulatory compliance. *Savannah Coll. of Art & Design, Inc. v. Sportswear, Inc.*, 983 F.3d 1273, 1276–77 (11th Cir. 2020) ("[S]entimentality and pride create great demand for products emblazoned with schools' word and design marks—so much so that an entire industry has grown up around producing logo products for schools, colleges, and universities.").

## C. The Proposed Framework Constitutes a Sea Change that Only Congress May Enact

The Professors seek a carveout for unauthorized commercial uses of marks belonging to "culturally significant institutions." That would be a sea change depriving an unknown number of trademark owners of protections the Lanham Act expressly grants them.

If the Professors' carveout were adopted, licensing systems would be destabilized, unauthorized sellers would be encouraged to free-ride on institutional goodwill with zero accountability, and courts would be forced to draw an unworkable line between institutions that are "culturally significant" and those that are not. If Congress wishes to adopt such an unworkable rule, it can do so. Until then, courts should

apply the Lanham Act as written. That means preserving trademark owners' rights to stop unauthorized commercial uses that mislead consumers into believing goods are affiliated with, sponsored by, approved by, or otherwise connected to the organization whose marks they bear.

## II. Binding and Persuasive Precedent Affirm the Statutory Prohibition Against Confusion as to Sponsorship and Affiliation

Circuit courts, academics, and policymakers have repeatedly affirmed the Lanham Act's prohibition against misleading attributions of sponsorship and affiliation. They have recognized that these prohibitions reinforce, rather than undermine, the role of trademark law in protecting consumers' self-expression. Consumers don't just believe that institutions stand behind their branding indicia—they want them to.

In suggesting the contrary, the Professors badly misconstrue doctrinal counterweights to trademark rights: the *Rogers*-type First Amendment defense, functionality, and fair use. Each of these doctrines entails countervailing interests distinct from those of trademark law, or otherwise bolsters the Lanham Act's protection of fair competition and clear communication with consumers. In contrast, the Professors'

"culturally significant institutions" test would erase existing trademark rights with no material benefit.

### A. The Circuits Have Categorically Affirmed the Role of Trademarks in Signifying Sponsorship and Affiliation

This Circuit and others have affirmed the Lanham Act's guarantee of universities' trademark rights in sponsorship and affiliation. In *University of Pittsburgh v. Champion Products, Inc.*, 686 F.2d 1040 (3d Cir. 1982), this Court addressed the University of Pittsburgh's trademark infringement claims against Champion, which had imprinted Pitt's names, insignia, and mascot on clothing. *Id.* at 1042–43. This Court endorsed the theory of "confusion of sponsorship": "the crucial element is consumer desire to associate with the entity whose imprint is reproduced," and "[t]his desire is based on success or notoriety which, in turn, is a result of the efforts of that entity." *Id.* at 1049. "The entire impetus for the sale is the consumer's desire to identify with . . . Pitt's successful athletic programs." *Id.* at 1047.

Other circuits agree. In *Board of Supervisors for Louisiana State University Agricultural & Mechanical College v. Smack Apparel Co.*, 550 F.3d 465 (5th Cir. 2008), the Fifth Circuit affirmed summary judgment for four major universities—LSU, Oklahoma, Ohio State, and USC—

against a t-shirt manufacturer that had appropriated the universities' color schemes and other identifying indicia. The circuit noted that consumers' "desire . . . to associate with a particular university supports the conclusion that team colors and logos are, in the minds of the fans and other consumers, source indicators of team-related apparel." *Id.* at 478. The court rejected the argument that a lack of consumer interest in official licensing negated confusion, holding that "[w]hether or not a consumer cares about official sponsorship is a different question from whether that consumer would likely believe the product is officially sponsored." *Id.* at 485. The court underscored the connection between university sports programs and their indicia: "[f]ans and other members of the public purchase Smack's shirts only because the shirts contain the plaintiffs' colors and indicia identifying the Universities' football teams." *Id.* at 486.

In *University of Georgia Athletic Ass'n v. Laite*, 756 F.2d 1535 (11th Cir. 1985), the Eleventh Circuit affirmed an injunction against a wholesaler who marketed beer in red-and-black cans bearing a knockoff of the University of Georgia's bulldog mascot. The court rejected as "irrelevant" the argument that "no one actually believes that the

University of Georgia has gone into the brewing business." *Id.* at 1546. "[T]here [could] be no doubt that Laite hoped to sell 'Battlin' Bulldog Beer' not because the beer tastes great, but because the cans would catch the attention of University of Georgia football fans." *Id.* at 1545; *see also Savannah Coll.*, 983 F.3d at 1286 ("[C]ompanies like Sportswear copy the word marks of schools like SCAD . . . for the very reason that SCAD's goodwill and educational reputation fundamentally drive the sales.").

