Nos. 25-2398, 25-2494

In The

# United States Court of Appeals
## for the Third Circuit

THE PENNSYLVANIA STATE UNIVERSITY,

*Plaintiff-Appellant/Cross-Appellee*,

vs.

VINTAGE BRAND LLC, ET AL.,

*Defendants-Appellees/Cross-Appellants*.

On Appeal from the United States District Court
for the Middle District of Pennsylvania, Case No. 4:21-cv-01091
Honorable Matthew W. Brann, U.S. District Judge

**REPLY BRIEF OF
VINTAGE BRAND LLC, ET AL.**

Joshua D. Harms
John T. Fetters
STOKES LAWRENCE, P.S.
1420 Fifth Avenue, Suite 3000
Seattle, Washington 98101
(206) 626-6000
*josh.harms@stokeslaw.com*
*john.fetters@stokeslaw.com*

Mark P. McKenna
LEX LUMINA PLLC
745 Fifth Avenue, Suite 500
New York, New York 101501
(646) 898-2055
*mark@lex-lumina.com*

*Counsel for Defendants-Appellees/Cross-Appellants
Vintage Brand LLC, Sportswear, Inc. and Chad Hartvigson*

## TABLE OF CONTENTS

Page


I. INTRODUCTION .......... 1

II. ARGUMENT .......... 5

A. Penn State Misstates Controlling Precedent and Relies on the Progeny of *Boston Hockey*, which is Bad Law .......... 5

B. The Historic Images are Functional as used by Vintage Brand .......... 8

1. Features are Functional When They Are Useful for Anything Beyond Branding .......... 8

2. Functionality is About How Features Function; Not Whether They are Attractive .......... 12

3. Giving Penn State Exclusive Use of Historic Images Would Put Defendants at a Significant, Non-Reputation-Related Disadvantage .......... 16

a. "Reputation" Means Reputation as a Source of the Goods Bearing the Historic Images .......... 16

b. The Evidence Demonstrates a Significant, Non-Reputation-Related Disadvantage .......... 19

4. The Ninth Circuit *Au-Tomotive Gold* Case is Importantly Different .......... 22

C. The District Court Erred in Failing to Instruct the Jury on Trademark Use .......... 24

D. The District Court Erred in Denying Defendants' Motion for Judgment as a Matter of Law on Initial Interest and Post-Sale Confusion .......... 26

E. Sportswear Cannot Be Directly Liable .......... 27

F. Vintage Brand's Renewed Motion Was Timely .......... 29

III. CONCLUSION .......... 32

## TABLE OF CITATIONS

**Cases** **Page(s)**

*Abitron Austria GmbH v. Hetronic Int'l, Inc.*,
600 U.S. 412 (2023) .......... 24, 25

*Am. Greetings Corp. v. Dan-Dee Imports, Inc.*,
807 F.2d 1136 (3d Cir. 1986) .......... 10, 11

*Au-Tomotive Gold, Inc. v. Volkswagen of America, Inc.*,
457 F.3d 1062 (9th Cir. 2006) .......... 22, 23

*Bd. of Governors of Univ. of N. Carolina v. Helpingstine*,
714 F. Supp. 167 (M.D.N.C. 1989) .......... 7

*Bd. of Supervisors for La. State Univ. Agric. & Mech. Coll. v. Smack Apparel Co.*,
550 F.3d 465 (5th Cir. 2008) .......... 6

*Boston Athletic Ass'n v. Sullivan*,
867 F.2d 224 (1st Cir. 1989) .......... 6

*Boston Professional Hockey Association, Inc. v. Dallas Cap & Emblem Mfg., Inc.*,
510 F.2d 1004 (5th Cir. 1975) .......... 5, 6

*Budinich v. Becton Dickinson & Co.*,
486 U.S. 196 (1988) .......... 31

*Century 21 Real Estate Corp. v. Lendingtree, Inc.*,
425 F.3d 211 (3d Cir. 2005) .......... 18

*Dastar Corp. v. Twentieth Century Fox Film Corp.*,
539 U.S. 23 (2003) .......... 13, 16

*Ezaki Glico Kabushiki Kaisha v. Lotte Int'l Am. Corp.*,
986 F.3d 250 (3d Cir. 2021) .......... *Passim*

*Fair Wind Sailing, Inc. v. Dempster*,
764 F.3d 303 (3d Cir. 2014) .......... 8

**<u>Cases</u> (cont.)** **Page(s)**

*G.D. Searle & Co. v. Hudson Pharm. Corp.*,
715 F.2d 837 (3d Cir. 1983) ........................................................22

*Gen. Mills, Inc. v. Henry Regnery Co.*,
421 F. Supp. 359 (N.D. Ill. 1976) .........................................................7

*In re Slokevage*,
441 F.3d 957 (Fed. Cir. 2006) ...........................................................8, 9

*Int'l Order of Job's Daughters v. Lindeburg & Co.*,
633 F.2d 912 (9th Cir. 1980)........................................................*Passim*

*Inwood Lab'ys, Inc. v. Ives Lab'ys, Inc.*,
456 U.S. 844 (1982) ...................................................................10, 11

*Jack Daniel's Props. Inc. v. VIP Prods,*
*Inc.*, 599 U.S. 140 (2023)...........................................................3, 13, 16

*Keene Corp. v. Paraflex Indus., Inc.*,
653 F.2d 822 (3d Cir. 1981) ..................................................7, 8, 10, 22

*Lerner & Rowe PC v. Brown Engstrand & Shely LLC*,
119 F.4th 711 (9th Cir. 2024) ..........................................................25

*LTTB LLC v. Redbubble, Inc.*,
840 Fed. App'x 148 (9th Cir. 2021)...............................................17, 23

*New Kids on the Block v. News Am. Publ'g., Inc.*,
971 F.2d 302 (9th Cir. 1992)..............................................................19

*O. Hommel Co. v. Ferro Corp.*,
659 F.2d 340 (3d Cir. 1981) ...........................................29, 30, 31, 32

*Pagliero v. Wallace China Co.*,
198 F.2d 339 (9th Cir. 1952)................................................................8