In *Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd.*, 604 F.2d 200 (2d Cir. 1979), the Second Circuit barred the distribution of a film in which the leading character wore a knock-off of the Dallas Cowboys Cheerleaders uniform. The court rejected the argument that the Lanham Act prohibits only confusion as to *origin*: "[t]he public's belief that the mark's owner sponsored or otherwise approved the use of the trademark satisfies the confusion requirement." *Id.* at 204–05; *id.* ("The trademark laws are designed not only to prevent consumer confusion but also to protect the synonymous right of a trademark owner to control his product's reputation.") (quotation omitted).

And in *Boston Athletic Ass'n v. Sullivan*, 867 F.2d 22 (1st Cir. 1989), the First Circuit barred the manufacture and sale of unlicensed t-shirts

bearing Boston Marathon logos. *Id.* at 35. When "defendants intentionally referred to the Boston Marathon on [their] shirts, and [ ] purchasers were likely to buy the shirts precisely because of that reference, [it was] fair to presume that purchasers are likely to be confused about the shirt's source or sponsorship." *Id.* at 34.

Thus, circuit authority affirms the Lanham Act's prohibition against misattributions of sponsorship and affiliation. Consumers buy goods bearing institutions' indicia believing those goods originate from, are sponsored by, *or* are affiliated with, institutions.

**B.    The Lanham Act Rights of Sponsorship and Affiliation Affirm, Rather Than Undermine, Consumers' Self-Expression**

The Professors contend that institutions' right to control use of their indicia somehow undermines consumers' self-expression. That is wrong. The statutory prohibition against misleading attributions of sponsorship or affiliation *reinforces* consumers' self-expression. This has been recognized by the circuits, policymakers, and academics.

*1. Circuit Courts Acknowledge the Connection Between Sponsorship/Affiliation and Self-Expression*

The circuits have noted the connection between sponsorship/affiliation and self-expression. This Court has recognized

that "the crucial element is consumer desire to associate with the entity whose imprint is reproduced," and that "[t]he entire impetus for the sale is the consumer's desire to identify with Pitt." *Champion*, 686 F.2d at 1047, 1049. This "is based on success or notoriety which, in turn, is a result of the efforts of that entity," which an unlicensed manufacturer "merely packages and exploits." *Id.* at 1049.

The Fifth Circuit has recognized "the public's indisputable desire to associate with college sports teams by wearing team-related apparel," 550 F.3d at 484, and held consumers' "desire . . . to associate with a particular university supports the conclusion that team colors and logos are, in the minds of the fans and other consumers, source indicators of team-related apparel." *Id.* at 478. "By associating the color and other indicia with the university, the fans perceive the university as the source or sponsor of the goods *because they want to associate with that source.*" *Id.* (emphasis added).

The Eleventh Circuit too: "sentimentality and pride create great demand for products emblazoned with schools' word and design marks— so much so that an entire industry has grown up around producing logo products for schools, colleges, and universities." *Savannah Coll.*, 983 F.3d

at 1276–77. "The very nature of school memorabilia relies upon the goodwill, reputation, and affiliation people associate with that school," *id.* at 1285, and consumers desire "apparel bearing the name of the school, team, or organization with which they *desire to express affiliation*," *id.* (emphasis added) (noting concession of defendant). In *Laite*, the circuit noted "most consumers who purchase products containing the name or emblem of their favorite school or sports team would prefer an officially sponsored or licensed product to an identical non-licensed product. Were this not true, the word 'official' would not appear in so many advertisements for such products." 756 F.2d at 1546 n.28.

### 2. *The Legislative History of Section 43(a) Proves Congress Understood the Importance of Sponsorship and Affiliation*

Congress amended the Lanham Act in 1988 to add an express right against misattributions of "sponsorship" and "affiliation" in addition to the prohibition against misattributions of "origin." The original 1946 text of Section 43(a) addressed only "a false designation of origin." 60 Stat. 441 (1946). But by 1988, courts had expanded Section 43(a) well beyond literal geographic origin, applying it to reach confusion as to sponsorship, endorsement, and affiliation—"creating, in essence, a federal law of

unfair competition." S. Rep. No. 100-515, at 40 (1988). The Trademark Review Commission thus proposed a cause of action against any use "likely to cause confusion, mistake, or deception as to the affiliation, connection, or association of such person with another, or as to the origin, sponsorship, or approval of his goods, services, or commercial activities by another." 77 Trademark Rep. 375, 426–36 (1987).