*PIM Brands Inc. v. Haribo of Am.*,
81 F.4th 317 (3d Cir. 2023)..........................................................*Passim*

**Cases (cont.)** **Page(s)**

*Prestonettes, Inc. v. Coty*,
264 U.S. 359 (1924) .......... 1

*Qualitex Co. v. Jacobson Prods. Co., Inc.*,
514 U.S. 159 (1995) .......... *Passim*

*Riley v. Kennedy*,
553 U.S. 406 (2008) .......... 31

*Savannah Coll. of Art & Design, Inc. v. Sportswear, Inc.*,
983 F.3d 1273 (11th Cir. 2020) .......... 6

*Smith v. Chanel*,
402 F.2d 562 (9th Cir. 1968) .......... 18

*State National Insurance Co. v. County of Camden*,
824 F.3d 399 (3d Cir. 2016) .......... 31

*Sullivan v. Finkelstein*,
496 U.S. 617 (1990) .......... 30

*Sulzer-Mixpac AG v. A&N Trading Co.*,
988 F.3d 174 (2d Cir. 2021) .......... 10

*Supreme Assembly*, *Order of Rainbow for Girls v. J.H. Ray Jewelry Co.*,
676 F.2d 1079 (5th Cir. 1982) .......... 17

*Tarlton v. Exxon*,
688 F.2d 973 (5th Cir. 1982) .......... 32

*U.S. Golf Ass'n v. St Andrews Systems, Data-Max, Inc.*,
749 F.2d 1028 (3d Cir. 1984) .......... 8

*United States v. Giles*,
213 F.3d 1247 (10th Cir. 2000) .......... 6

*Univ. of Ga. Athletic Ass'n v. Laite*,
756 F.2d 1535 (11th Cir. 1985) .......... 6

**<u>Cases</u> (cont.)** **Page(s)**

*Univ. of Pittsburgh v. Champion Products, Inc.*,
566 F. Supp. 711 (W.D. Pa. 1983) ........ 6, 7

*University of Pittsburgh v. Champion Products Inc.*,
686 F.2d 1040 (3d Cir. 1982) ........ 8

*Wal-Mart Stores, Inc. v. Samara Bros., Inc.*,
529 U.S. 205 (2000) ........ 8, 9

*WCVB-TV v. Boston Athletic Ass'n*,
926 F.2d 42 (1st Cir. 1991) ........ 18

**<u>Statutes</u>**

15 U.S.C. § 1052(e) ........ 2, 9

15 U.S.C. § 1055 ........ 3

15 U.S.C. § 1064(3) ........ 2, 9

15 U.S.C. § 1065 ........ 2, 9

15 U.S.C. § 1114 ........ 3

15 U.S.C. § 1114(a) ........ 27, 28

15 U.S.C. § 1114(b) ........ 27

15 U.S.C. § 1127 ........ 3, 25, 28

28 U.S.C. § 1291 ........ 30

**<u>Other Authorities</u>**

John A. Rothchild, *That Old College Try: Judge-Made Monopolies in the Market for Affinity Goods*,
13 TEX. A&M L. REV. 343 (2025) ........ 20

**Other Authorities** (cont.) **Page(s)**

Stacey Dogan & Mark Lemley*, The Merchandising Right: Fragile Theory or Fait Accompli?*,
54 EMORY L.J. 461 (2005) .......... 7, 15

MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION (5th ed.) .......... 7

## I. INTRODUCTION

Penn State casts Defendants' arguments as "policy," and some kind of radical attempt to rewrite the Lanham Act. But there is nothing radical about the position that trademark rights extend only to uses of trademarks *as trademarks*; that is, as indications of who is responsible for the products or services. Trademark rights are not rights in gross. That is black letter law. *Prestonettes, Inc. v. Coty*, 264 U.S. 359, 368 (1924) ("Then what new rights does the trade-mark confer? It does not confer a right to prohibit the use of the word or words. It is not a copyright. . . . When the mark is used in a way that does not deceive the public we see no such sanctity in the word as to prevent its being used to tell the truth. It is not taboo.").

Penn State's accusation that Defendants seek to rewrite the Lanham Act is ironic, since Penn State's arguments have only a glancing relationship with the text of the statute. Penn State claims, for example, that Defendants' argument about functionality "reads the word 'aesthetic' out of the functionality defense." Doc. 59 ("Resp. Br.") at 20. But the word "aesthetic" appears nowhere in the Lanham Act, which precludes

protection for *functional* features. 15 U.S.C. §§ 1052(e), 1064(3), 1065, 1125(a)(3).

It is Penn State that seeks to rewrite the law of functionality by limiting it to features with "inherent aesthetic appeal." Resp. Br. at 20. Neither the Supreme Court's nor this Court's functionality cases use the word "inherent," nor do they focus on features that serve only particular functions. This Court takes a broad view of functionality, under which features are functional when they are useful for anything other than branding. *PIM Brands Inc. v. Haribo of Am.*, 81 F.4th 317, 321 (3d Cir. 2023). That approach keeps trademark law in its lane, as controlling precedent demands. *Qualitex Co. v. Jacobson Prods. Co., Inc.*, 514 U.S. 159, 170 (1995) ("The upshot is that, where a color serves a significant non-trademark function—whether to distinguish a heart pill from a digestive medicine or to satisfy the 'noble instinct for giving the right touch of beauty to common and necessary things'—courts will examine whether its use as a mark would permit one competitor (or a group) to interfere with legitimate (non-trademark-related) competition through actual or potential exclusive use of an important product ingredient.") (internal citation omitted).

Penn State's argument about trademark use is likewise divorced from the text of the statute. Penn State quotes the language of the infringement provisions but leaves "use in commerce" out of the quotation and ignores the statutory definition of that requirement (by reference to cherry-picked legislative material, not statutory text). Resp. Br. at 30. The plain language of the statute limits infringement to uses of marks to identify the source of a party's own goods or services. 15 U.S.C. §§ 1114, 1125(a), 1127.