The Senate Judiciary Committee adopted this approach. In its report discussing the revised statutory definition of "trademark," the Committee observed that the definition "intentionally retain[s] . . . language relating to a trademark's ability to indicate source" as well as "the definition's incorporation, by implication, of attributes such as standards of quality, reputation and goodwill." S. Rep. No. 100-515, at 44. Congress's inclusion in the 1988 amendment of "sponsorship," "approval," "affiliation," "connection," and "association" ensured the statutory text reflected the full scope of the relationship between indicia and the entities they represent.

### 3. Empirical Research Confirms the Importance to Consumers of Sponsorship and Affiliation

Empirical research confirms that consumers not only strongly associate institutions' indicia with the institutions themselves

(regardless of manufacturer); they *want* institutions to stand behind those indicia. That connection supports self-expression.

Professor Matthew Kugler researched how often consumers care about whether merchandise bearing an institution's marks is officially sponsored. Matthew B. Kugler, *The Materiality of Sponsorship Confusion*, 50 U.C. Davis L. Rev. 1911 (2017). Kugler surveyed 1,049 consumers across categories including sports merchandise and college apparel and measured whether sponsorship attributions were "material" to purchasing behavior. *Id.* at 1924–32. Kugler found that "sponsorship confusion is material to about half of consumers" across the full range of products. *Id.* at 1911, 1957.

For sports and college merchandise, the data were striking. For MLB jerseys, 58% of consumers who believed the product was sponsored would have been *less interested* in purchasing it if they learned it was unsponsored. *Id.* at 1948 tbl.2. For a Harvard University t-shirt, 53% of sponsorship-confused consumers would be less interested in purchasing an unsponsored version. *Id.* And, at significant rates, consumers held trademark owners responsible for quality for both MLB jerseys (47.92%) and Harvard shirts (49.14%). *Id.*

More, Professor Kugler's data revealed *why* consumers care about sponsorship. "[T]he effect of perceived sponsorship on willingness to pay and purchase interest . . . appears to be a function of whether people believe that the sponsor should have a right to control the use of their mark on a particular good." *Id.* at 1957. In other words, "what consumers actually care about—as indicated by willingness to pay and the equity measure—is . . . something related to identity signaling and moral judgment." *Id.* at 1960; *id.* ("The data show that people care about whether a product is authorized because they feel the mark owner *deserves* to control these uses of their mark."). The research found that 72% of consumers evaluating MLB jerseys and 65% evaluating college apparel believed that sponsorship *should be required. Id.* at 1954 tbl.4. Consumers backed these beliefs with their wallets: the median consumer demanded a 50% (MLB Jersey), 70% (NFL Shirt), and 60% (Harvard shirt) discount to purchase an unsponsored version, and some said they would "never buy" an unsponsored product. *Id.* at 1950 tbl.2A. In short: "[p]eople do care who sent the Cubs logo." *Id.* at 1960.

Consumers vote with dollars. They understand the role their purchases have in supporting institutions, and they understand the

values embodied in those institutions. What's more, when consumers buy products, they project the values they support with their dollars. Degrading the association between symbols and the institutions responsible for creating and sustaining them would not empower consumers' self-expression, but undermine it.

### C. Trademark Law's Doctrinal Carveouts Support Countervailing Interests—the Professors' Proposed Erasure of Sponsorship and Associational Rights Has Little Benefit

The Professors' analogies to the First Amendment defense, functionality, and fair use are inapposite. They argue that trademark law includes carveouts that are analogous to the entitlement they propose— one divesting "culturally significant institutions" of trademark rights in "expressive uses." But the Professors paint these doctrines with a broad brush and, in so doing, mask important nuances. Each of these doctrines is analytically distinct from the vague "expressive use" carveout for the trademarks of "culturally significant institutions" because each of the doctrines either promotes the core values of trademark law, or prevents the entitlements of the Lanham Act from impinging upon other critical values.