Contrary to Penn State's claim, Resp. Br. at 3, nothing in Defendants' argument suggests that all brand licensing is illegitimate. Indeed, Defendants' argument specifically invokes the statutory requirement of trademark licensing—control over the quality of the goods. Under the Lanham Act, a trademark owner must legitimately control the quality of the licensed goods or services in order to benefit from the licensee's use. 15 U.S.C. § 1055; *id.* § 1127 (defining a "related company" as a party whose "use is controlled by the owner of the mark with respect to the nature and quality of the goods or services on or in connection with which the mark is used"). Control is required because it is centrally connected to the function of a trademark, which is to tell consumers who

is responsible for quality. *Jack Daniel's Props. Inc. v. VIP Prods Inc.*, 599 U.S. 140, 146 (2023) ("a mark tells the public who is responsible for a product"). Without control, a trademark falsely represents responsibility.

Indication of responsibility also defines the scope of infringement. When a defendant uses a mark to indicate the source of its own products and consumers are confused about who is responsible for them, the trademark owner has a claim. When a defendant does not use a mark to indicate source but for other purposes like reference or ornamentation, the trademark owner does not have a claim. That does not disqualify all brand licensing; it properly makes claims contingent on trademark function.

When Nike adorns t-shirts with its Swoosh logo, consumers understandably treat that logo as an indication of responsibility for quality, because Nike makes clothing and footwear. In contrast, when Penn State licenses others to print merchandise with images that contain Penn State logos, consumers understandably do not see the images as indications of responsibility for the quality of the merchandise, because

Penn State is an educational institution with no reputation for making those goods.[1]

## II. ARGUMENT

### A. <u>Penn State Misstates Controlling Precedent and Relies on *Boston Hockey*, which is Bad Law</u>

Penn State wrongly asserts that the law uniformly supports university merchandising rights. Resp. Br. at 25–26. The cases on which Penn State primarily relies are the progeny of *Boston Professional Hockey Association, Inc. v. Dallas Cap & Emblem Manufacturing, Inc.*, 510 F.2d 1004 (5th Cir. 1975), which improperly stretched the Lanham Act to allow trademark claims when the plaintiff's mark is the "triggering mechanism" for the sale of the defendant's products. *Id.* at 1012 ("The argument that confusion must be as to the source of the manufacture of the emblem itself is unpersuasive, where the trademark, originated by the team, is the triggering mechanism for the sale of the emblem.").

---

[1] CLC, whose business model depends on monopoly control over collegiate licensing, claims that there is no evidence indicating that consumers discredit institutions as being the source of merchandise bearing their "branded indicia." Doc. 66 ("CLC Amicus Br.") at 3. But in this case, Defendants' survey expert, Dr. Tülin Erdem, provided unrebutted survey evidence demonstrating that consumers do not believe that Penn State is responsible for the quality of Vintage Brand's products. JA8809; JA8815; JA8877–JA8878.

Tellingly, Penn State never mentions *Boston Hockey*, even though all of its cases rely on that decision. *See* Resp. Br. at 25–26 (citing *Univ. of Ga. Athletic Ass'n v. Laite*, 756 F.2d 1535, 1546 (11th Cir. 1985) (adopting *Boston Hockey*'s "triggering mechanism" language); *Boston Athletic Ass'n v. Sullivan*, 867 F.2d 22, 33-34 (1st Cir. 1989) (relying on *Boston Hockey* and *Laite*); *Savannah Coll. of Art & Design, Inc. v. Sportswear, Inc.*, 983 F.3d 1273, 1286 (11th Cir. 2020) (same); *Bd. of Supervisors for La. State Univ. Agric. & Mech. Coll. v. Smack Apparel Co.*, 550 F.3d 465, 478, 482 (5th Cir. 2008) (same, and rejecting the doctrine of aesthetic functionality wholesale)).

Penn State avoids *Boston Hockey* because that case is widely criticized as unsound. VB Br. at 23 n.6; *see also* JA 308 (characterizing the *Boston Hockey* approach as a "clear loser"); *United States v. Giles*, 213 F.3d 1247, 1250 (10th Cir. 2000) ("[T]he [*Boston Hockey*] court relied upon a novel and overly broad conception of the rights that a trademark entails."); *Int'l Order of Job's Daughters v. Lindeburg & Co.*, 633 F.2d 912, 919 (9th Cir. 1980) ("The *Boston Hockey* decision transmogrifies this narrow protection into a broad monopoly."); *Univ. of Pittsburgh v. Champion Products, Inc.*, 566 F. Supp. 711, 719 (W.D. Pa. 1983) ("We do

not think that *Boston Hockey* is good law."); *Gen. Mills, Inc. v. Henry Regnery Co.*, 421 F. Supp. 359, 362 n.2 (N.D. Ill. 1976) (refusing to adopt *Boston Hockey* because it "would convert trademark law into copyright law"); MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 24:10 (5th ed.) ("The *Boston Hockey* attempt to stretch trademark law failed (and rightly so) because it violated a basic rationale of trademark law."); Stacey L. Dogan & Mark A. Lemley, *The Merchandising Right: Fragile Theory or Fait Accompli?*, 54 EMORY L.J. 461, 482 (2005) ("The *Boston Hockey* approach has no logical stopping point. It conflicts with the text of the Lanham Act[.]").

This Court is particularly "careful to keep trademark law in its lane." *Ezaki Glico Kabushiki Kaisha v. Lotte Int'l Am. Corp.*, 986 F.3d 250, 256 (3d Cir. 2021). It should do so here by rejecting *Boston Hockey*, as well-reasoned decisions already have. *See, e.g.*, *Job's Daughters*, 633 F.2d at 919; *Univ. of Pittsburgh*, 566 F. Supp. at 719; *Bd. of Governors of Univ. of N. Carolina v. Helpingstine*, 714 F. Supp. 167, 172 (M.D.N.C. 1989).[2]

---

[2] Penn State incorrectly asserts that *Job's Daughters* "is not good law in this Circuit." Resp. Br. at 28. The Third Circuit case Penn State cites, *Keene Corp. v. Paraflex Indus., Inc.*, 653 F.2d 822 (3d Cir. 1981), does

## B. The Historic Images are Functional as used by Vintage Brand

### 1. Features are Functional When They Are Useful for Anything Beyond Branding

Nowhere is Penn State's accusation that Defendants advance "policy" arguments more of a confession than in the context of functionality. Penn State suggests that Defendants misstate the law by arguing that product features are functional if they are "useful for anything beyond branding." Resp. Br. at 20. Defendants do indeed take that position, because it is unambiguously the law of this Circuit. *PIM Brands*, 81 F.4th at 321 ("A design is functional if it is useful for anything beyond branding.").[3]

not discuss *Job's Daughters* at all. *Keene* rejected the formulation in *Pagliero v. Wallace China Co.*, 198 F.2d 339 (9th Cir. 1952). *Keene*, 653 F.2d at 825. After *Keene*, this Court declined to resolve the dispute between *Job's Daughters* and *Boston Hockey*. *University of Pittsburgh v. Champion Products Inc.*, 686 F.2d 1040, 1048 (3d Cir. 1982).