### 1. The First Amendment

The right of self-expression already has a bulwark against the overexpansion of trademark rights: the First Amendment. For decades, American courts have shielded creators' expressive uses of others' trademarks when such marks were integral to the message of an expressive work and did not explicitly mislead consumers. This doctrinal shield is referred to by the eponymous case of *Rogers v. Grimaldi*, 875 F.2d 994 (2d Cir. 1989).

But whatever latitude the *Rogers* test affords expressive works, the Supreme Court made clear the defense is quite limited. In *Jack Daniel's Properties, Inc. v. VIP Products LLC*, 599 U.S. 140 (2023), the Court held that the *Rogers* test "does not" apply "when an alleged infringer uses a trademark in the way the Lanham Act most cares about: as a designation of source for the infringer's own goods." *Id.* at 153. "That kind of use falls within the heartland of trademark law, and does not receive special First Amendment protection." *Id.* at 145. "When a mark is used as a mark (except, potentially, in rare situations), the likelihood-of-confusion inquiry does enough work to account for the interest in free expression." *Id.* at 159.

The Professors' proposed "expressive use" carveout for the marks of "culturally significant institutions" would do exactly what *Jack Daniel's* forbids: it would exempt from the ordinary likelihood-of-confusion analysis a class of uses that function as *trademark* uses. *See* Professors' Br. at 4 (arguing courts should "tolerate some confusion" when "use of the mark [is] necessary to convey a message"). This would be a broader protection for such uses than the Supreme Court has afforded even expressive works under the First Amendment. Here, such a protection would not benefit ordinary consumers, but a willful trademark infringer. JA7842–7849.

### 2. *Utilitarian Functionality*

The doctrine of utilitarian functionality provides that useful (i.e., functional) aspects of a product cannot be protected by trademark law. A "functional" attribute of a product is simply "the reason the device works." *Smack Apparel*, 550 F.3d at 486; *TrafFix Devices, Inc. v. Marketing Displays, Inc.*, 532 U.S. 23, 32 (2001) (holding functional feature "is essential to the use or purpose of the article or . . . affects the cost or quality of the article") (citation omitted). Functionality is a poor

analogue for the Professors' unprecedented "expressive use" carveout for at least two reasons.

First, the functionality doctrine exists for a specific structural reason: "The functionality doctrine prevents trademark law, which seeks to promote competition by protecting a firm's reputation, from instead inhibiting legitimate competition by allowing a producer to control a useful product feature." *Qualitex Co. v. Jacobson Prods. Co., Inc.*, 514 U.S. 159, 164 (1995); *see also Rosetta Stone Ltd. v. Google, Inc.*, 676 F.3d 144, 161 (4th Cir. 2012) ("The purpose of the doctrine is to preserve the distinction between the realms of trademark law and patent law."). Thus, the Professors' analogy fails for the additional reason that they are not advocating for a limitation on trademark rights in support of another property entitlement (such as patent), but a blanket entitlement that subverts the very purpose of trademark law.

Second, functionality is not a *defense*, per se, but a limitation on a trademark owner's ability to obtain trademark rights in the first instance. *See* 15 U.S.C. § 1052(e)(5) (prohibiting registration of a trademark that "comprises any matter that, as a whole, is functional"). The Fourth Circuit illustrated this distinction: "[o]nce it is determined

that the product feature . . . is not functional, then the functionality doctrine has no application, and it is irrelevant whether [the defendant's] computer program functions better by use of [the plaintiff's] nonfunctional mark." *Rosetta Stone*, 676 F.3d at 162. The Professors' proposed carveout, by contrast, is not a limitation on what *can* be a trademark, but a blanket entitlement to infringe regardless of a trademark's validity.

### 3. Aesthetic Functionality

*Aesthetic* functionality is also a weak doctrinal toehold for the Professors' leap to a free pass for "expressive uses." The aesthetic functionality doctrine precludes the ownership of an aesthetic element of a product (color being the classic example) that would give the claimant a competitive monopoly *unrelated* to its reputation and goodwill. For example, granting a T-shirt maker exclusive trademark rights to the color burgundy for T-shirts would "put competitors" at a competitive "disadvantage" completely unrelated to the protection of the T-shirt maker's reputation and goodwill. *See Abercrombie & Fitch Stores, Inc. v. Am. Eagle Outfitters, Inc.*, 280 F.3d 619, 643 (6th Cir. 2002) (deeming

primary color combinations in connection with solid, plaid and stripe designs aesthetically functional).