[3] Penn State claims that this Court "has applied functionality analysis only in the product design context." Resp. Br. at 22. That is incorrect. *See Fair Wind Sailing, Inc. v. Dempster*, 764 F.3d 303, 310–11 (3d Cir. 2014) (student feedback procedures, catamarans, teaching itineraries, and curriculum functional in context of Fair Wind's services); *U.S. Golf Ass'n v. St Andrews Systems, Data-Max, Inc.*, 749 F.2d 1028, 1034 (3d Cir. 1984) (mathematical formula for calculating golfers' handicaps was functional). Even if functionality were confined to product design cases, it would apply here. This case is fundamentally about use of historic images *as features of the design of merchandise*. *See Wal-Mart*

As this Court said, "[f]unctionality is not a high bar." *Id.* at 321. Trademark protection "is limited to design choices that serve *only to brand a product*. If a design choice 'would put competitors at a significant non-reputation-related disadvantage,' then it is functional." *Id.* (quoting *Qualitex*, 514 U.S. at 165) (emphasis added). "Conversely, a design is not functional if *all it does* is identify its maker." *Ezaki*, 986 F.3d at 257 (emphasis added). "Even if the design chosen both promotes a brand and also 'makes a product work better,' it is functional and unprotectable." *PIM Brands*, 81 F.4th at 321 (citing *Ezaki*, 986 F.3d at 258).

Penn State asks this Court to reject its own rule because, according to Penn State, that rule "reads the word 'aesthetic' out of the aesthetic functionality defense." Resp. Br. at 20. But there is nothing magic about the word "aesthetic"—indeed, that word does not appear in the Lanham Act, which expressly precludes protection for *functional* features. 15 U.S.C. §§ 1052(e), 1064(3), 1065, 1125(a)(3).

---

*Stores, Inc. v. Samara Bros., Inc.*, 529 U.S. 205, 214 (2000) (analyzing designs applied to clothing); *In re Slokevage*, 441 F.3d 957 (Fed. Cir. 2006) (treating designs on back pocket of pants as product design subject to *Wal-Mart*).

Nor does *Qualitex*, the case Penn State contends governs here, single out "aesthetic" features. Resp. Br. at 22. *Qualitex* takes a broad approach to functionality, disqualifying features whenever they serve *nontrademark* functions. *See Qualitex*, 514 U.S. at 170 (functionality relevant whenever the claimed feature "serves a significant nontrademark function"); *Inwood Lab'ys, Inc. v. Ives Lab'ys, Inc.*, 456 U.S. 844, 853 (1982) (color of medical pills serves the informational function of differentiating types of medicine).

Functionality also has nothing to do with "inherent" appeal; context is everything. *See Keene Corp. v. Paraflex Indus., Inc.*, 653 F.2d 822, 826 (3d Cir. 1981) (design of wall-mounted luminaire functional because of its architectural compatibility with structure on which it is mounted); *Sulzer-Mixpac AG v. A&N Trading Co.*, 988 F.3d 174, 182–83 (2d Cir. 2021) (candy-colored mixing tips on tubes of products used by dentists were functional because the colors of the cartridge caps were matched to the mixing tips to indicate the proper sizes and mixing rations for dental materials); *Am. Greetings Corp. v. Dan-Dee Imports, Inc.*, 807 F.2d 1136, 1143 (3d Cir. 1986) ("tummy graphics" on plush teddy bears were functional because they served the purpose of "communicating the

particular personality of each of the Care Bear characters, and . . . convey an emotional message through such personality").[4]

*Inwood* was about the color of medical pills—colors that were arbitrarily chosen (having nothing to do with the composition of the pills, nor any pre-existing convention). Those colors were functional because, *once they were chosen*, they were used by pharmacists to distinguish types of medication. *Inwood,* 456 U.S. at 853. And there was nothing "inherently aesthetic" about the shape or colors of the watermelon flavored candies in *PIM Brands*—those features served the informational function of indicating flavor, a function that was entirely related to the context of their use. 81 F.4th at 322.

As this Court has correctly held, features are functional if they are useful for anything beyond branding, whether their function is "aesthetic" in any judgmental sense, informational (indicating the flavor of candies), or helpful to users in sorting products (indicating what kind

---

[4] *American Greetings* used the term "aesthetic functionality," but that usage confirms that the concept is much broader than Penn State suggests. The tummy designs in that case served the function of identifying personality characteristics of the different Care Bears. *Am. Greetings*, 807 F.2d at 1143. There was nothing "inherently aesthetic" about the designs' appeal. Their function was informational, even if the designs were attractive.

of medication is involved). Functionality is not about free use of features that serve special functions; to the contrary, *non*-functionality requires proof that the claimed features serve *only* a branding (quality-indicating) function. *PIM Brands*, 81 F.4th at 321; *Qualitex*, 514 U.S. at 170.

### 2. Functionality is About How Features Function; Not Whether They are Attractive

Penn State follows a familiar rights-in-gross playbook in suggesting that applying this Court's functionality precedent will inevitably invalidate every visually appealing mark. Resp. Br. at 24. It will not. Indeed, it is only Penn State's framing of functionality that runs that risk—it would require courts to determine whether a feature has "inherent aesthetic appeal." Resp. Br. at 20. The Supreme Court and this Court focus on the function of a feature as it is used, not on the visual appeal of the feature. Specifically, under *PIM Brands*, the question is whether the feature is useful for something other than branding, or whether, instead, the feature serves only (even if appealingly) to identify source. 81 F.4th at 321.