This dispute, however, concerns trademarks that embody the reputation and goodwill of Penn State. Protecting them does not put any other organization at a "*non-reputation-related* disadvantage," *TrafFix*, 532 U.S. at 32–33 (emphasis added)—in fact, the opposite is true. That is why the Fifth Circuit rejected the same aesthetic functionality argument the Professors make here: "[f]ans and other members of the public purchase Smack's shirts only because the shirts contain the plaintiffs' colors and indicia identifying the Universities' football teams"; "any demand for Smack's t-shirts is inextricably tied to the Universities' trademarks themselves." *Smack Apparel*, 550 F.3d at 486–88.

Thus, the doctrine of aesthetic functionality is completely inapt. *See id.* at 488 (noting that a T-shirt manufacturer's "alleged competitive disadvantage in the ability to sell game day apparel relates solely to an inability to take advantage of the Universities' reputation and the public's desired association with the Universities that its shirts create"). Whereas aesthetic functionality leaves room for the reputation-signaling

function of indicia, the Professors' carveout would badly weaken that function.

### 4. Fair Use – Nominative and Descriptive

The doctrines of fair use (nominative and descriptive) are equally poor analogues for the Professors' new carveout for "expressive uses." Nominative fair use protects the use of another's trademark solely as a reference to the trademark owner, and not to create an association or cause confusion. For example, the doctrine protects newspapers' ability to print the word MICROSOFT when reporting on Microsoft. Descriptive, or "classic," fair use protects the use of another's trademark in a purely descriptive sense, and not to create an association or cause confusion. For example, news coverage of the Tour de France referring to the "peloton" is a fair use of that term that does not infringe the PELOTON mark. Both fair use doctrines protect common uses of others' trademarks that are not intended to, and do not, create confusion or an association with the trademark owner.

Here, that is *exactly* what Appellees are trying to do. They are trying to use Penn State's marks to create an association with Penn State, and their conduct has created a likelihood of confusion as to

whether Penn State created, authorized, or approved Appellees' goods. Such conduct is so far afield of the uses protected by the fair use doctrines that neither doctrine lends even the slightest support to the Professors' proposal.

### III. The Professors' "Culturally Significant Institutions" Test Is Unworkably Vague

The Professors' proposed carveout for "expressive uses" belonging to "culturally significant institutions" would create a nightmare for courts and institutions. Courts would be left with the near-impossible task of deciding what *is* a "culturally significant institution" whose trademark rights should be forfeit for the sake of "expressive uses." And institutions would face a minefield of contradictory regional rules concerning sponsorship and affiliation.

#### A. No One Agrees on What a "Culturally Significant Institution" Is

The Professors' test is unworkable. If this Court were to adopt it, lower courts would face a parade of impossible-to-answer questions before even reaching the three elements of "necessary . . . to convey the message," "reasonable in scope," and "no affirmative steps to mislead." Professors' Br. at 4.

To start: when is a trademark owner considered a "culturally significant institution"? How "significant" does such an institution have to be before it's deprived of its trademark rights? The Professors lump America's oldest and best-reputed universities into that category, but what about our oldest and best-reputed *companies*—companies that, over decades and centuries, have carved out a reputation in the United States and abroad for quality, reliability, and value—like Coca-Cola, Ford, and General Electric? What company is not "culturally significant" if not Google? Or luxury brands such as Tiffany and Gucci, which are routinely counterfeited? *See generally Tiffany (NJ) Inc. v. eBay Inc.*, 600 F.3d 93 (2d Cir. 2010).

What about bands? Are trademarks belonging to The Eagles, The Grateful Dead, and Nirvana in the crosshairs? What about the Beatles?

Or would such entities *not* fall within the definition of "institutions"? And if not, why not? Aren't Americans inclined to associate with such entities as much and as often as they associate with universities? Is the "expressive use" of their brand indicia any rarer (or less "significant" to consumers) than the expressive value of university

brand indicia? Are the iPhone, a blue Tiffany box, and the Fender Stratocaster any *less* a part of American culture than the Nittany Lion?