Visually appealing marks that function as trademarks—that is, marks that identify who is responsible for the quality of tangible goods—are protected against confusing uses of those marks. *Jack Daniel's*, 599

U.S. at 153 (holding that "the Lanham Act most cares about" use "as a designation of source for the infringer's own goods"); *Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23, 37 (2003) ("[T]he phrase 'origin of goods' in the Lanham Act . . . refers to the producer of the tangible goods that are offered for sale, and not to the author of any idea, concept, or communication embodied in those goods."). Features that are useful for something other than branding are outside the scope of a trademark owner's rights. *PIM Brands*, 81 F.4th at 321; *Ezaki*, 986 F.3d at 256.

The evidence at trial, including testimony from Penn State's own witnesses, demonstrates that Vintage Brand's historic images do not identify the source of Vintage Brand's tangible products. Consumers want those images so they can show their affinity for Penn State. *See* Doc. 49 ("VB Br.") at 31–34. Even when Penn State's lawyers tried to coax its witnesses into saying that Penn State marks indicated something about the quality of the goods, those witnesses did not take the bait; their testimony was about the reputation of the university as an educational institution. *See* JA8137; JA8221; JA8004–JA8005.

The testimony Penn State cites, *see* Resp. Br. at 17, deals primarily with Penn State's general efforts to license quality goods.[5] That testimony says nothing about whether consumers perceive *the imagery* on the merchandise to indicate responsibility for the quality of those goods. *E.g.*, JA7988, JA7991, JA8001, JA8014, JA8032–JA8033; JA8069–73; JA8104–JA8106. The only direct evidence on that question was Dr. Erdem's unrebutted survey evidence demonstrating that consumers do not believe that Penn State is responsible for the quality of Vintage Brand's products. JA8809; JA8815; JA8877–JA8878.

CLC contends that some segment of the population cares whether merchandise is officially licensed. CLC Br. at 17–20. Even if true, that does not support giving Penn State exclusive rights in historic images printed on merchandise. Consumers have ample other information about licensing status, allowing them to allocate their dollars in exactly the way CLC advocates. CLC requires that the "Official Label" be affixed to all licensed goods, and licensees prominently advertise their goods as official.

---

[5] In reality, the officially-licensed merchandise varies substantially in price and quality, ranging from plain Hanes white t-shirts with screen-printed images to higher-quality goods sold at Nieman Marcus. JA8201–JA8203; JA8630-JA8631; JA8638–JA8639 (discussing JA9655); JA9615–JA9621.

JA8083; JA8086-JA8087; JA8401–JA8402; JA8627–JA8630 (discussing JA9603–JA9610); JA8637 (discussing JA9628); JA8638 (discussing JA9655); JA9446; JA9451–JA9452; JA9461; JA10319. Professors Dogan and Lemley anticipated this market condition:

> Indeed, if consumers do in fact value obtaining goods from the trademark owner itself—perhaps because it supports the school or team—then we would expect the market to reflect that by developing a distinction between ordinary merchandise and officially licensed merchandise. This may be the best of all worlds, because consumers will learn whether merchandise is sponsored by the trademark owner or not, and can choose their goods accordingly. The emphasis in merchandising inquiries would appropriately shift, then, to whether the defendant had deceptively suggested that its goods were officially licensed by the trademark holder.

Dogan & Lemley, *supra*, at 485.

This Court should adopt the "best of all worlds"—which is also the arrangement that is consistent with the Lanham Act. Consumers who care about licensing status can easily find licensed goods by relying on the prominent signals already in use. Consumers who do not care should not have to pay a licensing tax to CLC. This arrangement keeps trademark law in its lane, because virtually no consumers—regardless of whether they care about licensure—are confused about whether Penn State is responsible for the quality of Vintage Brand's merchandise.

### 3. Giving Penn State Exclusive Use of Historic Images Would Put Defendants at a Significant, Non-Reputation-Related Disadvantage

The evidence at trial confirmed the obvious: Giving Penn State exclusive use of the composite historic images would put Vintage Brand and other competitors at a significant, non-reputation-related disadvantage.

#### a. "Reputation" Means Reputation as a Source of the Goods Bearing the Historic Images

Critically, for purposes of determining functionality, "reputation" means reputation as a source of goods, not a general reputation as a university or as the institution to which the images refer. The source of goods is the party responsible for their quality. *Jack Daniel's*, 599 U.S. at 146 ("a mark tells the public who is responsible for a product"); *see also Dastar*, 539 U.S. at 37 (holding that "origin of goods" in the Lanham Act "refers to the producer of the tangible goods that are offered for sale").

That the historic images on Vintage Brand's products include words or symbols that identify the source of *other* goods or services (like educational services or sports-related services) does not mean those words or symbols indicate the source of merchandise bearing the historic images. *See Job's Daughters*, 633 F.2d at 918; *Supreme Assembly, Order*

*of Rainbow for Girls v. J.H. Ray Jewelry Co.,* 676 F.2d 1079, 1082–83 (5th Cir. 1982); *LTTB LLC v. Redbubble, Inc.*, 840 Fed. App'x 148, 150 (9th Cir. 2021). The question is not whether the images are "aesthetically pleasing independent of their association with Penn State." Resp. Br. at 17. It is whether exclusive use of the historic images would put competitors at a disadvantage unrelated to consumers' ability to identify who is responsible for the quality of the tangible merchandise bearing those images. The evidence makes clear that exclusive use of these historic images would do just that.

In its effort to avoid the Lanham Act's limitations, Penn State revealingly slips between the concepts of "reputation" and "recognition." *See* Resp. Br. at 23–24. There is no evidence that consumers believe that Penn State is responsible for the quality of Vintage Brand's products—indeed, there is clear evidence that consumers *do not* believe that. Penn State therefore candidly seeks a rule that would give it exclusive rights to any products that *reference* it, so that consumers can only show their allegiance to the school by paying a licensing tax. Resp. Br. at 24.