What are "expressive uses"? Even the First Amendment is not a categorical trump to trademark infringement. It cannot be the case that *any* expressive use defeats a claim of trademark infringement. *Jack Daniel's Props.*, 599 U.S. at 157 ("On that view, *Rogers* might take over much of the world. For trademarks are often expressive, in any number of ways."). How expressive, then, does an expressive use have to be before it becomes a blanket license to infringe? When is a trademark use "necessary . . . to convey a message"? Professors' Br. at 4. After all, consumers can convey their support in ways other than the purchase of unlicensed memorabilia. *See A Guide to the ESPN College Gameday Posters*, James Madison University Libraries Special Collections (May 4, 2026), https://ead.lib.virginia.edu/vivaxtf/view?docId=oai/JMU/repositories_4_resources_693.xml;query=2024.

Sometimes, the parade of horribles is real. This is one of those times.

## B. Adopting The Professors' Proposed Test Would Create a Legal Patchwork Nightmare

If this Court contravened its own precedent and ignored the widely embraced, congressionally mandated rule against misattributions of sponsorship and affiliation, it would create utter chaos for companies of any kind that license their marks to third-party manufacturers. Every such company would face a compliance minefield of inconsistent rules among regional circuits.

Federal statutes of nationwide application (like the Lanham Act) should be interpreted uniformly across the states and circuits. *Miss. Band of Choctaw Indians v. Holyfield*, 490 U.S. 30, 43 (1989) (rejecting use of state law to interpret term on the basis that "federal statutes are generally intended to have uniform nationwide application"); *Rickard v. Auto Publisher, Inc.*, 735 F.2d 450, 457 (11th Cir. 1984) (noting "Congress' goals of simplicity and uniformity" in passing the Lanham Act). This Circuit has recognized the importance of this rule. *See United States v. Gen. Battery Corp., Inc.*, 423 F.3d 294, 298–305 (3d Cir. 2005) ("In the case of federal liability statutes enforced under a federal cause of action, the law is generally intended to have uniform nationwide application."); *Wallerstein v. Christian Feigenspan, Inc.*, 215 F. 919, 920

(3d Cir. 1914) ("In the interest of uniformity of decision among the circuits, we think it desirable to give much weight to the decision of a co-ordinate court.").

Circuit courts (including this Circuit) have frequently affirmed and reaffirmed that the Lanham Act precludes misattributions of sponsorship and affiliation, *supra* Part II.A.—despite academics' gripes about that statutory prohibition. Revisiting this settled area of law would badly undermine the need for uniform nationwide application of the federal statute.

## IV. Protecting Sponsorship and Associational Rights Preserves a Licensing System that Benefits Institutions, Consumers, and the Public

The Professors' proposed carveout would deprive institutions of control over commercial uses of the symbols that identify them and destabilize a multibillion-dollar licensing system. And the fallout would not be limited to so-called "culturally significant institutions." If unauthorized commercial uses of institutional marks could be dismissed as merely expressive or non-source-identifying, licensing programs would erode—along with the quality control, regulatory compliance, and

accountability they provide. The harm would extend beyond institutions to the public.

The Lanham Act's protection of sponsorship and affiliation serves these interests by preserving licensing systems that allow trademark owners to control the quality, safety, and integrity of goods bearing their marks and to prevent unauthorized exploitation. The Professors' policy objections are misplaced. Trademark law does not confer a monopoly over apparel or other goods: competition persists between *licensed* sellers and across abundant substitute products. And requiring commercial vendors to obtain permission before profiting from another institution's symbols does not meaningfully burden expression.

## A.     Licensing is Essential to Institutions

Licensing is how institutions control the commercial meaning of their indicia. Those symbols embody goodwill built through sustained investment in academics, athletics, student life, alumni engagement, and public service. *Savannah Coll.*, 983 F.3d at 1285 (noting "[t]he very nature of school memorabilia relies upon the goodwill, reputation, and affiliation people associate with that school"). A licensing program allows

the institution to decide who may use its marks, on what terms, and subject to what standards of quality, legality, and accountability.

Just as important, licensing provides the tools to oversee the lifecycle of marked goods. Through license terms and enforcement mechanisms institutions can set standards for design, materials, manufacturing, labor conditions, advertising, insurance, distribution channels, and legal compliance. That oversight prevents unsafe, unethical, or unlawful practices from tarnishing the institution and causing reputational harm.

Weakening sponsorship and associational rights would destabilize this system. If unauthorized sellers could label their uses "expressive" to avoid liability, institutions would lose practical control over a marketplace that trades on their identity. *Dall. Cowboys Cheerleaders*, 604 F.2d at 205 ("The trademark laws are designed . . . to protect the synonymous right of a trademark owner to control his product's reputation.") (citation omitted).