But trademark law routinely distinguishes between use of a mark to identify source, on one hand, and mere references to a mark owner, on

the other. Only the former uses are infringing. *See Century 21 Real Estate Corp. v. Lendingtree, Inc.*, 425 F.3d 211, 214 (3d Cir. 2005) (nominative fair use occurs when the alleged infringer uses a trademark to refer to the plaintiff, even if the ultimate goal is to describe his own product); *WCVB-TV v. Boston Athletic Ass'n*, 926 F.2d 42, 46 (1st Cir. 1991) (unauthorized broadcaster not liable for use of "Boston Marathon" in broadcast: "those words do more than call attention to Channel 5's program; they also *describe* the event that Channel 5 will broadcast. Common sense suggests . . . that a viewer who sees those words flash upon the screen will believe simply that Channel 5 will show, or is showing, or has shown, the marathon, not that Channel 5 has some special approval from the BAA to do so"); *Smith v. Chanel*, 402 F.2d 562, 563 (9th Cir. 1968) (parties may use competitors' trademarks for the purpose of identifying their own products); *id.* at 566 (rejecting argument that "protection should also be extended to the trademark's commercially more important function of embodying consumer good will created through extensive, skillful, and costly advertising;" courts "have generally confined legal protection to the trademark's source

identification function for reasons grounded in the public policy favoring a free, competitive economy").

Trademark owners do not own references, no matter how much they would like to. *See New Kids on the Block v. News Am. Publ'g., Inc.*, 971 F.2d 302, 309 (9th Cir. 1992) ("Voting for their favorite New Kid may be, as plaintiffs point out, a way for fans to articulate their loyalty to the group . . . . But the trademark laws do not give the New Kids the right to channel their fans' enthusiasm (and dollars) only into items licensed or authorized by them.").

**b. The Evidence Demonstrates a Significant, Non-Reputation-Related Disadvantage**

Penn State takes the position that a complete prohibition on any ornamental use of images containing its trademarks—including the words PENN STATE and THE PENNSYLVANIA STATE UNIVERSITY—would not significantly harm Vintage Brand's ability to compete in the market for Penn State fan apparel. Resp. Br. at 15–16. It contends that Vintage Brand can use images that do not include Penn State marks. *Id.*

But the evidence is clear in this case that the alternatives are not reasonable; indeed, it defies common sense to suggest that barring

Vintage Brand from referring to Penn State by name would not impose a significant competitive disadvantage. *See* John A. Rothchild, *That Old College Try: Judge-Made Monopolies in the Market for Affinity Goods*, 13 TEX. A&M L. REV. 343, 381 (2025) ("It is an understatement to say that granting a trademark owner complete control over uses of the mark as ornamentation on affinity goods would place competitors at a 'significant' disadvantage.").

Penn State's own witnesses testified that consumers want merchandise with Penn State imagery in order to signal their allegiance to Penn State, not because the imagery indicated Penn State's responsibility for the products. *See* JA8237 (discussing JA10330); JA8220–JA8221. The trial record also includes a breakdown of Vintage Brand's sales by image; unsurprisingly, the images from which Vintage Brand derived by far the most revenue are those including the text PENN STATE. JA9694–JA9704. For example, Vintage Brand sold $7,118.92 worth of goods bearing the below image:



JA9694; JA9593. Penn State argues there are other, non-infringing images Vintage Brand can use, pointing to testimony regarding the below mug as an example.



Resp. Br. at 16 (citing JA8179–JA8180); JA10338. But Vintage Brand only sold $658.47 worth of goods bearing that lion image, JA9701, less than ten percent of Vintage Brand's revenue from the previous image. Clarity of reference is a significant advantage that functionality promotes.

In any event, the availability of alternative designs would not make the historic images nonfunctional even if the alternatives were reasonable ones. *See Ezaki*, 986 F.3d at 260 ("There are alternative designs, but that does not make Pocky's design non-functional"); *PIM Brands*, 81 F.4th at 321; *Keene*, 653 F.2d at 827; *cf. G.D. Searle & Co. v.*

*Hudson Pharm. Corp.*, 715 F.2d 837, 842 n.12 (3d Cir. 1983) ("The Lanham Act does not compel a competitor to resort to second-best communication.").

### 4. The Ninth Circuit *Au-Tomotive Gold* Case is Importantly Different

Penn State relies heavily on the unique case of *Au-Tomotive Gold, Inc. v. Volkswagen of America, Inc.*, 457 F.3d 1062 (9th Cir. 2006). Resp. Br. at 24-25. That case is very different from this one. The defendants in *Au-Tomotive Gold* sold products "related to Volkswagen and Audi's primary goods— cars[—]" to "Audi or Volkswagen car owners who want accessories to match their cars." *Id*. at 1076. The Ninth Circuit believed that "the alleged aesthetic function [was] indistinguishable from and tied to the mark's source-identifying nature"—*i.e.*, Audi and Volkswagen as the source of cars for which consumers were buying Audi- and Volkswagen-branded accessories. *Id*. at 1074. As such, the Ninth Circuit found it difficult to "quarantine" consumer demand "from the source identification . . . of the trademarks themselves." *Id*. And the defendant submitted no evidence about consumer perception of responsibility for quality.

Here, Vintage Brand sells products far afield from Penn State's primary educational services. Penn State has no reputation as a source of apparel or the types of products Vintage Brand sells, so there is no difficulty quarantining consumer demand from source identification. Any consumer who wants officially licensed merchandise has ample opportunity to identify those products, so the market has already addressed any concerns about licensing status.

The Ninth Circuit also appears to have believed that a finding of functionality in *Au-Tomotive Gold* would necessarily have invalidated the plaintiff's marks. *See id*. But functionality need not have that effect. Even Ninth Circuit law is not so limited—both *Job's Daughters* (before *Au-Tomotive Gold*) and *LTTB* (after) applied functionality as a scope limitation—meaning that those cases declared the particular defendant's use outside the scope of the plaintiff's legitimate trademark rights but did not invalidate the plaintiff's rights in relation to other uses. *Job's Daughters*, 633 F.2d at 919–20; *LTTB*, 840 Fed. App'x at 151 n.2.

Defendants do not argue that Penn State's claimed marks are invalid for all purposes; rather, Defendants argue that the historic

images are functional when used to decorate t-shirts and other merchandise.