### B. Licensing is Essential for Consumers

Licensing also advances trademark law's core consumer-protection function. By vetting licensees and imposing uniform standards,

institutions ensure that goods bearing their symbols are consistent in quality, safety, and legal compliance. *See Doeblers' Penn. Hybrids, Inc. v. Doebler*, 442 F.3d 812, 823 (3d Cir. 2006) ("A trademark license is typically written and contains express terms giving the licensor power to engage in quality control.").

Licensing further protects consumers from misleading marketing. Licensors review how marks are used in advertising, websites, social media, and retail presentation to ensure claims are accurate and legally compliant and to prevent institutional symbols from being used to lend false credibility to unverified sellers.

Finally, licensing helps enforce lawful and ethical conduct in the supply chain. Institutions require financial transparency; insurance coverage; compliance with intellectual-property and distribution rules; and adherence to laws governing workplace safety, child or forced labor, and discrimination. Licensed systems are also a key tool for screening out and combating counterfeit goods, which are often unregulated, substandard, and produced through exploitation.

To that end, requiring a commercial vendor to obtain permission before profiting from an institution's symbols does not inhibit speech.

Individuals remain free to express support or affiliation in unbranded ways and through noncommercial uses. It simply prevents merchants from using institutional identity to boost sales by implying sponsorship or affiliation they have not earned. *Jack Daniel's Props.*, 599 U.S. at 159 ("When a mark is used as a mark (except, potentially, in rare situations), the likelihood-of-confusion inquiry does enough work to account for the interest in free expression.").

## C.    Licensing Is Essential for the Public

Licensing also serves broader public interests. Institutions are not ordinary commercial actors; they use their names and symbols to support communities of students, faculty, and alumni, and to advance public-facing missions in teaching and service. Revenue from licensed merchandise can help fund those nonprofit missions.

As discussed above, the public also benefits because licensing promotes accountable commerce. By vetting licensees and enforcing uniform standards, licensing reduces the circulation of unsafe goods, deceptive advertising, unlawful labor practices, and counterfeit products—harms that affect consumers, workers, and retail markets alike.

The Professors' proposed policy rests on an inflated view of the costs of licensing. Competition remains robust within licensed markets, where multiple authorized sellers compete on price, style, and quality, giving consumers ample choices. Preserving the licensing framework therefore serves—not frustrates—the public interest.

## CONCLUSION

For the foregoing reasons, CLC respectfully requests that this Court reject the Professors' novel test, which would divest countless brands of valuable trademark rights, and affirm the jury's verdict.

DATED: May 18, 2026

Respectfully submitted,

R. Charles Henn Jr.
Alexander H. Weathersby
**KILPATRICK TOWNSEND & STOCKTON LLP**
1100 Peachtree Street, Suite 2800
Atlanta, Georgia 30309
Telephone: (404) 815-6500
chenn@ktslaw.com
aweathersby@ktslaw.com

*Attorneys for Amicus Curiae CLC*

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rules of Appellate Procedure 29(a)(5), 32(a), and 32(g)(1) counsel for Amicus Curiae certifies that this brief complies with the spacing, typeface, and style requirements of Rules 32(a)(4)–(6) (Century Schoolbook in 14 point), and that, in compliance with Rules 29(a)(5) and 32(a)(7)(B), this brief contains 6,486 words, exclusive of portions exempted by Federal Rule of Appellate Procedure 32(f).

Pursuant to Local Appellate Rule 31.1(c), counsel certifies that the text of the electronic brief is identical to the text in the paper copies. Additionally, a virus-detection program has been run on the file, and no virus was detected. The virus detection program used was Crowdstrike Falcon Sensor security platform. This platform conducts real-time monitoring and scanning of all data communications, documents and machine learning of automated processes. The classification of the platform is NGAV – next generation of antivirus and is set to the general release version of N-1.

Pursuant to Local Appellate Rule 46.1(e), lead counsel for Amicus Curiae, R. Charles Henn Jr., certifies that he is a member of the bar of this Court.

DATED: May 18, 2026

R. Charles Henn Jr.

# CERTIFICATE OF SERVICE

Pursuant to L.A.R. 25.1(b), the below-signed counsel for Amicus Curiae certifies that this brief was served electronically upon counsel of record through the court's CM/ECF docketing system on May 18, 2026.

DATED: May 18, 2026

Alexander Weathersby