### C. <u>The District Court Erred in Failing to Instruct the Jury on Trademark Use</u>

Penn State's argument that the Lanham Act does not require trademark use reads the statutory definition of use in commerce out of the statute. Tellingly, Penn State leaves "use in commerce" out of its quotation of the infringement provisions, and out of its characterization of infringement altogether. *See* Resp. Br. at 30 (characterizing infringement as the "*use* of a confusingly similar designation" where statutory language requires "*use in commerce*").

To avoid the Lanham Act definition, Penn State switches its mode of argument from textualist to purposivist, claiming that Congress did not mean the sole statutory definition to apply to infringement, citing legislative history and pre-*Abitron* caselaw. Resp. Br. at 32–33. But that move is foreclosed by *Abitron*, which interpreted the same infringement provisions at issue here and defined infringing "use in commerce" by reference to its statutory definition. *Abitron Austria GmbH v. Hetronic*

*Int'l, Inc.*, 600 U.S. 412, 428 (2023);[6] *see also Lerner & Rowe PC v. Brown Engstrand & Shely LLC*, 119 F.4th 711, 729–30 (9th Cir. 2024) (Desai, J., concurring) (calling for Ninth Circuit to revisit its treatment of "use in commerce" to conform to the statutory definition).

The Lanham Act required Penn State to prove that Vintage Brand used the historic images to indicate the source of Vintage Brand's merchandise. 15 U.S.C. § 1127. The District Court's failure to instruct the jury on this essential issue was a material error that infected the jury's verdict.[7]

---

[6] Penn State partially quotes a footnote in *Abitron*, claiming the Court "expressly declined to elaborate on the meaning of 'use in commerce.'" Resp. Br. at 31. The Court actually said that it "declined to address *the precise contours*" of the use in commerce requirement. *Abitron*, 600 U.S. at 428 n.6 (emphasis added). The Court's reluctance to describe all of the ramifications of defining "use in commerce" by reference to its statutory definition does not detract from the fact that it required future courts to use that statutory definition. *Id.*

[7] The inadvertent inclusion of a trademark notation in the S-Lion images—which Mr. Hartvigson explained as an artifact of the scanning and enhancing process, JA8601–JA8602—is not evidence that Vintage Brand used the images to identify the source of Vintage Brand's goods. Neither is the fact that Vintage Brand's own promotional merchandise included the ® symbol. Vintage Brand is a print-on-demand company that uploaded a digital image for printing on the shirts. Vintage Brand never claimed that its logos identified the source of t-shirts when those logos were merely printed on the front of the shirt, as opposed to being printed on the hangtag or inside the back of the shirt, where trademarks are typically found. JA8732–JA8733.

## D. The District Court Erred in Denying Defendants' Motion for Judgment as a Matter of Law on Initial Interest and Post-Sale Confusion

This was a point-of-sale confusion case, as the District Court recognized at the summary judgment stage. *See* JA30 ("Nor does this case involve a theory of post-sale confusion . . . ."); JA8324–JA8325 (Mr. Franklyn describing his survey as a "point of purchase" survey, not a post-sale confusion survey). Penn State nonetheless introduced testimony that was directed toward initial interest and post-sale confusion, testimony that was insufficient as a matter of law to establish either theory. *See* VB Br. at 47–48.

Defendants attempted to focus the case on point-of-sale confusion by moving for judgment as a matter of law on other theories at the end of Penn State's case and at the close of evidence. Dkt. 311 at 10–15; JA8885–JA8886. The District Court's denial of that motion was error. Its failure to instruct the jury regarding either theory, despite Defendants' objection, JA9051, compounded the error. Penn State invited the jury to consider evidence regarding legal theories for which they were given no

---

Even if either of those pieces of evidence were relevant, the jury had no way to evaluate them because the District Court failed to instruct them on trademark use.

guidance, even though both initial interest and post-sale confusion are highly circumscribed. *See* VB Br. at 48–51. That could only have confused the jury and warrants reversal.

**E. <u>Sportswear Cannot Be Directly Liable</u>**

Penn State wrongly claims that the Lanham Act "expressly imposes liability on manufacturers . . . ." Resp. Br. at 45. The infringement provisions of the Lanham Act do not mention manufacturing at all. 15 U.S.C. § 1114(a) (limiting direct liability to those engaged in "sale, offering for sale, distribution, or advertising"); *id.* § 1125(a)(1)(A).

Section 32(b) extends direct liability to those who apply a registered mark "to labels, signs, prints, packages, wrappers, receptacles or advertisements intended to be used in commerce . . . ." 15 U.S.C. 1114(b). But Sportswear does not copy *Penn State's* marks and apply those marks to "labels, signs, prints, packages, wrappers, receptacles or advertisements." *Id.* Sportswear only copies and applies *Vintage Brand's* marks for labels and packaging of Vintage Brand's products. In sum, neither of the infringement provisions extend direct liability to Sportswear as a manufacturer—whether "explicitly," as Penn States incorrectly states, or otherwise.

Nor does the Lanham Act impose direct liability on Sportswear as a distributor. Distributors are subject to direct liability under Section 32 only when they have used the registered mark *in commerce*. *See* 15 U.S.C. § 1114(a) (establishing direct liability for "[a]ny person who shall, without the consent of the registrant—*use in commerce* any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, *distribution*, or advertising of any goods or services . . . .") (emphasis added).

Distributors like Sportswear that are invisible to consumers do not use a mark in commerce because they do not use the asserted mark to identify themselves as the source of any goods. *See* 15 U.S.C. § 1127 (defining use of a mark in commerce as use of "any word, name, symbol, or device, or any combination thereof—used by a person . . . to identify and distinguish *his or her goods* . . . from those manufactured or sold by others and to indicate the source of the goods, even if that source is unknown") (emphasis added).

Under the Lanham Act's statutory definitions, Sportswear cannot be held directly liable. Sportswear is not using the Penn State marks in commerce because it is not using them *as marks*—that is, Sportswear is

not using them to identify and distinguish the source of *its own goods*, as the statute requires. Rather, Sportswear is invisible to consumers, and so the Penn State marks—however consumers may otherwise understand them—cannot possibly be understood by consumers to point to *Sportswear* as the source of the products. VB Br. at 53–55. At most, Sportswear is subject to secondary liability claims, which Penn State has not advanced. *See* JA333–JA410.

### F. <u>Vintage Brand's Renewed Motion Was Timely</u>

Penn State recognizes that "final judgment [was] entered on June 25, 2025." JA249 (Penn State's Notice of Appeal). That was the day the District Court entered a permanent injunction, JA244–JA248, and Vintage Brand filed its renewed motion for judgment as a matter of law 14 days later. Dkt. 370. Nevertheless, Penn State contends that the time for Defendants to have renewed their motion for judgment as a matter of law ran from the judgment on the jury's verdict, not final judgment. That is contrary to the Federal Rules of Civil Procedure and this Court's precedent, *O. Hommel Co. v. Ferro Corp.*, 659 F.2d 340, 353–54 (3d Cir. 1981). *See* JA257–JA261.

A renewed motion for judgment as a matter of law is timely if it is brought "[n]o later than 28 days after the entry of *judgment*." FED. R. CIV. P. 50(b) (emphasis added). The term "'[j]udgment' as used in [the Federal Rules] includes a decree and any order *from which an appeal lies*." FED. R. CIV. P. 54(a) (emphasis added). With limited exceptions, an appeal only lies from a "final judgment." *See* 28 U.S.C. § 1291; *Sullivan v. Finkelstein*, 496 U.S. 617, 628 (1990). Thus, in most cases, a Rule 50(b) motion must be made no later than 28 days after final judgment.[8]

In *O. Hommel*, the defendant did not file its Rule 50(b) motion within 28 days of "the jury verdict and the entry of judgment thereon" but, instead, after a later decision resolving the plaintiff's post-verdict motion for attorneys' fees. 659 F.2d at 353. Finding the defendant's motion timely, this Court "conclude[d] that entry of judgment" as used in Rule 50(b) "should be construed as entry of final judgment," and therefore

[8] Penn State points to a few instances where the Federal Rules refer to "final judgment" rather than simply "judgment." *See* Resp. Br. at 51. A "judgment" under Rule 54(a) is usually but not always a "final judgment." It is undisputed there was no appealable order or decree at the time the Court entered judgment on the jury's verdict and invited Penn State to move for post-trial relief. JA7850; JA7851. Thus, no distinction between a "judgment" and a "final judgment" matters in this case.

the time to file a motion under Rule 50(b) begins running after post-verdict motions are resolved. *Id.* at 354.

Penn State argues that *O. Hommel* has been "overruled" because the Supreme Court later concluded that an outstanding request for attorneys' fees does not render a judgment non-final. *See Budinich v. Becton Dickinson & Co.*, 486 U.S. 196, 199 (1988). But that part of *O. Hommel* is irrelevant here. The unresolved issue following the jury verdict in this case was Penn State's request for permanent injunctive relief, not an ancillary request for attorneys' fees. JA249. A pending claim for injunctive relief means judgment entered on a jury's verdict is not final. *See, e.g.*, *Riley v. Kennedy*, 553 U.S. 406, 419 (2008). Nothing in *Budinich* casts doubt on this Court's central conclusion in *O. Hommel* that the time for filing an appeal runs from a final judgment. Judgment was not final in this case until the District Court entered the permanent injunction.

Penn State relies on *State National Insurance Co. v. County of Camden*, 824 F.3d 399 (3d Cir. 2016), a procedurally complex case that says nothing about whether a Rule 50(b) motion is timely if it is filed

within 28 days after entry of a final judgment.[9] The District Court in this case considered and rejected Penn State's argument, correctly concluding that "nothing in *State National* contradicts the Third Circuit's decision in *Hommel*." JA258.

## III. CONCLUSION

For the foregoing reasons, Defendants' respectfully request that this Court reverse the District Court's denial of Defendants' motion for judgment as a matter of law.

---

[9] Penn State also cites an out-of-circuit case concerning a party's belated joinder of a co-litigant's timely-filed Rule 59(b) motion, *Tarlton v. Exxon*, 688 F.2d 973, 977–79 & n.4 (5th Cir. 1982). That case is inapposite; there are no co-parties here that moved at different times, and there is no possible argument that a final judgment was entered before June 25, 2025.

Dated: June 1, 2026.

Respectfully submitted,

By: /s/Joshua D. Harms
Joshua D. Harms
Wash. Bar No. 55679
John T. Fetters
Wash Bar No. 40800
STOKES LAWRENCE, P.S.
1420 Fifth Avenue, Suite 3000
Seattle, Washington 98101
Phone: (206) 626-6000
Joshua.Harms@stokeslaw.com
John.Fetters@stokeslaw.com

By: /s/ Mark P. McKenna
Mark P. McKenna
Illinois I.D. No. 6272699
LEX LUMINA PLLC
745 Fifth Avenue, Suite 500
New York, New York 101501
Phone: (646) 898-2055
Mark@lex-lumina.com

*Attorneys for Vintage Brand LLC, Sportswear, Inc. and Chad Hartvigson*

**COMBINED CERTIFICATIONS**

1. At least one of the attorneys whose names appear on the foregoing brief, including the undersigned, is a member of the bar of this Court, as required by Local Rule 28.3(d).

2. This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B)(ii), because it contains 6,500 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

3. This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in a proportionately spaced typeface using Microsoft Word in Century Schoolbook size 14 font.

4. The text of the electronic version of this Brief filed on ECF is identical to the text of the paper copies filed with the Court.

5. The electronic versions of this Brief filed on ECF were virus checked using Windows Defender ATP v.4.18.26040.7, and no virus was detected.

6. On this 1st day of June, 2026, I filed the foregoing Brief with the Clerk of the Court using the CM/ECF System, which will send notice of such filing to all registered CM/ECF users, and thereafter caused seven copies of the foregoing Brief to be served via United States First Class Mail, on the following:

Clerk's Office
U.S. Court of Appeals for the Third Circuit
21400 U.S. Courthouse
601 Market St.
Philadelphia, PA 19106-1790

DATED: June 1, 2026

By: *_/s/ Joshua D. Harms_*
Joshua D. Harms